IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| R.W. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | 1:13-cv-02115-SCJ |
| | ) | |
| Board of Regents of the University | ) | |
| System of Georgia | ) | |
| | ) | |
| Defendant. | | |

---

**PLAINTIFF'S INITIAL DISCLOSURES**

COMES NOW Plaintiff R.W. ("Plaintiff" or "R.W.") and files these *Initial Disclosures*, as follows:

(1) State precisely the classification of the cause of action being filed, a brief factual outline of the case including plaintiff's contentions as to what defendant did or failed to do, and a succinct statement of the legal issues in the case.

**Response:** This is a disability discrimination case in which Defendant subjected Plaintiff to discrimination based upon a disability in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; § 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 701; and 45 C.F.R. § 84.4.

The facts alleged by Plaintiff follow. As discovery has not yet commenced, and the full evidentiary picture has yet to be developed, Plaintiff does not waive

his right to prosecute his case based on evidence that diverges from the facts as Plaintiff currently believes them to be.

Plaintiff graduated from high school in 2012. He was admitted to Georgia State University as a full-time student, and he began taking classes in January 2013. As a full-time student, Plaintiff lived in on campus housing. On February 14, 2013, Plaintiff visited the University's student health center for a routine, voluntary medical screening, unrelated to any mental health diagnosis.

Upon his arrival at the health clinic, Plaintiff was asked to fill out paperwork related to his medical history and past medical diagnosis. On that paperwork, Plaintiff voluntarily disclosed that he had been previously diagnosed with schizophrenia. The nurse practitioner administering the health screening then asked about Plaintiff's mental state. Plaintiff stated he had been depressed and was not doing well in his classes. The nurse then followed-up and asked whether Plaintiff was currently taking any medication. Plaintiff stated that he was not, due to undesirable side-effects. The nurse practitioner then walked Plaintiff from the student health center to the student counseling and testing center ("the counseling center") for a mental health evaluation.

Plaintiff had not requested any assistance from the counseling center at any time before, during, or after his medical test. Plaintiff was told to accompany the nurse practitioner to the counseling center; Plaintiff did not

request the accompaniment of the nurse-practitioner. Plaintiff did not authorize the nurse-practitioner to disclose any of his protected health information. The nurse-practitioner did not report any facts to the counseling and testing center that caused any employee to believe that Plaintiff was a risk to himself or others. At the counseling center, University staff required Plaintiff to sign a release form authorizing the counseling center to share his medical information with Grady Hospital, the University's Dean of Students Office, and the University Housing Office.

After signing the waiver, Plaintiff was instructed to take a diagnostic screening on a computer in the counseling center. After the screening, Dr. Justin Donaldson, a psychologist on contract with the University, interviewed Plaintiff regarding his mental health. During the interview, Plaintiff stated he had been diagnosed as schizophrenic since the third grade and that sometimes he experienced visual and auditory hallucinations of animals and other creatures. Plaintiff denied any suicidal ideation.

Plaintiff did nothing to indicate to Dr. Donaldson that he was a harm to himself or others. Dr. Donaldson's demeanor during the assessment was adversarial and his questions were intrusive. Plaintiff eventually terminated the consultation with Dr. Donaldson because Plaintiff was not comfortable with Dr. Donaldson's demeanor and repeated questions about Plaintiff's medical history.

Plaintiff calmly asked Dr. Donaldson if he was free to leave. Dr. Donaldson informed Plaintiff that he could. Plaintiff then exited. Plaintiff was not aggressive or confrontational when he terminated the meeting. Plaintiff did nothing to indicate that he was a threat to himself, Dr. Donaldson, or any other person.

In fact, during his time at the University, Plaintiff did not commit any act of violence or make any threats of violence. The University had no disciplinary record for Plaintiff prior to the time of this assessment. Based upon Plaintiff's attendance at the University, consultation with Dr. Donaldson, and medical history there was no evidence that Plaintiff was a danger to himself, a danger to others, or unable to care for his own physical health and safety so as to create an imminently life-endangering crisis.

