IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

R.W.,                                  |
                                       |
        Plaintiff,                     |
                                       |
v.                                     |        CIVIL ACTION NO.
                                       |        1:13-cv-02115-SCJ
BOARD OF REGENTS OF THE                |
UNIVERSITY SYSTEM OF                   |
GEORGIA,                               |
                                       |
        Defendant.                     |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF
MATERIAL FACTS**

Comes now the Board of Regents of the University System of Georgia, Defendant in the above-styled action, by and through counsel, Samuel S. Olens, Attorney General for the State of Georgia, and responds to Plaintiff's statement of material facts (Doc. 41-3). Defendant is filing herewith motions to exclude the testimony of Plaintiff's experts (Ebbeling and Dr. Agharkar), and thus, objects to any statements that rely on that expert testimony. Defendant notes, however, that, aside from his actual opinions, much of Dr. Agharkar's testimony is actually favorable to Defendant. Defendant further shows the Court as follows:

1.    *R.W. has been diagnosed with schizophrenia. (Deposition of R.W. ("R.W. Dep.") at 15, 38 (Excerpts attached as Attachment 4).*

**Response**:  Admitted.

2.    *Schizophrenia is a mental illness that is attended by difficulties in cognition and thinking, often attended by disorganized thinking and visual and auditory hallucinations. (Deposition of Bhushan Agharkar ("Agharkar Dep.") at 70 (excerpts attached as Attachment 25)).*

**Response:**  Admitted.

3.    *Though R.W. has taken medication for symptoms of schizophrenia in the past, he discontinued those medications because they did not alleviate any symptoms, they made him depressed, interfered with his schoolwork, made him sleep through the day, and made him unable to function physically. (Id. at 24-25; Deposition of F.R. ("F.R. Dep.") at 31-32 (Excerpts attached as Attachment 5)).*

**Response:**  Defendant admits only that R.W. has taken medication for symptoms of schizophrenia in the past and that he has discontinued those medications.  This statement is otherwise denied as unsupported.  Testimony must be made on the basis of personal knowledge.  Fed.R.Evid. 602.  The person with personal knowledge of R.W.'s reasons for discontinuing medication is R.W.  To the extent that F.R. is testifying to information conveyed to her by R.W., her testimony is inadmissible hearsay.  Fed.R.Evid. 802.

Defendant also notes that Plaintiff's expert Dr. Agharkar testified that the treatment of schizophrenia often involves a process of adjustments to types and dosages of medication until the combination is found.  (Dr. Agharkar dep. at 80).

Additionally, this fact is immaterial.

4. *R.W. enrolled as a student at Georgia State University ("GSU") in or around January 2013, for the Spring semester of the 2012-2013 school year. (Verified Complaint [Doc. 1] at ¶ 6; Answer [Doc. 9] at ¶ 6 (admitting fact)).*

**Response**:  Admitted.

5. *Along with his enrollment, Plaintiff was accepted to live in GSU student housing. (Id.).*

**Response**:  Admitted.

6. *Throughout his enrollment at GSU, R.W. has never been disciplined for any sort of threatening or disruptive behavior in classes or in student housing. (Deposition of Rebecca Stout ("Stout Dep.") at 54-55 (Excerpts attached as Attachment 7)).*

**Response**:  Admitted, but immaterial.

7. *During his enrollment at GSU, R.W. has never written or said anything suggesting violence or a desire to harm someone. (Id. at 55).*

**Response**:  Admitted, but misleading when viewed in isolation.  Fed.R.Evid. 403.

As Plaintiff's own expert, Dr. Agharkar testified, a person experiencing a paranoid

delusion may act violently in a confused attempt at self-defense.  (Dr. Agharkar

dep. at 630.

8. *During his enrollment at GSU, R.W. has not been involved in any altercations. (Id.).*

**Response**:  Defendant admits that it is not aware of any such altercations, but

immaterial.

9.      *R.W. has never been arrested or charged with a crime. (Attachment 8 (Excerpts from R.W. Interrogatory Responses) at ¶ 14).*

**Response**:  Admitted, but immaterial.

10.      *R.W. remains enrolled at GSU. (R.W. Dep. at 88).*

**Response**:  Admitted.

11.      *R.W. is not currently living in student housing, but he wishes to return. (Id. at 96).*

**Response**:  Defendant admits that R.W. is not currently living in student housing and admits that he testified that he wishes to return.  Defendant otherwise denies this statement.  R.W. testified that his current housing is "way cheaper" than campus housing, he is not sure that he can afford to live in campus housing, and admitted that he has made no application to live in student housing since the spring of 2013.  (R.W. dep. at 84, 86-87, 89).  Based on this evidence, a reasonable jury could believe that R.W.'s testimony concerning any wish or intention to live in campus housing was not credible.

12.      *R.W. may not return to student housing without first complying with GSU's "mandated risk screening" process. (Attachment 6 (August 30, 2013 Letter to R.W. from Dean of Students Rebecca Stout)).*

**Response**:  Admitted.

13.    *Defendant Board of Regents of the University of Georgia ("Board") oversees the 31 colleges and universities that comprise the University System of Georgia, including Georgia State University ("GSU"). (Answer at ¶ 1).*

**Response**: Admitted.

14.    *GSU is a recipient of federal funding with respect to its educational and housing programs and activities. (Joint Stipulation of Facts [Doc. 37] at ¶ 1).*

**Response**: Admitted.

15.    *Should the court order injunctive relief in this matter, that relief will be implemented by GSU's Dean of Students or her designee. (<u>Id.</u> at ¶ 2).*

**Response**: Admitted.

16.    *On February 14, 2013, R.W. went to GSU's Student Health Center in order to obtain a voluntary test for sexually transmitted disease. (Complaint at ¶ 7; Answer at ¶ 7; R.W. Dep. at 46-47).*

**Response**: Admitted.

17.    *In providing his medical history, R.W. disclosed to John Gentry ("Gentry"), a nurse practitioner at the Student Health Center, information about his medical background, including that he had been diagnosed with schizophrenia. (R.W. Dep. at 47-48).*

**Response**: Admitted.

18. *Gentry then phoned Dr. Jill Lee-Barber, who is the Director of GSU's Counseling and Testing Center ("CTC"), to report that he was meeting with a student who was schizophrenic but not taking medication. (Deposition of Dr. Jill Lee-Barber ("Lee-Barber Dep.") at 19 (Excerpts attached as Attachment 9)).*

**Response**:  Admitted, but incomplete.  Gentry reported a number of concerns to

Dr. Lee-Barber.  (Dr. Lee-Barber dep. at 20).

19. *Gentry further disclosed that R.W. seemed depressed, was not doing well in school, and was engaging in risky sexual behavior. (Id.).*

**Response**:  Admitted.

20. *However, Gentry did not give Dr. Lee-Barber any indication that R.W. "was going to hurt somebody or had gotten in trouble for causing a disruption or anything like that." (Id. at 21).*

**Response**:  Admitted.

21. *At Dr. Lee-Barber's suggestion, Gentry placed a phone call to Dr. Justin Donaldson ("Donaldson"), a staff psychologist and the Coordinator of Risk Screening for the CTC. (Deposition of Justin Donaldson ("Donaldson Dep.") at 12) (excerpts attached as Attachment 10)).*

**Response**:  Denied as written as unsupported.  Defendant admits that Gentry called

the counseling center to refer R.W. and that Dr. Donaldson, who had the specified

job titles, spoke with Gentry.  (Dr. Donaldson dep. at 11-12).

22.     *Gentry reported to Donaldson that he had a student in his office who "had a history of symptoms, [and a] history of medication that he had discontinued against medical advice." (Id. at 13).*

**Response**:  Admitted, but incomplete.  Gentry reported a number of concerns to Dr. Donaldson.  (Dr. Donaldson dep. at 12-13).

23.     *Gentry reported to Donaldson that R.W. was "exhibiting unusual behavior," which Gentry defined further "in the context of being able to effectively communicate with the student." (Id. at 12).*

**Response**:   Admitted.   Defendant notes that Plaintiff's expert Dr. Agharkar testified that poverty of speech can be a sign of a thought disorder.  (Dr. Agharkar dep. at 86-87).

24.     *However, Gentry did not report any evidence that R.W. was in "acute crisis," nor any other behaviors that would warrant "emergency immediate action." (Id. at 13).*

**Response**:  Admitted.

25.     *Donaldson requested that Gentry bring R.W. to Donaldson's office at the CTC, which Gentry did. (Id. at 14).*

**Response**:  Denied as written.  Defendant admits that Dr. Donaldson informed Gentry that he was welcome to bring R.W. to the CTC.  (Dr. Donaldson dep. at 44).