Nevertheless, after Plaintiff left Dr. Donaldson's office, Dr. Donaldson consulted with another University employee, Dr. Daugherty. Following that consultation, Dr. Donaldson executed a "1013" form authorizing Plaintiff's involuntary commitment under OCGA § 37-3-41. Dr. Donaldson and University employee Lanette Brown ("Ms. Brown") then contacted University police and "requested assistance from the police department in locating a GSU student who was possibly suffering from a mental illness." University police officer Pamisa Scott ("Officer Scott") responded to the call. Dr. Donaldson stated to police that

Plaintiff was "confused and delirious" and recommended, "that [R.W.] needed to be evaluated further by the mental health staff at Grady Hospital."

Nicole Morrison, an employee in the Office of the Dean of Students, then contacted Plaintiff via cellular phone and requested that Plaintiff return to the counseling center to meet with her. Feeling he had no choice, Plaintiff agreed to return. Prior to Plaintiff's arrival, Ms. Brown and Dr. Donaldson arranged to have Officer Scott waiting at the counseling center to transport Plaintiff to Grady Memorial Hospital for an involuntary commitment. Upon his arrival at Ms. Brown's office, Plaintiff was calm and cooperative. Officer Scott placed Plaintiff under arrest and transported him to Grady Memorial Hospital pursuant to the involuntary commitment form signed by Dr. Donaldson. Plaintiff was transported without incident.

After his arrival at Grady Memorial Hospital, Dr. Bryan McNally evaluated Plaintiff and performed multiple diagnostic tests. Dr. McNally and Grady staff found that Plaintiff's condition was stable and that Plaintiff did not meet the criteria for involuntarily commitment. Dr. McNally and the staff at Grady tested Plaintiff for any illegal or prescription drugs. Plaintiff tested negative for all substances. No diagnostic test used by Grady staff showed that Plaintiff was a risk to himself or others. Grady Memorial Hospital discharged Plaintiff shortly after the initial diagnostic screening.

On February 15, 2013, University counseling center employee Nicole Morrison ("Ms. Morrison") phoned Plaintiff and asked whether he had been discharged from Grady Memorial Hospital. Plaintiff responded that he had been discharged. Ms. Morrison scheduled a meeting with Plaintiff to undergo a mandated risk assessment with University's clinical staff.

The University's mandated risk assessment program is designed to assess students who had been involved in an act of violence, threatened violence, or who engaged in conduct that disrupted other students' educational experience at the University. The purpose of the assessment was to assist the Dean of Students in determining whether a student should be subject to non-academic withdraw from the University. But the University does not require that a student be involved in any act or threat of violence to trigger a mandatory risk assessment. Instead, the University authorizes a mandated screening when a student has "a mental health issue **which has bearing on** safety and/or community disruption is **potentially** present." The effect of this standard is that students are subject to mandatory mental health assessments solely on the basis of a psychiatric disability, without regard to whether the disability poses a risk of harm to others.

The University's student handbook does not disclose or discuss the risk assessment program. The University handbook does not warn students that they will face academic withdrawal for the failure to comply with a mandatory

assessment. If the Dean of Students, or his designee, determines, in his or her sole discretion, that a student should be subject to a mandatory screening, the student is contacted via phone or email to schedule an appointment. The Dean of Students then gathers information on the student and supplies that information to the counseling and testing center prior to the mandatory screening. Prior to the screening, the student is required to complete initial paperwork and medical forms. These include: Informed Consent Form, Mandatory Risk Screening Requirements and Acknowledgement Form, Mandated Risk Screening Referral Form, and any required psychological assessments.

The student is also required to sign a complete waiver of medical privilege. All medical information exchanged during the risk assessment screening is shared with the Office of the Dean of Students. After signing the required medical forms and waivers, a University employee takes the student's cell phone and walks the student to the room where the mandated screening will occur. During the assessment, the psychologist "will assess the student with regard to the referral question, and when possible will designate a specific level of clinical risk (i.e., Imminent, Significant, Moderate, or Mild/Absent) for suicide, violence, and/or substance abuse risk. When the reason for referral does not lend itself to a categorical level of risk (ex. Psychosis), a narrative description of the issue assessed will be provided in the place of a category."