26.   *Upon arriving at the CTC, R.W. went with Donaldson into Donaldson's office. (Id. at 15).*

**Response**:   Denied as written.   Defendant admits that R.W. met with Dr. Donaldson in Dr. Donaldson's office after arriving at the CTC, but note that there was an intervening period during which R.W. sat at a computer station and provided information concerning himself.   (Dr. Donaldson dep. at 15-16; R.W. dep. at 53).

27.   *Donaldson initiated a "clinical interview" with R.W., which "segued pretty quickly into a mental status examination." (Id. at 17).*

**Response**: Admitted.

28.   *Donaldson began to question R.W. about his "history of symptoms" and his "current symptoms," including any history of hallucinations. (Id. at 18).*

**Response**: Admitted.

29.   *R.W. disclosed that he did sometimes experience visual and auditory hallucinations, and had experienced them in the previous two days. (Id. at 17)*

**Response**: Admitted.

30.   *Over the course of the interview, Donaldson observed that R.W. seemed as if he did not want to be there. (Id. at 19).*

**Response**:   Admitted, but incomplete.   Dr. Donaldson testified that R.W. did not seem this way at first, but that he did gain this impression over the course of the interview.   (Dr. Donaldson dep. at 19).

31.     *R.W. admits that he was "agitated," "annoyed," "uncomfortable," and "kind of angry" throughout the meeting because Donaldson was "asking [him] a bunch of questions and [he] didn't want to answer them." (R.W. Dep. at 55-56).*

**Response**:  Defendant admits that R.W. so testified, but also notes that he stated that the meeting "all happened in a blur."  (R.W. dep. at 56).

32.     *Donaldson opined that, during the interview, R.W. may have been "responding to internal stimuli" as evidenced by him "looking into corners, checking around," having "difficulty maintaining focus [and] eye contact" and having an unusual "time and cadence" to his speech. (Donaldson Dep. at 18-19).*

**Response**:   Admitted, except that Dr. Donaldson said that the "timing" and cadence of R.W.'s speech was "distinctive."  (Dr. Donaldson dep. at 19).   Dr. Donaldson further testified that "responding to internal stimuli" is typically a sign that a person is experiencing a hallucination.  (*Id.* at 18).  Moreover, Plaintiff's expert Dr. Agharkar provided testimony concerning what it is like to witness someone experiencing a hallucination that is strikingly consistent with what Dr. Donaldson saw.  (Dr. Agharkar dep. at 76-76).

33.     *R.W. did not tell Donaldson that he was having hallucinations at that moment. (Id. at 18)*

**Response**:   Defendant admits only that R.W. did not explicitly tell Dr. Donaldson that he was experiencing hallucinations at that moment.  Dr. Agharkar testified that

a trained person can recognize a hallucination.  (Dr. Agharkar dep. at 76).  *See also* response to Statement No. 32.

34.   *Donaldson admits, based on the information he had, he "couldn't conclude that [R.W.] was" having hallucinations. (Id. at 23).*

**Response**:   Admitted, but misleading in isolation.   Fed.R.Evid. 403.   Dr. Donaldson could not be sure that R.W. was hallucinating, but thought that it was likely that he was.  (Dr. Donaldson dep. at 23-24).  Dr. Agharkar testified that a trained person can recognize a hallucination.  (Dr. Agharkar dep. at 76).  *See also* response to Statement No. 32.

35.   *At some point during the course of the interview, R.W. asked Donaldson if he was free to leave. (Id. at 25, 27).*

**Response**:  Admitted.

36.   *R.W. was in fact free to leave the meeting at any time. (Id. at 26-27).*

**Response**:  Admitted.

37.   *Donaldson told R.W. he did not have to be in the meeting. (R.W. Dep. at 56-57).*

**Response**:  Admitted.

38.   *At some point, R.W. "got up and exited the room." (Donaldson Dep. at 27).*

**Response**:  Admitted, but incomplete.  R.W. left when Dr. Donaldson asked him if he had experienced command hallucinations.  (Doc. 39-17, ¶ 55).  Command

hallucinations are hallucinations that direct a person to do something. (*Id.*, ¶ 56). Command hallucinations are well documented as a risk factor for violence towards others. (*Id.*, ¶ 57).

> 39.   *R.W. did not threaten Dr. Donaldson or anyone else during the meeting or upon leaving. (Id.).*

**Response**:  Defendant admits that R.W. did not explicitly threaten Dr. Donaldson and that it is not aware of R.W. explicitly threatening anyone after he left. *But see also* response to Statement No. 38.

> 40.   *R.W. did not knock anything over or slam the door. (Id. at 32-33).*

**Response**:  Admitted, but immaterial.

> 41.   *Donaldson had no indication that R.W. had a plan to hurt someone. (Id. at 34).*

**Response**:  Denied as written.  Dr. Donaldson testified that he had no "evidence that he was about to enact a planned action to harm someone else." (Donaldson dep. at 34). *See also* response to Statement No. 7.

> 42.   *Donaldson has testified that, at the time R.W. exited the interview, Donaldson had been asking R.W. whether he ever experienced "command hallucinations." (Id. at 25, 27).*

**Response**:  Admitted.  *See* response to Statement No. 38 as to why this is significant.

43.    *R.W. did not answer the question about whether he experienced "command hallucinations." (Id. at 55-56).*

**Response**:  Admitted.

44.    *Following R.W.'s exit from Donaldson's office, Donaldson contacted Nicole Johnson (nee Morrison) ("Johnson"), a staff member of the Dean of Student's office to request a "safety check" of R.W. (Id. at 34-35).*

**Response**:  Defendant admits that Dr. Donaldson contacted the Office of the Dean of Students for this purpose.  The record is unclear as to whether he contacted Johnson or Lanette Brown, the Associate Dean of Students.  (Johnson dep. at 13). Defendant acknowledges that this distinction is immaterial.

45.    *Johnson informed Donaldson she would "call the university police to initiate a safety check." (Id. at 35).*

**Response**:  Defendant admits the general substance of this fact.  *See also* response to Statement No. 44.

46.    *A university police officer apparently sought R.W. out and could not locate him. (Id. at 36).*

**Response**:   Defendant admits that Donaldson so testified.  The record does not establish that he has the requisite personal knowledge to so testify.  Fed.R.Evid. 602.  At any rate, this statement is immaterial.

47.   *Johnson called R.W. on his cellular phone and was able to make contact with him. (Id. at 37-38; R.W. Dep. at 57).*

**Response**:   Admitted, except that the record is unclear as to whether the person making contact was Johnson or Brown.  *See* response to Statement No. 44.

48.   *Johnson asked R.W. to come to the Dean of Student's Office, and R.W. agreed to do so "because [he] didn't want to get in trouble." (R.W. Dep. at 58).*

**Response**:   Admitted, except as noted in response to Statement No. 47.

49.   *At the request of the Dean of Student's Office, Donaldson completed a "1013 form" while R.W. was en route to the Dean of Student's Office. (Donaldson Dep. at 36-38).*

**Response**:   Defendant denies that the record shows that this was done "at the request of the Dean of Student's Office," but otherwise admits this statement.

50.   *A "1013 form" is a request "for involuntary transport for a mental evaluation." (Id. at 36).*

**Response**:   Admitted.

51.   *R.W. returned voluntarily to the Dean of Student's office, where he met Johnson. (Deposition of Nicole Johnson ("Johnson Dep.") at 16-17 (excerpts attached as Attachment 11); Lee-Barber Dep. at 32).*

**Response**:   Defendant denies that R.W. "returned" to the Office of the Dean of Students as there is no indication that he had been there previously, but otherwise admits this statement.

13

52.     *When R.W. arrived at the Dean of Student's Office, two GSU police officers were waiting there for him. (R.W. Dep. at 58).*

**Response**:   Admitted, except that the record is unclear as to whether there were one or two police officers.  (Dr. Donaldson dep. at 37; Johnson dep. at 17).

53.     *Johnson asked R.W. to complete a "release of information form" to allow Grady Memorial Hospital to communicate with GSU about R.W.'s medical care, which he did. (Johnson Dep. at 13-17).*

**Response**:  Admitted.

54.     *Johnson observed that R.W. was quiet and cooperative during these interactions. (Id. at 17-18).*

**Response**:  Admitted.

55.     *After he completed the form, R.W. was instructed to get into the patrol car of a GSU police officer to be transported to Grady Hospital. (R.W. Dep. at 58-59; Johnson Dep. at 17-18).*

**Response**:  Admitted.

56.     *R.W. was "calm and cooperative" throughout his interaction with the police officer. (Attachment 12 (police report)).*

**Response**:  Defendant notes that this statement constitutes hearsay.  Nevertheless, Defendant admits this immaterial fact.