At the discretion of the assessing psychologist, a student may be required to attend up to four assessment sessions. Following the assessment, the psychologist notifies the Office of the Dean of Students to confirm that the assessment is complete and to share the determination of the student's level of risk. The psychologist also submits a mandatory assessment note and copies of the results of any clinical tests or instruments. If the assessment shows that the "student is at imminent risk for harm to self and/or other(s), or when otherwise clinically appropriate for psychosis or other clinical issues, the assessing psychologist will initiate psychiatric hospitalization." Based upon the student's screening and other medical information, the University may: (a) immediately withdraw the student from the University; (b) allow the student to attend the University but immediately remove the student from on-campus housing; or (c) make the student's continued enrollment or living in on-campus housing contingent upon certain requirements. Any student who refuses to participate in any aspect of the mandatory assessment will be immediately withdrawn from the University.

Plaintiff arrived at the University counseling center on February 15, 2013 to undergo his mandatory risk assessment. Upon his arrival, Ms. Morrison took Plaintiff's room keys and access card for his residence hall and informed Plaintiff that he was no longer allowed to reside in his residence hall. Ms. Morrison

removed Plaintiff from his residence hall before the risk assessment was conducted. There was no basis for Ms. Morrison to determine that Plaintiff's continued presence in University housing posed a threat to any person or violated any legitimate policy. Ms. Morrison informed Plaintiff that upon the completion of his screening he would be allowed to gain temporary access to his room to remove his belongings. Ms. Morrison stated that Plaintiff would not be allowed to reside in on-campus housing "until he had been cleared to do so by the office of the dean of students." Ms. Morrison did not give Plaintiff time to make arrangements for other housing, in spite of the fact that Plaintiff was in the midst of the regular school semester. Ms. Morrison required that Plaintiff execute waivers allowing the University to obtain his prior psychiatric records from his previous treatment providers. Ms. Morrison also required that Plaintiff execute waivers allowing University counseling staff to share his private medical information with the University's administrative staff.

On February 21, 2013, Ms. Morrison and Dr. Lee-Barber continued to follow-up with Plaintiff's two most recent medical providers, Dr. Liberty and Dr. Patel. On February 22, 2013 Dr. Lee-Barber was informed that Dr. Liberty and Dr. Patel would not release Plaintiff's information without first speaking to her and that the form they received did not match the signature they had on file. Dr. Lee-

Barber then contacted Plaintiff and stated that Plaintiff must immediately obtain the records.

On February 28, 2013, Dr. Lee-Barber completed Plaintiff's risk assessment and made certain recommendations regarding Plaintiff's future medical care including that he be hospitalized until fully medicated, that the University counseling and testing center was not equipped to handle Plaintiff's condition, and that he seek treatment in the medical community.

On March 15, 2013, Dr. Rebecca Stout of the Office of the Dean of Students sent Plaintiff a letter summarizing the University's recommendations and findings following his mandatory assessment. She recommended that Plaintiff: (1) resume psychiatric medication consultation, individual counseling, and support classes offered by Georgia Regional or Grady Memorial Hospital; (2) be hospitalized as an inpatient at Georgia Regional Hospital; and (3) complete an application for Hardship Withdrawal for the Spring 2013 term. Dr. Stout's letter also informed Plaintiff that the University was placing the following conditions on Plaintiff's continued enrollment: (a) he promptly initiate psychiatric medication consultation and individual counseling services in the community; (b) he submit a signed Release of Information consent form to his medical providers allowing them to discuss his treatment status with the University staff; and (c) Plaintiff's treatment providers confirm with the university on a monthly

basis that Plaintiff is regularly participating in all aspects of the recommended treatment.