57.     *The police officer brought R.W. to Grady, where he stayed for several hours, meeting with physicians there. (R.W. Dep. at 60-62).*

**Response**:   Admitted, but incomplete.   R.W.'s medical records from Grady provide no indication that he ever met with a psychiatrist or a psychologist or any other mental health provider.  (Doc. 41-13).

58.     *The physician at Grady determined that R.W. "d[id] not meet 10-13 criteria," and released him to his sister, who was there waiting for him. (Attachment 13).*

**Response**:  Admitted, but incomplete.  *See* Response to Statement No. 57.

59.     *The physician at Grady further noted that R.W. reported leaving Donaldson's office earlier that day "because he did not feel comfortable speaking about his mental health." (Id.).*

**Response**:  Admitted.  Defendant notes, however, that R.W.'s treating psychiatrist concluded that his judgment and insight were impaired.  (Doc. 39-17, ¶ 77).

60.     *Following these events, Dr. Rebecca Stout, GSU's Associate Vice-President of Student Affairs and Dean of Students decided that R.W. would be required to participate in GSU's "mandated risk assessment" process. (Stout Dep. at 48).*

**Response**:  Admitted.

61.     *The mandated risk assessment process is designed to determine whether to invoke GSU's "non-academic withdrawal process," in order to withdraw a student who poses a risk of "harm to others or significant behavioral disruption." (Id. at 12).*

**Response**:  Defendant admits that the risk assessment process is connected to the non-academic withdrawal policy, but note that the risk assessments are conducted

with the intent and hope of finding supports and resources that will allow the student to avoid withdrawal and remain in school.  (Doc. 39-17, ¶ 29).

> 62.   *Students who are identified as targets of the mandated risk assessment process are required to participate in that screening process in order to continue their studies at GSU. (Id. at 44)*.

**Response**:  Defendant denies that students are "targets" of the risk screening process, but otherwise admit that this statement accurately describes the application of the process to students who are subjected to it.

> 63.   *Stout testified that, to be a proper subject of the mandated risk assessment process, there must be "some objective evidence . . . that the student poses a risk of threatening others or engaging in disruptive behavior." (Id. at 46)*.

**Response**:  Defendant admits that Dr. Stout so testified.  *See also* responses to Statement Nos. 32 and 38 and Doc. 39-17, ¶ 67 concerning R.W.'s behaviors with Dr. Donaldson which appeared to manifest a potentially dangerous psychotic break.

> 64.   *Stout admitted that it would be "inappropriate" to invoke the mandated risk assessment process "based upon someone's diagnosis, absent some overt disruptive or threatening behavior." (Id. at 18-19)*.

**Response**:  Defendant admits that Dr. Stout so testified.  *See also* response to Statement No. 63 and Dr. Donaldson's deposition generally for descriptions of behaviors that raised concerns of a risk of violence; *Watson v. City of Miami*

*Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (an entity is not required "to wait until a perceived threat becomes real or questionable behavior results in injuries").

> 65.    *However, at the time the Dean of Student's Office made the decision to call the police to transport R.W. to Grady Hospital, nobody at GSU had any indication that R.W. had engaged in any threatening or disruptive behavior. (Id. at 50).*

**Response**:  Denied.  R.W.'s behaviors during his meeting with Dr. Donaldson evidenced a possible psychotic break.    (Doc. 38-17, ¶¶ 46-58, 63, 67).  Additionally, R.W.'s decision to leave that meeting at the exact moment when he was being questioned about command hallucinations indicated a potential risk of a threat to others given the known connection between command hallucinations and violence.  (*Id.*, ¶ 57).

> 66.    *Stout testified that, to her understanding, the decision to contact the police was not based on R.W. being a safety threat, but was based on "Donaldson's concern about the medical well-being of the student." (Id. at 51).*

**Response**:  Defendant admits only that Dr. Stout testified that the police were contacted based on Dr. Donaldson's concerns for R.W.'s medical well-being.  This statement is otherwise immaterial and misleading.  Fed.R.Evid. 403.  The two categories are not mutually exclusive.

67.   *Stout admitted, at the time she decided to require R.W. to undergo the mandated risk assessment process, she had no evidence that R.W. had ever engaged in any threatening behavior. (Id. at 54).*

**Response**:  Denied.  *See* response to Statement No. 65.

68.   *At the time she decided to require R.W. to undergo the mandated risk assessment process, Stout had no evidence that R.W. had ever violated any campus policies. (Id.).*

**Response**:   Admitted, but immaterial.   The risk assessment process is not a disciplinary process.

69.   *At the time she decided to require R.W. to undergo the mandated risk assessment process, Stout had no evidence that R.W. had been disruptive in class or in housing. (Id. at 54-55)*

**Response**:  Admitted, but immaterial.  *See* response to Statement No. 65.

70.   *At the time she decided to require R.W. to undergo the mandated risk assessment process, Stout had no evidence that R.W. had ever written or said anything suggesting violence or a desire to harm someone. (Id. at 55).*

**Response**:  Denied.  *See* response to Statement No. 65.  Defendant also notes that Plaintiff's expert Dr. Agharkar testified that persons who experience delusions and hallucinations may act violently not out of a desire to harm, but out of an intent to protect themselves (albeit from a danger that does not actually exist).   (Dr. Agharkar dep. at 63).

71.   *At the time she decided to require R.W. to undergo the mandated risk assessment process, Stout had no reports that R.W. had been in altercations with anyone. (Id.).*

**Response**:   Admitted but immaterial.   Nothing in the law requires Defendant to wait until a student is violent before it engages in risk assessment.   28 C.F.R. § 35.139(b); *see also Watson*, 177 F.3d at 935 (an entity is not required "to wait until a perceived threat becomes real or questionable behavior results in injuries").

72.   *At the time she decided to require R.W. to undergo the mandated risk assessment process, Stout had no indication that R.W. had been involved in any excessive drug or alcohol use. (Id.).*

**Response**:   Admitted.

73.   *Based on instructions from Stout, on February 15, 2013, the day after R.W. was transported to and then released from Grady, Johnson telephoned R.W. and asked him to come and meet with her at the Dean of Student's Office that day, which R.W. did. (Johnson Dep. at 20; R.W. Dep. at 64).*

**Response**:   Admitted.

74.   *Johnson presented R.W. with a number of documents to sign as part of the mandated risk assessment process. (Johnson Dep. at 21).*

**Response**:   Defendant admits that Johnson presented R.W. with two documents to sign as part of the process.   (Doc. 41-14; Doc. 41-15).

75.     Among those documents was a "referral form," which explained that R.W. was being referred for a "Mandated Clinical Risk Screening" due to "cognitive impairment," of which the form provided as examples, "nonresponsive, incoherent, loose associations, highly distractible." (*Id.* at 21; Attachment 14).

**Response**:  Admitted.  *See also* Doc. 39-17, ¶ 67.

76.     The "referral form" informed R.W. that he would meet with a mental health provider, who "will be . . . responsible for conducting an evaluation for the Students of Concern Team with respect to the interests of the overall University community." (*Id.*).

**Response**:  Defendant admits that this is an accurate quote from a portion of the cited document.

77.     Along with the referral form, R.W. was asked to sign a document entitled "Mandatory Risk Screening Requirements." The document read, in part:
Georgia State University's Office of the Dean of Students (ODOS) has received information that has caused great concern for your safety and well-being. In the interest of your health and safety, and that of the University community, you are required to participate in a mandatory Risk Screening at the Georgia State University Counseling and Testing Center.

To complete the mandatory Risk Screening, you are required to do the following:

1. Read and sign this document. Your signature indicates that you have been informed of the mandatory Risk Screening process and understand what is expected of you. [. . .]

4. If you are under the care of a community mental health provider, you must sign a Release of Information Form allowing communication between your provider and the Georgia State

*University Counseling and Testing Center as part of the screening process.*

*5. Pay the cost of the screening and/or testing [. . .]*

*6. Comply with any follow-up treatment recommendations made by the Georgia State University Counseling and Testing Center if made a condition of your continued University enrollment and/or residence in University Housing.*

*Failure to comply with all requirements of the mandated Risk Screening will result in initiation of the University's non-academic withdrawal process. [. . .] In order to facilitate your compliance with the above requirements, a hold has been placed on your student account.*

*If you are a resident of University Housing, your suitability for continued residence on campus will be reviewed as part of this process. As such, you may not return to University Housing until your Risk Screening is completed and you have been notified that you are cleared for continued on-campus residence.*

(Attachment 15).