The University informed Plaintiff that his failure to comply with these conditions would result in Plaintiff being withdrawn from the University. The University informed Plaintiff he would not be eligible to reside in University housing until he demonstrated that he is complying with the University's recommended course of treatment. Plaintiff visited his previous psychiatrist, Dr. Patel, on April 2. Following that meeting, Plaintiff's psychiatrist referred Plaintiff back to the University counseling center and stated that there was no need for Plaintiff to take medication for schizophrenia.

Upon learning that Plaintiff's treating psychiatrist recommended no treatment, Ms. Morrison responded by stating that if Plaintiff's psychiatrist did not feel he needed treatment then Plaintiff "would need to go to one of the providers on the list given to him by Dr. Barber." Ms. Morrison wrote that if Plaintiff's psychiatrist "is not treating him then he would need to seek services with another provider in order to remain enrolled." Plaintiff returned to Dr. Patel, with whom he is current receiving treatment. Plaintiff finished the Spring semester and is currently enrolled in summer classes. Dr. Patel has complied with the University's requirement that he submit regular reports to the University regarding Plaintiff's medical care.

Plaintiff is not currently allowed to live in on-campus housing, and has not received permission from the Office of the Dean of Students to return to on-campus housing for the fall semester.

As a result of the actions described herein, Plaintiff has suffered financial losses and physical and emotional distress.

(2) Describe in detail all statutes, codes, regulations, legal principles, standards and customs or usages, and illustrative case law which plaintiff contends are applicable to this action.

**Response:** Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, § 504 of the Rehabilitation Act of 1973 ("Rehab Act"), 29 U.S.C. § 701, and 45 C.F.R. § 84.4, all cases of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the United States District Court for the Northern District of Georgia, and persuasive authority from other courts, construing standards of liability, methods of proof, measures of damages, and other legal issues related to the ADA, Rehab Act, and all other applicable law.

(3) Provide the name and, if known, the address and telephone number of each individual likely to have discoverable information that you may use to support your claims or defenses, unless solely for impeachment, identifying the subjects of the information. (Attach witness list to Initial Disclosures as Attachment A.)

**Response:** See Attachment A.

(4) Provide the name of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. For all experts described in Fed.R.Civ.P. 26(a)(2)(B), provide a separate written report satisfying the provisions of that rule. (Attach expert witness list and written reports to Responses to Initial Disclosures as Attachment B.)

**Response:** See Attachment B.

(5) Provide a copy of, or a description by category and location of, all documents, data compilations, and tangible things in your possession, custody, or control that you may use to support your claims or defenses unless solely for impeachment, identifying the subjects of the information. (Attach document list and descriptions to Initial Disclosures as Attachment C.)

**Response:** See Attachment C.

(6) In the space provided below, provide a computation of any category of damages claimed by you. In addition, include a copy of, or describe by category and location of, the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered, making such documents or evidentiary material available for inspection and copying as under Fed.R.Civ.P. 34. (Attach any copies and descriptions to Initial Disclosures as Attachment D).

**Response:** Smith seeks recovery of: 1) compensatory damages in an amount to be proven at trial, calculated as the sums expended by Plaintiff in securing new housing after he was removed from campus housing and any other sums expended by Plaintiff in complying with Defendant's arduous requirements as a condition of his continued enrollment at Georgia State University; 2) an injunction preventing Defendant's from further conditioning Plaintiff's enrollment on complying with their requirements for medical care and

regular reporting; 3) reinstatement of Plaintiff to University Housing; 4) an injunction preventing Defendant from ongoing use of the its' risk assessment program against individuals solely on the basis of that person's illness or psychiatric history; 4) compensatory damages in an amount reasonable and commensurate with the losses imposed upon Plaintiff by Defendant's unlawful and discriminatory acts, including emotional distress arising from Defendant's wrongful acts, in an amount to be determined by the jury; 5) punitive damages against Defendant in an amount reasonable and commensurate with the harm done and calculated to be sufficient to deter such conduct in the future, as determined by the jury; 6) costs of this action including reasonable attorneys' fees; 7) an award of pre-judgment and post-judgment interest; and, 8) such other equitable and monetary relief as the Court deems just and necessary.