**Response**:  Defendant admits that this is an accurate quote from a portion of the

cited document.

78.    Attached to the "Mandatory Risk Screening Requirements" form was a copy of GSU's "Non-Academic Withdrawal" policy, which provides, in part:
*A student may be withdrawn from the university for non-academic reasons when in the judgment of the Dean of Students, it is determined that the student has demonstrated behavior that (a) poses a significant danger or threat of physical harm to self or to the person or property of others; or (b) interferes with the rights of other members of the university community or with the exercise of any proper activities or functions of the university or its personnel.*

21

*(Attachment 16).*

**Response**:  Defendant admits that this is an accurate quote from a portion of the cited document.

> 79.    *After R.W. signed the forms, Johnson took R.W.'s dormitory keys and access card and informed him he would not be permitted to reside in student housing until the screening process had been completed. (Johnson Dep. at 21; R.W. Dep. at 64-65).*

**Response**: Admitted.

> 80.    *That same day, February 15, 2013, after his meeting with Johnson, R.W. met with Lee-Barber. (Lee-Barber Dep. at 38).*

**Response**: Admitted.

> 81.    *Lee-Barber observed that, during their meeting, R.W. was "alert and cooperative," and was "oriented and able to speak in a coherent manner." (Id. at 39).*

**Response**: Admitted.

> 82.    *R.W. told Lee-Barber that he had left Donaldson's office the previous day because he did not want to see a psychologist for any reason that day; that he had come to the student health center only for an STD test; and he became agitated and frustrated because he did not want to be at the CTC answering questions about his mental health diagnosis. (Id. at 39-40).*

**Response**: Admitted.

83.    *In the days that followed, R.W. was required to obtain from his personal mental healthcare providers records related to his health care, in order to provide them to Dr. Lee-Barber, in order for her to complete her "risk assessment." (Lee-Barber Dep. at 42-43).*

**Response**:  Defendant admits that R.W. ultimately was requested to obtain his medical records when Dr. Patel failed to respond to request directly from GSU. (Dr. Lee-Barber dep. at 43).

84.    *The report generated by Lee-Barber regarding R.W.'s "risk assessment" identifies "Cognitive Impairment" as the reason for R.W.'s referral for said assessment. (Lee-Barber Dep. at 47; see also Attachment 17, Mandated Risk Screening Report ("MRS Report") at 1).*

**Response**:  Admitted.  *See also* Doc. 39-17, ¶ 67 for further explanation of the meaning of "cognitive impairment."

85.    *The report has check boxes to indicate a referral for "Harm to Self," "Harm to Others," "Alcohol & Drug," and "Behavioral Disruption," among other categories; however, none of those boxes was indicated for R.W. (Id. at 47).*

**Response**:  Admitted.  *See also* response to Statement No. 84.

86.    *The MRS report also has a section where the Dean of Students or CTC can indicate that the student is a possible risk of suicide and/or violence; and, in R.W.'s case, there was no indication that he posed any such risk. (Id. at 47-48).*

**Response**:  Admitted, but misleading.  Fed.R.Evid. 403.  The referral was based on cognitive impairment because the cognitive break Plaintiff experienced while meeting with Dr. Donaldson had made Dr. Stout concerned that Plaintiff posed a

potential risk of harm to others and Dr. Stout concluded that she needed further

medical advice and guidance.  (Dr. Stout dep. at 51-54; Dr. Stout decl., ¶ 6).

> 87.  *Though Dean Stout testified that R.W. had not engaged in any threatening or disruptive behaviors on campus (See Stout Dep. at 54-55), Stout also testified that she believed R.W. had engaged in "disruptive" behavior by "leaving the Counseling and Testing Center," and had engaged in "threatening" behavior because "the specific question that was being asked had to do with command hallucinations." (Id. at 51).*

**Response**:  Defendant admits that Dr. Stout testified that R.W. had not engaged in

explicitly threatening behaviors.  *See also* response to Statement No. 65 concerning

the potential risks of R.W.'s psychotic break; *Watson*, 177 F.3d at 935 (an entity is

not required "to wait until a perceived threat becomes real or questionable behavior

results in injuries").

> 88.  *At the time she required R.W. to undergo the mandated risk assessment process, Stout possessed no objective evidence that R.W. posed a risk of harm to anyone. (See id. at 54 ("Q. At that time you were not aware of any objective evidence that he had been told to do anything that was harmful to others, correct? A. No objective evidence of that, yes.")*

**Response**:  Admitted, but immaterial.  There is no such requirement.

> 89.  *Stout admitted that "There wasn't any threatening behavior," but she "thought there was a possibility that he might be told to do something threatening." (Id. at 52-53).*

**Response**:  Admitted.  The next portion of Dr. Stout's testimony shows that she

was concerned with the potential risk of violence related to command

hallucinations.  *See also* response to Statement No. 38.

90. *Stout testified, "I did not know what he was being told and, therefore, I did not know how threatening it may be." (Id. at 53-54).*

**Response**: Admitted. *See also* response to Statement No. 38.

91. *For her part, Lee-Barber testified that the reason R.W. was required to undergo the "mandated risk screening" process was "cognitive impairment and the associated risk . . . which came to our attention related to the behavioral disruption when he left the office abruptly after being asked if the voices were directing him to harm himself or someone else and he could not answer." (Lee-Barber Dep. at 48).*

**Response**: Admitted. *See also* Doc. 39-17, ¶ 67.

92. *Notably, Dr. Donaldson never testified or reported that R.W. had indicated that "voices" were "directing him" to do anything. (See Donaldson Dep. at 23 ("I couldn't conclude that he was [having hallucinations]"; 27 (R.W. left without answering question whether he experienced "command hallucinations.")*

**Response**:   Admitted, but misleading in isolation.   Fed.R.Evid. 403.   Dr.

Donaldson could not be sure that R.W. was hallucinating, but thought that it was

likely that he was.  (Dr. Donaldson dep. at 23-24).  Dr. Agharkar testified that a

trained person can recognize a hallucination.  (Dr. Agharkar dep. at 76).  *See also*

response to Statement No. 32.

93. *Donaldson did not testify that he had, as Lee-Barber asserts, asked R.W. "if the voices were directing him to harm himself or someone else." (See generally Donaldson Dep.).*

**Response**:  Admitted but misleading.  Plaintiff never asked that exact question.

Plaintiff left before Dr. Donaldson was done with the interview and at the exact

moment when Dr. Donaldson was asking about command hallucinations.  (Doc. 39-17, ¶ 55).

> 94.     *Lee-Barber admitted that R.W. had never disrupted a class or engaged in a disruption to student housing. (Lee-Barber Dep. at 49).*

**Response**:  Admitted.

> 95.     *Yet, Lee-Barber has stated that she agreed with the decision to subject R.W. to the mandated risk screening process because it was "unpredictable" whether someone experiencing hallucinations may feel attacked and "feel the need to defend themselves." (Id. at 51-52).*

**Response**:   Admitted, but misleading and incomplete.   *See* Doc. 39-17, ¶ 67; responses to Statement Nos. 7 and 38.

> 96.     *In preparing her February 28, 2013, report, Lee-Barber relied upon her own clinical interview with R.W., in addition to a psychological assessment by Jaymie Lockow Fox, Ph.D. (Lee-Barber Dep. at 57).*

**Response**:  Admitted, but incomplete.   Dr. Lee-Barber relied on other records as well, including Dr. Patel's records.  (Doc. 39-8).

> 97.     *Dr. Fox's assessment was completed on October 25, 2011, while R.W. was 17 years old. (See Attachment 18 at 1).*

**Response**:  Admitted.  Defendant notes that Plaintiff's medical records contained no more recent assessment and that Plaintiff has not proffered any more recent assessment.   Defendant further notes that Dr. Agharkar has testified that consideration of such medical records is an appropriate part of conducting a risk assessment.  (Dr. Agharkar dep. at 10, 106).

98.   *Dr. Fox's 2011 report stated that R.W. reported occasional hallucinations in the form of "others that insult him and tell him to harm himself," and that he "experiences paranoid thoughts and feels that people are following him or that there is a 'guy waiting for him.'" (Attachment 17 at 000102).*

**Response**:  Admitted.

99.   *Dr. Fox's report did not indicate that R.W. had ever threatened or harmed anyone. (Lee-Barber Dep. at 58-59).*

**Response**:  Admitted as to human beings.  Dr. Fox reported that (1) R.W. had hit a dog, which can be a precursor to violence against humans and (2) his symptoms were likely to worsen as he got older.  (Doc. 39-17, ¶¶ 87-88, 96).