(7) Attach for inspection and copying as under Fed.R.Civ.P. 34 any insurance agreement which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment. (Attach copy of insurance agreement to Initial Disclosures as Attachment E.)

**Response:** Plaintiff is not in possession of any such document at this time.

(8) Disclose the full name, address, and telephone number of all persons or legal entities who have a subrogation interest in the cause of action set forth in plaintiff's cause of action and state the basis and extent of such interest.

**Response:** None.

Respectfully submitted this September 9, 2013.

*/s/ James Radford*
James E. Radford, Jr.
Georgia Bar No. 108007
*Counsel for Plaintiff*

*/s/ Caleb Gross*
Caleb Gross
Georgia Bar No. 960323

James Radford, LLC
545 N. McDounough St., Suite 212
Decatur, Georgia 30030
(678) 369-3609
james@jamesradford.com
caleb@jamesradford.com

*/s/ Jeffrey R. Filipovits*
Jeffrey R. Filipovits
Georgia Bar No. 825553

FILIPOVITS LAW FIRM, P.C.
2900 Chamblee-Tucker Road
Building 1
Atlanta, Georgia 30341
Phone: 770-455-1350
Fax: 770-455-1449
jeff@law.filipovits.com

*Counsel for Plaintiff*

**ATTACHMENT A**
**PLAINTIFF'S PRELIMINARY LIST OF WITNESSES**

The following **preliminary** list of witnesses describes individuals who Plaintiff believes, as of the date of these *Initial Disclosures*, possess knowledge that may be material to this case. By listing these witnesses, Plaintiff in no way waives her right to present at trial additional witnesses that are discovered subsequent to the submission of these disclosures. Moreover, Plaintiff reserves the right to call subsequently-discovered witnesses without being required to amend her *Initial Disclosures* with said witnesses, so long as the existence of said witnesses is made known to all parties by way of deposition testimony, evidence produced during the discovery process, or otherwise.

1. R.W.
2. Dr. Justin Donaldson
3. Dr. Mikyta Daugherty
4. Lanette Brown
5. Officer Pamissa Scott
6. Nicole Morrison
7. Dr. Bryan McNally
8. Dr. Jill Lee-Barber
9. Ted Liberty
10. Dr. Piyush Patel
11. Dr. Rebecca Stout
12. Melissa A. Alves
13. Corey M. Arranz
14. Sandrine M. Bosshardt
15. Kensa K. Gunter
16. Alaycia D. Reid
17. Douglass F. Covey
18. Carol Clark
19. Linda J. Nelson
20. Dr. Yared Alemu
21. Francine Reeves
22. O'Neal Cook
23. Jaymie L. Fox
24. Dr. Colby Carter

**ATTACHMENT B**
**PLAINTIFF'S LIST OF EXPERT WITNESSES**

As of the filing of these Disclosures, Plaintiff has not retained an expert witness whose testimony may be used at trial under Federal Rules of Evidence 702, 703, or 75. In the event Plaintiff retains such an expert, these responses will be amended accordingly.

**ATTACHMENT C**
**PLAINTIFF'S PRELIMINARY LIST OF DOCUMENTS IDENTIFIED**

The following **preliminary** list of documents identifies categories of documents that Plaintiff believes, as of the date of there *Initial Disclosures*, contain information that may be material to this case. By listing these documents, Plaintiff in no way waives her right to present at trial additional documents that are discovered subsequent to the submission of these disclosures. Moreover, Plaintiff reserves the right to present subsequently-discovered documents without being required to amend her *Initial Disclosures* with said documents, so long as the existence of said documents is made known to all parties by way of deposition testimony, evidence produced during the discovery process, or otherwise.

- Georgia State University's Mandatory Risk Screening Policy
- Plaintiff's psychological and health records
- Plaintiff's academic records
- Georgia State University's Counseling Center records pertaining to plaintiff
- Georgia State University's Student Handbook
- Georgia State University's Student Code of Conduct
- Various emails and other correspondence
- Various deposition transcripts