100.   *According to Lee-Barber's MRS Report, R.W.'s sister F.R. (initials used to protect identity of Plaintiff) told Dr. Fox in 2011 that R.W. "has a history of aggression, depression, anxiety, anger, language delays, poor social skills, temper tantrums, and sexual abuse." (Attachment 17 at 000102).*

**Response**:  Admitted.

101.   *However, F.R. has testified that she did not tell Dr. Fox any such thing, and denies R.W. exhibiting any aggressive behavior as a child. (F.R. Dep. at 16-17, 25, 28-29 (excerpts attached as Attachment 19).*

**Response**:   Defendant admits that F.R. so testified during the course of this litigation and notes that this information was not provided to Dr. Lee-Barber during her evaluation process, and thus, is immaterial and misleading.  Fed.R.Evid. 403.   Additionally, Dr. Fox's report is only a portion of the information that informed Dr. Lee-Barber's evaluation.  (Dr. Lee-Barber dep. at 57-58).

102. *F.R. admits that R.W. sometimes had "tantrums" when he seven or eight years' old. (F.R. Dep. at 15).*

**Response**:  Defendant admits that this statement accurately portrays F.R.'s testimony, but denies that this information was conveyed to Dr. Lee-Barber at time she was conducting risk assessment, and thus, it is immaterial.

103. *With respect to any reference to R.W. being "aggressive," Lee-Barber admitted that she "do[esn't] know what that means"; she has "no idea" what "aggression" refers to; and that Dr. Fox used a "broad term." (Id.).*

**Response**:  Admitted.

104. *Dr. Lee- Barber stated that she believed Dr. Fox's report indicated R.W. having "hit and beat his dog," which she described as "abuse of animals." (Id. at 59).*

**Response**:  Defendant admits that Dr. Lee-Barber so testified and that this testimony accurately described Dr. Fox's report.  *See* Statement No. 105 below. Defendant submits that any reasonable person would consider hitting a dog to be abuse of an animal.  Additionally, violence against an animal can be a precursor to violence against humans.  (Doc. 39-17, ¶ 88).

105. *Dr. Fox's report does refer to R.W. reporting that "he has hit his dog in the past, for no reason other than to do it." (Attachment 18 at RW-PLAINTIFF 000054).*

**Response**:  Admitted.

106. *R.W. denies telling Dr. Fox any such thing; rather, he says he once hit his dog on the nose after his dog bit him. (R.W. Dep. at 35).*

**Response**:   Defendant admits that R.W. so testified.   Defendant notes that his

treating psychiatrist has concluded that his judgment and insight are impaired.

(Doc. 39-17, ¶ 77).   Moreover, there is no evidence that Dr. Lee-Barber was aware

of this milder version of this incident, making it immaterial.

> 107.   *Lee-Barber cited a reference in Dr. Fox's report to a childhood incident in which R.W. allegedly "went berserk in public," causing his sister to want to hospitalize him. (Attachment 17 at 000102).*

**Response**:  Admitted.

> 108.   *R.W. denies ever "going berserk," though he admits he may have cried or become overemotional on occasion. (R.W. Dep. at 37-38).*

**Response**:   Defendant submits that "going berserk" is in the eye of the beholder.

Defendant notes that his treating psychiatrist has concluded that his judgment and

insight are impaired.   (Doc. 39-17, ¶ 77).

> 109.   *With respect to the "going berserk" reference in Dr. Fox's report, Dr. Lee-Barber admits that "there are lots of possibilities for what that could mean," and she simply did not know what happened in that supposed incident. (Lee-Barber Dep. at 59).*

**Response**:  Admitted.

> 110.   *Lee-Barber admitted that, absent any knowledge of the context of the supposed "berserk" incident, she had no basis to conclude whether it was a normal emotional response or something threatening or dangerous. (Id. at 64).*

**Response**:  Admitted.

111.   *Not cited in Lee-Barber's report was Dr. Fox's completion of a "Behavior Assessment System for Children-2-Parent Rating Scale" (BASC-2-PRS) indicating that, based on information provided by R.W.'s primary caregiver, his sister F.R., R.W. was deemed to be "statistically average and normal functioning" in the areas of aggression, conduct problems, and anger control. (Attachment 18 at 000058-000059; Lee-Barber Dep. at 75-78).*

**Response**:   Defendant admits that this statement accurately describes Dr. Lee-Barber's report, but notes that nothing about Dr. Lee-Barber's report indicates that it was intended to be a verbatim repeat of everything in every record she reviewed.

112.   *Dr. Fox's report did note contrary indications based on R.W.'s own self-reporting, which indicated poor anger control; though Dr. Fox's report indicated R.W. was a "caution on faking bad," meaning that, although his responses appeared credible, there was some risk of his exaggerating his symptoms. (Attachment 18 at 000060-000061; Lee-Barber Dep. at 79-81).*

**Response**:   Admitted, but misleading.  Fed.R.Evid. 403.  Dr. Fox's report was explicit that "it is likely that [R.] was being forthright and candid in describing his behaviors."  (Doc. 41-18 at 60).

113.   *R.W. has exhibited none of the supposed troubling behaviors noted in Dr. Fox's counseling report while a student at GSU. (Stout Dep. at 106).*

**Response**:   Denied as unanswerable as Defendant is unsure of the meaning of "supposed troubling behaviors."  R.W. did report hallucinations to Dr. Donaldson and appeared to be hallucinating in Dr. Donaldson's presence.  (Doc. 39-17, ¶¶ 46-50).

114.   *Based on the circumstances of R.W. leaving Donaldson's office, her clinical interview with R.W., and her review of Dr. Fox's assessment, Lee-Barber concluded:*
*Due to his history of chronic mental illness his struggle with treatment compliance, and currently being out of treatment compliance, Mr. [R.W.] is assessed to be at significant risk related to his diagnosis of paranoid schizophrenia.*

*(Attachment 17 at 000103).*

**Response**: Admitted.

115.   *Dr. Lee-Barber recommended that R.W.'s "level of risk might decrease should he engage in regular treatment with a psychiatrist and follow treatment recommendations." (Id.).*

**Response**:   Admitted.   Plaintiff's expert Dr. Agharkar agrees that this is the appropriate course of treatment for a patient with schizophrenia.   (Dr. Agharkar dep. at 77-78, 81-83).

116.   *Dr. Lee-Barber further wrote that "[R.W.] seems likely to benefit from hospitalization to initiate getting his medication stabilized and to assist him with learning to manage his health condition on his own." (Id.).*

**Response**: Admitted.

117.   *Dr. Lee-Barber further indicated that R.W. "should provide monthly treatment compliance reports." (Id.).*

**Response**: Admitted.

118.   *However, Dr. Lee-Barber had no role in deciding whether GSU should place conditions on R.W.'s enrollment or housing in order to try and compel treatment compliance. (Lee-Barber Dep. at 65-66; Stout Dep. at 47).*

**Response**:   Defendant admits that Dr. Lee-Barber did not make the relevant

decisions in this matter.  Otherwise, this statement is denied as written.

119.   *Dean Stout was the deciding official regarding any conditions to be placed on R.W.'s housing or enrollment as a result of the mandated risk screening. (Stout Dep. at 9-11).*

**Response**:  Admitted.

120.   *On March 4, 2013, Johnson and Lee-Barber met with R.W. and suggested that he be hospitalized and withdraw from school due to his diagnosis. (R.W. Dep. at 74-75; Attachment 32).*

**Response**:  Defendant admits that Dr. Lee-Barber and Ms. Johnson suggested this

option to R.W., but also notes that no one at GSU ever imposed such a requirement

on him.

121.   *March 4, 2013, was R.W.'s birthday. (Johnson Dep. at 25).*

**Response**:  Admitted, but immaterial.

122.   *R.W. began to cry, and he left the meeting. (Id.).*

**Response**:  Admitted, but immaterial.

123.   *On or about March 15, 2013, Stout sent R.W. a letter, stating, in part:*
*[. . . T]he Counseling and Testing Center recommended that you resume psychiatric medication consultation, individual counseling, and support classes offered by  Georgia Regional Hospital or Grady Memorial Hospital to learn how to manage your chronic medical*

*condition. It was further recommended that the most effective way to provide you with that type of support would be through inpatient hospitalization at Georgia Regional Hospital. Finally, due to the length of stay at Georgia Regional Hospital for inpatient stabilization, it was recommended that you complete the application for Hardship Withdrawal for the Spring 2013 term. [. . .]*

*Based on the recommendations of the Counseling and Testing Center, it appears that your compliance with the above medical advice is critical to your health, your success as a student, and your success in community living. In light of the results of your Risk Screening, your continued enrollment is conditioned upon compliance with the above-referenced treatment recommendations. Specifically:*

> *1. You must promptly initiate psychiatric medication consultation and individual counseling services in the community;*

> *2. You must submit a signed Release of Information consent form(s) authorizing your providers, to: (a) discuss the status of your treatment and any recommendations for follow-up care with the mental health professionals at the GSU Counseling and Testing Center; and (b) for your providers to confirm with me a monthly basis during your enrollment whether or not you are regularly participating in all aspects of the treatment recommended[. . .]*

> *5. You are not eligible to reside in University Housing until you have demonstrated compliance with your medical providers in the community.*

*(Stout Dep. at 60-71; Attachment 20).*

**Response**: Defendant admits that this statement accurately quotes a portion of the letter.

124. *On March 26, 2013, Johnson sent R.W. an email, on which Stout was "courtesy copied," reminding R.W. that "your continued enrollment at the university is conditioned upon your participation in individual counseling, as well as psychiatric medication consultation with a provider in the community." (Stout Dep. at 71-72; Attachment 21).*

**Response**:   Admitted.   Defendant notes that Dr. Stout did not read the email closely.  (Dr. Stout dep. at 71-73).

125. *On April 5, 2013, Johnson sent to R.W. another email, on which Stout was copied, stating that R.W. would need to continue treatment with Dr. Patel or another medical provider "in order to remain enrolled." (Id. at 73-74; Attachment 22).*

**Response**:   Admitted.   Defendant notes that Dr. Stout did not read the email closely.  (Dr. Stout dep. at 74).

126. *Despite the clear language of her letter to R.W., and these repeated communications from the Dean of Students Office, Stout now admits that it was an "error" to inform R.W. that his enrollment was conditioned upon the requirements of the March 15, 2013, letter. (Stout Dep. at 65).*

**Response**:  Defendant admits that the enrollment language in the letter was an error and notes that the letter was prepared for Dr. Stout from a template and that, when reviewing it before signing it, Dr. Stout focused on the conditions, not the portion of the letter referring to enrollment.  (Doc. 39-17, ¶¶ 111-23).  Defendant further notes that, despite R.W.'s delays in complying with the letter's requirements, GSU took no steps to end his enrollment.  (Id., ¶¶ 110, 115, 120-23).

Plaintiff presents no evidence that the enrollment reference was the result of anything other than negligence.

> 127.  *Stout admits that she reviewed and signed the March, 15, 2013, letter, and that she read the subsequent emails, but the alleged "error" regarding the conditions on enrollment "didn't stand out to [her]." (Id. at 72).*

**Response**:  Admitted.  *See also* response to Statement No. 126.

> 128.  *Johnson, who was charged with enforcing the conditions placed upon R.W. by the Dean of Student's Office, testified that it was always her understanding that R.W.'s enrollment was conditioned upon his compliance with the requirements of the March 15, 2013, letter, and that she communicated such to R.W. in all her interactions with him. (Johnson Dep. at 28-29).*

**Response**:  Admitted.  Defendant notes that R.W. understood the conditions to be imposed on his housing.  Doc. 39-17, ¶ 114.

> 129.  *Johnson maintained this belief until on or around August of 2013, when Stout prepared a letter informing R.W. that, so long as he did not return to on-campus housing, he did not have to continue certifying his medical treatment. (Id. at 29; see also Attachment 6).*

**Response**:  Admitted.

> 130.  *R.W. complied with the conditions placed upon him in order to remain enrolled, including fulfilling the request to provide monthly reports from his healthcare provider confirming his compliance with treatment recommendations. (Stout Dep. at 85-86; R.W. Dep. at 78).*

**Response**:  Denied as written and denied that the conditions were on enrollment as opposed to housing.  On April 23, at the very end of the spring 2013 semester,

R.W. did finally submit a report confirming that he was seeing his psychiatrist and was complying, as of that date, with the physician's treatment recommendations. (Doc. 39-17, ¶¶ 122-23).  R.W. failed to meet the dates by which he was required to submit these reports and yet he was never unenrolled from GSU.  (*Id.*, ¶ 100 (March 29 and April 19 reporting dates) and ¶ 115).

131.  *R.W. was not permitted to live in the dorms during Spring and received a Code of Conduct violation because he continued to live there during some of this time. (R.W. Dep. at 81-82; Attachment 23 (Code of Conduct Violation)).*

**Response**:  Denied as written.  Defendant admits that R.W. was not permitted to live in campus housing during the spring 2013 semester.  Defendant notes that, despite being so forbidden, R.W. continued to live in a dorm during that semester and then submitted a request for a refund for the time period when he was supposed to be living elsewhere and was not.  (R.W. dep. at 80-81).  Once GSU discovered this attempted financial fraud, it brought charges against R.W., who pled guilty to false statements and failure to respond, violations of the Student Code of Conduct.  (R.W. dep. at 81-82 and Exh. 6 and 7).

132.  *On April 4, 2013, Danny Zayas, Hall Director for University Housing, learned that R.W. had remained in his dorm room. (Attachment 31 at 000138-000139).*

**Response**:  Admitted, but immaterial except as to Plaintiff's credibility and any damages claims.

133.   *Mr. Zayas removed R.W. from the dorm and informed him that he would be charged $75.00 to have the lock changed to his dorm room. (Id.).*

**Response**:  Admitted, but immaterial.

134.   *GSU's requirement that R.W. comply with its mandated risk assessment process caused R.W. to become "depressed and stressed out" and made it difficult for him to focus on his studies. (R.W. Dep. at 92-93).*

**Response**:   Denied.   R.W. has a history, pre-dating his admission to GSU, of depression that interfered with his academics.   (Pl. dep. at 22, 29-30; Dr. Lee-Barber decl., Exh. 1; Pl. Exh. 21 at 55, 63-64, 66; Dr. Donaldson dep. at 17).   As argued in Defendant's opening brief, given this pre-existing condition, R.W. cannot prove that GSU caused him any injury in the absence of expert testimony, which has not been proffered.   Moreover, if GSU acted lawfully and it did, then any injury is immaterial.

135.   *As a result, R.W. failed a number of classes, which he had to retake (successfully) in the Summer. (R.W. Dep. at 89-93).*

**Response**:   Denied as unsupported by the cited evidence.   *See also* response to Statement No. 134.

136. *As a result of failing these classes, R.W. has lost his eligibility for a Georgia HOPE scholarship. (Id. at 87).*

**Response**:  Defendant admits only that R.W. lost his HOPE eligibility.  Plaintiff cannot prove that this would not have occurred anyway.  *See* response to Statement No. 134.

137. *R.W. did not wish to release his medical records to GSU, but only did so in order to reside in housing and to stay in school. (Id. at 97).*

**Response**:  Admitted.

138. *Stout now admits that placing conditions of R.W.'s enrollment was not appropriate as her concerns were related only to R.W.'s continued residence in campus housing. (Id. at 66-67).*

**Response**:  Denied as written and specifically the "now admits" language.  This has always been Dr. Stout's intention and concern.  (Doc. 39-17, ¶ 113).

139. *Stout has identified the "risk" that R.W. poses if he returns to housing as such: "All I can say generally is a risk of disruption." (Id. at 68).*

**Response:**  Denied as written.  The record as a whole indicates that this cherry-picked snippet of testimony is misleading and inaccurate.  Fed.R.Evid. 403.

140. *R.W. must again subject himself to the "mandated risk assessment" process if he wishes to live in on-campus housing. (Attachment 6; R.W. Dep. at 78-79, 85).*

**Response**:  Admitted.

141. *R.W. wishes to return to on-campus housing. (R.W. Dep. at 96).*

**Response**:  Denied.  *See*  response to Statement No. 11.

142. *Dr. Bhushan Agharkar is a licensed psychiatrist with dual board certification as a Diplomate of Adult Psychiatry (AP) and Forensic Psychiatry (FP) of the American Board of Psychiatry and Neurology (ABPN). (Expert Report of Bhushan Agharkar (Attachment 24) at 1).*

**Response**: Admitted.

143. *Dr. Agharkar regularly conducts risk assessments, including historically for GSU, to determine whether a mentally ill person poses a significant risk of harm to self or others. (Deposition of Bhushan Agharkar ("Agharkar Dep.") at 40-43, 59)).*

**Response**: Defendant admits that Dr. Agharkar has conducted a risk assessment for GSU.   Defendant denies that Dr. Agharkar conducts risk assessments "regularly," noting that he testified that he conducts approximately five per year. (Dr. Agharkar dep. at 41).  Dr. Agharkar testified that he spends approximately half of his 40-hour work week consulting on criminal cases and the remainder attending to his approximately 100 patients.  (*Id.* at 8-9).  This would leave him little time to "regularly" conduct risk assessments.

144. *While a schizophrenic person may have delusions that he is being persecuted or followed, there is no statistical evidence that such delusions increase that individual's risk of violence. (Id. at 63).*

**Response**:  Denied.  Dr. Agharkar testified to the contrary.  (Dr. Agharkar dep. at 61-63).

145.   *While medication is generally recommended to manage the symptoms of schizophrenia, some with the illness do not use medication due to its high cost and negative side effects. (Id. at 77-79, 81).*

**Response**:  Defendant admits that some persons diagnosed with schizophrenia do not take medication, for numerous reasons.  As Dr. Agharkar testified, however, this is generally a bad idea.  (Dr. Agharkar dep. at 78, 81).

146.   *In some cases, an individual with schizophrenia can lead a happy and productive life without medications. (Id. at 81-82).*

**Response**:  Admitted, but Defendant notes that Dr. Agharkar recommends against this approach.  (Dr. Agharkar dep. at 78, 81-83).  There is no evidence in the record that R.W. is one of these persons; no such information was provided to GSU during the risk screening process or to Defendant during this litigation.

147.   *Some high-functioning schizophrenics "may be perfectly fine" without medication or therapy. (Id. at 83).*

**Response**:  Admitted, *but see* Response to Statement No. 164.

148.   *Certain types of schizophrenia can actually lower an individual's risk of violence relative to the general population. (Id. at 83-84).*

**Response**:   Admitted but immaterial and misleading.   Fed.R.Evid. 403.   Dr. Agharkar testifies that the type of schizophrenics to whom this applied were those

who were catatonic[1] or otherwise unable to function, which does not describe R.W.

(Dr. Agharkar dep. at 84).

  149. *Individuals who experience "command hallucinations," in which they have an auditory illusion telling them to do something, are not necessarily at higher risk of violence, because individuals are less likely to act upon commands that are dangerous. (Id. at 89-90).*

**Response**:  Denied.  *See* Doc. 39-17, ¶¶ 56-57.

  150. *Based on Dr. Agharkar's significant experience conducting risk assessments, he determined that the primary reason why R.W. was subjected to the risk assessment process and had conditions placed upon his housing and enrollment was his diagnosis. (Id. at 91-93).*

**Response**:  Denied.  Dr. Agharkar lacks the personal knowledge to determine the motivations of the persons who made the relevant decisions and assessments. Fed.R.Evid. 602.  Unless Dr. Agharkar can read minds, he is not competent to testify to other person's motivations and reasons.  He never testified to any expertise in determining the motivations of other mental health professions. Additionally, Defendant notes that GSU's counseling center regularly sees patients who have been diagnosed with schizophrenia and they are not subjected to risk

---

[1] Catotonic means "1.  having catatonia, a syndrome characterized by muscular rigidity and mental stupor: *The schizophrenic remained in a catatonic state.*  2. appearing to be in a daze or stupor; unresponsive: *She had the catatonic expression of an avant-garde model.*"   http://dictionary.reference.com/browse/catatonic

screening, which is not consistent with Dr. Agharkar's erroneous speculation. Doc. 39-17, ¶ 143.

151. *The behaviors observed by GSU officials of R.W. did not indicate an increased risk of violence to himself or others. (Id. at 94)*.

**Response**: Denied. *See* response to Statement No. 65.

152. *It was not medically justified to remove R.W. from housing or to subject him to mandatory risk assessment activities, because there were no objective indications that he posed a threat to anyone. (Id. at 95)*.

**Response**: Denied and immaterial and misleading. Fed.R.Evid. 403. The only issue in this case is whether GSU was deliberately indifferent to Plaintiff's legal rights when it took the challenged actions. *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 344-45 (11th Cir. 2012). As the record as a whole shows, those decisions were based on medical information and the insights of licensed mental health professionals.

The applicable law is clear that objective indications are not required; GSU was entitled to rely on objective indications *or* medical records. 28 C.F.R. § 35.139(b). Moreover, Plaintiff's expert Dr. Agharkar testified that much of the assessment work done by mental health professionals is subjective and that it is appropriate for a competent mental health professional to rely on subjective indications. (Dr. Agharkar dep. at 18-21).

153.   *GSU's requirement that R.W. receive mandatory treatment, and certify same, to GSU officials, amounted to "outpatient civil commitment," in that he was "mandated to go to treatment and there has to be a report made at least that you are attending and you're complying with treatment." (Id. at 97).*

**Response**:  Denied.  Defendant does not know what "outpatient civil commitment" means and submits that the concept is an oxymoron.  Nothing in Plaintiff's Complaint alleges that its actions constituted such.  Defendant submits that it fully complied with its legal obligations, which is all this Court can require.  28 C.F.R. § 35.139(b).

154.   *With respect to statements in Dr. Fox's report that R.W. had, in his childhood, acted "aggressively," these statements do not indicate that R.W. poses a threat, because there was no indication that R.W. had ever harmed anyone, or threatened to harm anyone, nor that he exhibited "aggressive" behavior on a regular or habitual basis, nor outside the context of stressful interactions with members of his family. (Agharkar Expert Report at 4).*

**Response**:  Denied.  *See* Dr. Lee-Barber's assessment.  Doc. 39-14.  Moreover, this is only a portion of the material on which Dr. Lee-Barber relied.  Doc. 39-17, ¶¶ 33-34, 72, 75.

155.   *The fact that a person has an occasional instance of acting emotional or verbally aggressive in a family setting is not necessarily indicative of a tendency toward violence in general. (Id.).*

**Response**:  Admitted, but incomplete and immaterial.  Dr. Lee-Barber relief on a number of factors as shown by her report.  Doc. 39-14.

156.  *Moreover, despite references to R.W. occasionally drinking alcohol or taking prescription medicines inappropriately, there was no evidence that R.W. suffered from a substance abuse disorder or that his use of drugs or alcohol was such that it might increase his overall risk for violence. (Id.).*

**Response**:  Denied.  Dr. Agharkar was clear that substance use can increase the likelihood of violence.  (Dr. Agharkar dep. at 73, 91).

157.  *Dr. Agharkar has opined, based on the facts of circumstances of this case, and based on his expertise in forensic psychiatric and risk assessment*

*GSU's risk assessment policies, as applied to the individual case of Richard Washington, pose a substantial risk of subjecting students with mental health diagnoses to unequal treatment relative to their non-disabled colleagues, without achieving a countervailing interest in campus safety. Specifically, the policies, if applied in the manner that they were applied to Mr. Washington's case, would cause a student with a diagnosis of schizophrenia to be subjected to housing and enrollment restrictions even in the absence of objective evidence that the student poses a risk to the safety of others.*

*(Attachment 24 at 3).*

**Response**:  Defendant admits only that Dr. Agharkar has so opined.  As noted above, this is refuted by the fact that GSU's counseling center regularly sees patients who have been diagnosed with schizophrenia and those patients are not subjected to risk screening.  (Doc. 39-17, ¶ 143).

158.  *GSU has not proffered an expert witness to contest Dr. Agharkar's findings*.

**Response**:  Defendant admits only that it has not proferred an expert in Dr. Agharkar's field.  Dr. Stout, in making her decisions, relied on information and guidance from licensed mental health professionals with a great deal of experience and expertise and the information they learned and conveyed is part of the body of evidence in this matter.  *See generally* Doc. 39-17, ¶¶ 23-108.

159.  *Jason Ebbeling is a nationally-recognized expert on risk management on college campuses. (Expert Report of Jason Ebbeling (Attachment 26) at 1)*.

**Response**:  Denied.  Defendant admits only that Ebbeling has spoken and written on this topic.  For the reasons set forth in Defendant's motion to exclude Ebbeling's report and testimony, Defendant submits that Ebbeling's competence in this topic is lacking and his testimony is improperly presented.

160.  *Nationally-recognized standards for risk management on college campuses have incorporated guidance from the U.S. Department of Education's (DOE) Office of Civil Rights (OCR) with respect to the treatment of mentally ill students under the Rehabilitation Act. (Id. at 5)*.

**Response**:  Denied and immaterial.  The only issue presented is whether Defendant was deliberately indifferent to Plaintiff's legal rights.  *Liese*, 701 F.3d at 344-45. This requires consideration of only the applicable law, not "nationally-recognized

standards," especially when those putative "standards" are in conflict with the law

as Defendant demonstrates in challenging Ebbeling testimony and below.

> 161.  *Under these standards, a university must consider whether the student poses a "direct threat" to the safety of others. (Id.).*

**Response**:  Denied as written and immaterial as these "standards" are irrelevant.

Defendant admits that, under *the law*, a university must consider whether a student

poses a direct threat to others.  28 C.F.R. § 35.139(b).  Defendant submits that the

evidence shows that it did so appropriately.

> 162.  *To meet the "direct test," a university as follows:*
> *(1)  To rise to a level of a direct threat, there must be a high probability of substantial harm;*
> *(2)  A University must make an individualized and objective assessment of the student's ability to participate in the university;*
> *(3)  Assessment must be based on reasonable medical judgment relying on the most current medical judgment or the best available non-medical evidence;*
> *(4)  Assessment must determine the nature, duration, and severity of risk; the probability that the potentially threatening injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.*

**Response**:  Denied.  Defendant notes that this statement cites no evidence or law[2]

and shows the Court that R.W. and his supposed legal expert misrepresent the law.

First, as a matter of law, a "direct threat" is "a significant risk to the health

or safety of others that cannot be eliminated by a modification of policies, practices

---

[2] Defendant acknowledges that Ebbeling set forth this erroneous standard in his report.

or procedures, or by the provision of auxiliary aids or services."   28 C.F.R. § 35.104; *see also* 42 U.S.C. § 12111(3) (Title I) (defining "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation") 42 U.S.C. § 12182(b)(3) (Title III) (defining "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services").   Contrary to Plaintiff's and Ebbeling's assertion, there is no requirement that there be "a high probability of substantial harm;" there simply must be "a significant risk" of harm.

Second, while a university must make an individualized assessment (which Plaintiff concedes occurred (*See* Statement No. 165, *below*)), there is no requirement that it be "objective." Instead, the assessment must be based on objective evidence *or* medical information.  28 C.F.R. § 35.139(b).  As Plaintiff's other expert concedes, much mental health assessment is unavoidably subjective and such subjective determinations are appropriately relied on by mental health professionals.  (Dr. Agharkar dep. at 18-21).

Plaintiff and his putative expert present "legal requirements" that do not actually exist in the law.  As to the requirements that are accurate, as Defendant demonstrates in its own summary judgment motion, it fully complied with its

actual legal obligations and certainly was not deliberately indifferent to Plaintiff's

legal rights.  *Liese*, 701 F.3d at 344-45.

> 163.  *In its decision to require R.W. to undergo a mandated risk assessment, and in its decision to condition R.W.'s enrollment and housing on his certifying continuing psychiatric care, GSU did not cite any behaviors that would meet the "direct threat" test. (Id. at 9).*

**Response**:  Denied for the reasons set forth in Defendant's summary judgment

motion (Doc. 39) and in response to Plaintiff's motion (submitted herewith).

Defendant further notes that Plaintiff cannot show the required deliberate

indifference.  *Liese*, 701 F.3d at 344-45.

> 164.  *R.W. did nothing to indicate a "high probability of substantial harm" to himself or others, as required by the "direct threat" test. (Id. at 10).*

**Response**:  Denied and immaterial.  *See* response to Statement No. 162.  As noted

therein, the law does not require a "high probability of substantial harm."  Nothing

in the law required Defendant to wait until the level of risk became that elevated

before taking action to protect its community.  *Watson*, 177 F.3d at 935 (an entity

is not required "to wait until a perceived threat becomes real or questionable

behavior results in injuries").

165.  *While GSU did conduct an "individualized" assessment of R.W., it was not designed to determine whether he posed a threat to others, but was rather designed to determine what was best for his own personal mental health, and therefore did not meet this element of the "direct threat" test. (Id. at 10).*

**Response**:  Defendant admits that it conducted an individualized assessment and admits that, in addition to considering whether R.W. posed a threat to others, Dr. Lee-Barber also made recommendations concerning what might be best for R.W.'s personal mental health.   Defendant shows that it fully complied with the requirements of the direct threat test, as argued in its briefs in this matter.

166.  *While GSU did look to medical data, again, the focus was on the diagnosis of schizophrenia itself, and R.W.'s own mental health, and not on any specific behaviors by R.W. and the extent to which those behaviors affected campus safety. (Id. at 11).*

**Response**:   Defendant admits that it looked at medical data, but denies the remainder of this statement.  The record as a whole shows that the focus was on R.W.'s paranoid delusions and hallucinations.

167.  *GSU did no analysis regarding the "nature, duration, and severity of the risk, the probability of injury, [or] whether modifications of policies and procedures would mitigate the risk" as required by the "direct threat" test. In fact, GSU has never identified any particularized risk, must less any such risks' duration and severity. (Id. at 11).*

**Response**:  Denied.  This statement is belied by Dr. Lee-Barber's report.  Doc. 39-14.

168.   *Mr. Ebbeling concluded:*

> *As a Vice President for Student Affairs, I am regularly faced with difficult decisions of how to manage student concerns and at-risk students.  I have made the decision to remove students who pose a substantial risk to the campus, and I don't take these decisions lightly.  However, in this case, there simply was not sufficient observable behaviors that would justify the removal of Mr. Washington from student housing, nor his participation in continuous mandatory monitoring.  I am quite sure that there are many students with schizophrenic diagnoses on other campuses, many who choose not to take medicine, some who are not appropriately medicated, and some who manage their medication consistent with doctor recommendations.  Our responsibility is to focus specifically on identifiable behaviors, and take action when there is a high probability of substantial harm, not to simply exclude students based on their diagnosis or the ways in which they are managing their condition.*

(*Id.* at 12).

**Response**:   Defendant admits only that this is what Mr. Ebbeling wrote. Defendant submits that, at most, this shows only a difference of professional opinion, which is insufficient to demonstrate deliberate indifference.  *See Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Torres v. Gardner*, 2006 U.S. Dist. LEXIS 78592, 3 (M.D. Ga. 2006).  Defendant further notes that Mr. Ebbeling misstates, and thus misapplies, the applicable law, and thus, is misleading, confusing, and not competent.  28 C.F.R. § 35.139(b); Fed.R.Evid. 403.

169. *GSU has not provided any expert witness to counter Mr. Ebbeling's findings*.

**Response**: Defendant admits only that it has not proferred an expert in Ebbeling's field. Dr. Stout, the decisionmaker for GSU, has similar—but more—experience, training, and expertise in this field and can explain her own decisions and the information she learned and used in her decisionmaking process and the reasons for the decisions she made is part of the body of evidence in this matter. *See generally* Doc. 39-17, ¶¶ 23-108.

SAMUEL S. OLENS  551540
Attorney General

KATHLEEN M. PACIOUS 558555
Deputy Attorney General

/s/ Devon Orland_____
DEVON ORLAND 554301
Senior Asst. Attorney General

/s/ Laura L. Lones_____
LAURA L. LONES 456778
Assistant Attorney General

/s/ Meeta T. Dama
MEETA T. DAMA  398137
Assistant Attorney General

Attorneys for Defendant

Please Address All
Communications To:
LAURA L. LONES
Assistant Attorney General
Department of Law, State of Georgia
40 Capitol Square, S.W.
Atlanta, Georgia  30334-1300
Telephone: (404) 463-8850
Facsimile:  (404) 651-5304
E-mail: llones@law.ga.gov

## CERTIFICATION AS TO FONT

Pursuant to Local Rule 7.1D, I hereby certify that this response is submitted in Times New Roman 14 point type as required by Local Rule 5.1(b).

/s/ Laura L. Lones
LAURA L. LONES 456778
Assistant Attorney General

Attorney for Defendants

LAURA L. LONES
Assistant Attorney General
Department of Law, State of Georgia
40 Capitol Square, S.W.
Atlanta, Georgia  30334-1300
Telephone: (404) 463-8850
Facsimile:  (404) 651-5304
E-mail: llones@law.ga.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed **DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to Plaintiff's attorneys of record:

James Radford
Caleb Gross
James Radford, LLC
545 N. McDonough Street
Suite 212
Decatur, Georgia  30030

Jeffrey R. Filipovits
Filipovits Law Firm, PC
2900 Chamblee-Tucker Road
Building 1
Atlanta, Georgia  30341

This 17th day of April, 2014.

/s/ Laura L. Lones
Georgia Bar No. 456778
Assistant Attorney General