IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| R.W. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | 1:13-cv-02115-SCJ |
| | ) | |
| Board of Regents of the University | ) | |
| System of Georgia, | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff R.W. ("Plaintiff" or "R.W.") and files this *Brief in Opposition to Defendant's Motion for Summary Judgment*, as follows:

### I.   INTRODUCTION

Chronic mental illness presents us with one of the most challenging civil rights issues of our time. Millions of Americans suffer from conditions such as schizophrenia and bipolar disorder, and the vast majority of them live peaceful and productive lives even as they struggle with the illness. Yet, these Americans continue to be viewed with great fear and misapprehension. In the wake of national tragedies like the Virginia Tech massacre, mental illness is often viewed as the culprit. This is very often inaccurate, as many of the most notorious campus shooters—including the Columbine High School shooters—had no

mental health diagnosis whatsoever, and the vast majority of people with mental illness are no more violent or dangerous than their non-disabled counterparts. In any case, fear toward people with chronic mental illness persists. The symptoms of their illness—confusion, eccentricity—are viewed as threatening and dangerous.

Of course, there will be rare instances in which mental illness does present a danger to human safety. Without a doubt, there have been cases in which a combination of an individual's mental illness, his disregard for others, and the influence of pure evil, merge into some violent act. The challenge for the federal courts under laws such as the Americans with Disabilities Act ("ADA") and the Rehabilitation Act is to balance the interests of educational institutions in protecting campus safety with the rights of mentally ill students, who are entitled to live and study on campus as free and autonomous individuals, without additional burdens or surveillance relative to their non-disabled counterparts, so long as their behavior does not pose a particular, identifiable threat to others.

Inevitably, mental illnesses fall somewhere along a broad spectrum. On one end of the spectrum are exceptional cases, in which a mental illness creates a risk of harm to others. However, on the other end of that spectrum is a case like this one, in which the individual's mental illness poses no threat whatsoever to

those around him. This case is not in the grey area of the middle of that spectrum, where the court has to balance difficult questions of campus safety against the rights of the disabled student. The only question in this case is whether a university is allowed to require a non-violent, non-disruptive, peaceful and responsible student with schizophrenia to disclose confidential information about his medical condition, track him down with police cars if he does not answer, transport him to the hospital and attempt to involuntarily commit him, remove him from campus housing, comb through his medical history, and then condition his eligibility for student housing and enrollment on his agreement to follow their prescribed course of psychiatric treatments. The question is whether, consistent with the Americans with Disabilities Act and the Rehabilitation Act, a university can do all of this in spite of any objective behavioral evidence that the student poses a risk of harm to others.  The answer to these questions is no.

GSU's Motion for Summary Judgment hinges on three primary arguments, each of which lacks basic support in the law and the record. First, GSU would have this Court ignore or overturn clearly established precedent stating that Title II of the Americans with Disabilities Act ("Title II") validly abrogates a state's sovereign immunity for claims of discrimination against disabled students by public universities. Second, GSU misstates the law regarding claims under Title

II, urging this Court to accept that malicious, bad faith discrimination is an element of liability, when in fact the landscape of the case law states that it is not. Third, GSU invites this Court to indulge the unfounded and unfair stereotype that brought about this case in the first place; that is, the assumption that a person with schizophrenia is an inherent danger to those around him. To support these stereotypical assumptions, GSU would invite this Court to simply overlook the vast bulk of record evidence, which establishes that there was no objective behavior demonstrating that R.W. posed a risk to campus safety or order sufficient to justify the onerous burdens placed upon him. Furthermore, GSU asks this Court to turn a blind eye toward the evidence, and to accept its insistence that R.W.'s diagnosis was not the reason for its adverse treatment of him, in spite of the fact that every document in the record states to the contrary. In short, R.W. did nothing wrong; yet, he was treated as a danger and a threat, and had onerous burdens placed upon him as a result of his disability, in clear violation of the ADA and the Rehabilitation Act.

## II.   FACTS

The complete set of material facts are set forth in R.W.'s *Statement of Material Facts as to Which There is No Genuine Dispute,* filed contemporaneously with his own Motion for Summary Judgment. [Doc. 41-3]. Plaintiff hereby

incorporates those facts by reference. Plaintiff will highlight below the specific facts related to the legal argument.

### III.   <u>Argument and Citation to Authority</u>

#### A. <u>Sovereign Immunity is no defense here</u>

Plaintiff will first address GSU's contention that sovereign immunity bars the instant suit. Plaintiff has previously briefed this issue in support of his own summary judgment motion. [<u>See</u> Doc. 41-2 at 16-19]. As GSU acknowledges, its position regarding sovereign immunity is directly contrary to binding precedent. (Defendant's Brief in Support of its Motion for Summary Judgment [Doc. 39-16] ("Dfts. Brief") at 34 n.6). Indeed, the Eleventh Circuit U.S. Court of Appeals has explicitly held that Title II of the ADA is a valid abrogation of a state's sovereign immunity with respect to damage claims of discrimination by public universities. <u>Ass'n for Disabled Americans, Inc. v. Florida Int'l Univ.</u>, 405 F.3d 954, 959 (11th Cir. 2005). Numerous other courts that have addressed the issue have reached the same conclusion. <u>See</u>, <u>e.g.</u>, <u>Toledo v. Sanchez</u>, 454 F.3d 24, 38-39 (1st Cir. 2006); <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 490 (4th Cir. 2005). This Court is without authority to deviate from the Eleventh Circuit's holding, as a panel decision by the Eleventh Circuit can only be overturned by an *en banc* panel of the Eleventh Circuit. <u>Morrison v. Amway Corp.</u>, 323 F.3d 920, 929 (11th Cir. 2003). <u>See also</u> <u>Briggs v. Pennsylvania R. Co.</u>,

334 U.S. 304, 306, 68 S. Ct. 1039, 1040 (1948) ("In its earliest days this Court consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court.")

GSU makes two arguments for why this Court should disregard this precedent. First, GSU suggests, the U.S. Supreme Court's decision in <u>United States v. Georgia</u>, 546 U.S. 151, 154, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) calls into question the holding of <u>Ass'n for Disabled Americans, Inc.</u> (Dfts. Brief at 34 n.6). In <u>Georgia</u>, the Supreme Court held, in the Eight Amendment "cruel and unusual punishment" context, that if conduct that violates the ADA *also* violates the U.S. Constitution, then Title II validly abrogates a state's sovereign immunity for such claim. <u>Georgia</u>, 546 U.S. at 159. GSU's argument appears to be that <u>Georgia</u> created a *limit* for said abrogation—in other words, that Title II may *only* abrogate sovereign immunity for conduct that actually violates the constitution. To the contrary, the Supreme Court in <u>Georgia</u> explicitly left for the lower courts to decide whether Title II abrogates sovereign immunity for conduct that violates Title II, but does not violate the constitution, to wit:

> Once Goodman's complaint is amended, ***the lower courts will be best situated to determine*** in the first instance, on a claim-by-claim basis [. . .] ***(3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.***

_Georgia_, 546 U.S. at 159. [1]

Consistent with the mandate of the Supreme Court in _Georgia_, the Eleventh Circuit has decided, with respect to claims of discrimination by public universities, that Title II is a valid abrogation of the states' sovereign immunity, even for conduct that is not independently unconstitutional. _Ass'n for Disabled Americans, Inc._, 405 F.3d at 959. For this reasons, GSU's arguments that R.W. has not proven an actual violation of the constitution (Dfts. Brief at 32-34) are inapposite.

GSU nonetheless invites this Court to revisit the findings of the Eleventh Circuit with respect to whether Congress identified, in the context of public education, a history and pattern of unconstitutional discrimination against the disabled. (Dfts. Brief at 36). Suffice to say, the Eleventh Circuit has found that Congress _did_ identify a history and pattern of such discrimination, in order to validly abrogate a state's sovereign immunity under Title II. _See_ _Ass'n for Disabled Americans, Inc._, 405 F.3d at 959 (citing the "long history of state discrimination against students with disabilities"). This Court is without

---

[1] GSU cites to the unpublished decision of _Redding v. Georgia_, 13-12866, 2014 WL 591047 (11th Cir. Feb. 18, 2014), a prison case in which the Court cited _Georgia_ for the proposition that Congress did not abrogate sovereign immunity for a prisoner's claim under the ADA. However, _Redding_ was, like _Georgia_, a claim by a prisoner, and not a claim by a student in public education, in which the Eleventh Circuit has specifically held that Title II abrogates sovereign immunity.

authority to deviate from the Eleventh Circuit's holding. Morrison, 323 F.3d at

929; Briggs, 334 U.S. at 306.

The First Circuit, in Toledo v. Sanchez, in the context of a university

student with "schizoaffective disorder," went to great lengths to describe the

long history of discrimination against disabled students in public education, and

Congress' longstanding inability to address it, before finally concluding:

> In sum, the thirty years preceding the enactment of the ADA
> evidence a widespread pattern of states unconstitutionally excluding
> disabled children from public education and irrationally
> discriminating against disabled students within schools. Faced with
> this record of persistent unconstitutional state action, coupled with
> the inability of earlier federal legislation to solve this "difficult and
> intractable problem," Congress was justified in enacting
> prophylactic § 5 legislation in response.

Toledo, 454 F.3d at 37-39.

GSU apparently disagrees with the Eleventh and First circuits, asserting

that the legislative history of the ADA contains little reference to discrimination

at state universities (as opposed to elementary or secondary school). (Dfts. Brief

at 38-40). However, the major decisions of the Circuit Courts of Appeal,

including the Eleventh Circuit's in Ass'n for Disabled Americans, Inc., have held

that Title II is a valid abrogation of sovereign immunity for claims of disabled

students in *state universities*. See 405 F.3d at 959 (Florida International

University); <u>Toledo</u>, 454 F.3d at 37-39 (University of Puerto Rico); <u>Constantine</u>, 411 F.3d at 490 (George Mason University).[2]

Notably, the number of disabled students graduating from secondary schools and entering college is growing substantially, according to the Government Accountability Office (GAO), which has found:

> [S]ources suggest that the size of this population [of disabled postsecondary students] has grown, which may result from the increased proportion of elementary and secondary students who have received special education services over the past 30 years. For example, two states' online data systems reported increases in the number of students with disabilities enrolled in the states' postsecondary schools. From 1999 to 2007, California public postsecondary schools reported an almost 20 percent increase in the number of undergraduate students with disabilities, and New York schools reported about a 40 percent increase in the number of undergraduate and graduate students with disabilities. Also, disability services officials at many of the schools we visited reported that increasing numbers of students are registering with their offices.

United States Government Accountability Office (GAO). *Report to the Chairman, Committee on Education and Labor, House of Representatives: HIGHER EDUCATION AND DISABILITY Education Needs a Coordinated Approach to Improve Its Assistance to Schools in Supporting Students*." October 2009. Page 7 (available at http://www.gao.gov/assets/300/297433.pdf). Therefore, there is a strong nexus

---

[2] The "Congressional history" that GSU cites in support of its assertion is apparently contained in a document that is not even available online. The citation provided by GSU does not reveal any document.

between the long history of discrimination against students in secondary school, and the discrimination those students would continue to face in universities, were it not for laws like that ADA.

While GSU argues that disability is not a "suspect class" for purposes of heightened scrutiny under an Equal Protection analysis, that does not matter. Even for non-suspect classes, such as disability, the Fourteenth Amendment prohibits *irrational* discrimination. Toledo, 454 F.3d at 36-37. Because Title II was designed as a prophylactic response to a *history* of *irrational* discrimination against the disabled, it may abrogate sovereign immunity for claims that go beyond irrational discrimination. Constantine, 411 F.3d at 490 ("The remedial measures employed in Title II may not be a perfect fit for the pattern of discrimination that Congress sought to remedy and deter, but they need not be. The Court has made it clear that prophylactic legislation such as Title II can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional.")  Also, as the Eleventh Circuit has held, "'[b]oth the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child,' distinguishes public education from other rights subject to rational basis review." Ass'n for Disabled Americans, Inc., 405 F.3d at 957, *quoting* Plyler v. Doe, 457 U.S. 202, 221, 102 S.Ct. 2382, 2396–97, 72 L.Ed.2d 786 (1982).

GSU suggests that the Supreme Court's opinion in <u>Coleman v. Court of Appeals of Maryland</u>, 132 S. Ct. 1327, 182 L. Ed. 2d 296 (2012) and <u>Bd. of Trustees of Univ. of Alabama v. Garrett</u>, 531 U.S. 356, 370, 121 S. Ct. 955, 966, 148 L. Ed. 2d 866 (2001) undermines <u>Ass'n for Disabled Americans, Inc.</u> (Dfts. Brief at 34 n.6). However, in both of those cases, the Supreme Court held that, for laws not at issue in the instant case (Title I of the ADA, FMLA), Congress had not identified a pattern of constitutional violations against state *employers*. The Eleventh Circuit in <u>Ass'n for Disabled Americans, Inc.</u> found the opposite to be true with respect to claims of discrimination against disabled students in public schools, namely, that there *has* been a history of irrational discrimination against the disabled.

In sum, both the Eleventh Circuit and its sister circuits have found that Congress identified a long history of irrational and unconstitutional discrimination against disabled students in public education; these Courts have concluded that, in light of that history, Title II validly abrogates states' sovereign immunity with respect to claims of discrimination against disabled students at public universities; and, these holdings are rational, given the logical nexus between discrimination against disabled elementary and secondary school students, and discrimination against those same students once they enter postsecondary studies. This Court is bound by precedent, and GSU's sovereign immunity argument therefore fails.

Moreover, as a recipient of federal funding, GSU has waived its claim of sovereign immunity with respect to claims under Section 504 of the Rehabilitation Act ("Section 504"). Garrett, 344 F.3d at 1293. GSU argues that it has not waived its sovereign immunity with respect to R.W.'s claims, because it did not intentionally discrimination against him. (Dfts. Brief at 43-44). However, contrary to GSU's assertion, and as will be more fully demonstrated in the next section, intentional discrimination is not an element of liability under the ADA or the Rehabilitation Act for claims of discrimination in public services. Moreover, there is substantial evidence from which a trier of fact may determine that GSU did intentionally discriminate against R.W., as shall be demonstrated below. Therefore, for purposes of the instant Motion, this Court cannot grant GSU judgment as a matter of law on the question of its waiver of immunity for claims under the Rehabilitation Act.

**B.  The record firmly establishes that R.W. was the victim of discrimination on the basis of his disability, in violation of Title II and Section 504.**

1.  Intentional discrimination is not an element of liability for Title II and Section 504.

GSU is woefully confused regarding the elements of liability in an action for discrimination in public services. GSU starts its analysis by citing to a case of employment discrimination under Title I of the ADA. [Doc. 39-16 at 19], citing

Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000). GSU plainly misstates the holding of the case it cites, asserting that an ADA claim requires a showing of "intentional discrimination" as an element of liability. The Earl case cited by GSU simply does not say that. The Court in Earl defined the elements of an employment discrimination claim under the ADA as follows:

> To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) she is disabled; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability.

Earl, 207 F.3d at 1365.

Disturbingly, it appears that GSU has invented out of whole cloth the assertion that "intentional discrimination" is an element of liability, and then have based their entire argument around that false assertion. More to the point, the elements for a Title II claim (discrimination in public services), as opposed to a Title I claim (for employment discrimination), are: (1) that the plaintiff is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability. Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007). Claims under the Title II and Section 504 are "essentially identical" and

"interpretations of the ADA must be consistent with interpretations of the Rehabilitation Act." Everett v. Cobb Cnty. Sch. Dist., 138 F.3d 1407, 1409 (11th Cir. 1998). As set forth in detail in R.W.'s brief in support of his own motion for summary judgment [Doc. 41-2], each of these elements is indisputably established by the record.

Contrary to GSU's contention, the law is firmly established that *intention* to discriminate is *not* an element of liability for a claim under Title II or the Section 504. As the Seventh Circuit has noted, every circuit that has addressed the issue has reached this conclusion. Washington v. Indiana High Sch. Athletic Ass'n, Inc., 181 F.3d 840, 847 (7th Cir. 1999). This holding is rooted in Supreme Court precedent, to wit:

> We cannot accept the suggestion that liability under Title II of the Discrimination Act [sic] must be premised on an intent to discriminate on the basis of disability. [. . .] Although the Supreme Court has not held squarely that a plaintiff need not prove discriminatory intent, it has implied that requiring such proof would be contrary to the intent of Congress. See Alexander v. Choate, 469 U.S. 287, 295–97, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). In Choate, the Court indicated that there is strong support in the legislative history for the proposition that the Rehabilitation Act was not intended to prohibit solely intentional discrimination. "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." Id. at 296, 105 S.Ct. 712. The Court also noted that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent." Id. at 296–97, 105 S.Ct. 712.

Washington, 181 F.3d at 846-47.

The Eleventh Circuit has recognized that both Title II and Section 504 prohibit "disparate treatment" discrimination in addition to "intentional" discrimination. See Schwarz v. City of Treasure Island, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008) ("the equal protection clause prohibits only intentional discrimination [. . .] but at least the ADA and the [Rehabilitation Act] recognize disparate treatment and reasonable accommodation theories as well"). Moreover, the other circuits that have considered the issue have taken the view that a plaintiff need not prove wrongful intent under Section 504 and Title II. See Ability Ctr. of Greater Toledo v. City of Sandusky, 385 F.3d 901, 908 (6th Cir. 2004), quoting Olmstead v. L. C., 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999) ("Title II targets more than intentional discrimination [. . .] Congress advanced a more comprehensive view of the concept of discrimination in Title II than one limited to the traditionally recognized categories of intentional and disparate impact discrimination"); Crowder v. Kitagawa, 81 F.3d 1480, 1483–84 (9th Cir. 1996) (history of both Title II and Section 504 demonstrate "intent to cover both intentional discrimination and discrimination as a result of facially neutral laws"); Chaffin v. Kansas State Fair Bd., 348 F.3d 850, 858 (10th Cir. 2003), overruled on other grounds as recognized by Muscogee (Creek) Nation v. Pruitt, 669 F.3d 1159, 1167 n. 4 (10th Cir.2012) ("A look at the findings made by Congress in

enacting the ADA confirms the conclusion that Congress prohibited a broad, comprehensive concept of discrimination, beyond discrimination motivated by a hostile discriminatory purpose.")

Now, it *is* true that one must prove intentional discrimination in order to obtain *compensatory damages* under Title II and Section 504. But that is a question as to damages, and not as to liability or entitlement to declaratory and equitable relief. See Henrietta D. v. Bloomberg, 331 F.3d 261, 289 (2d Cir. 2003) (even though intentional discrimination must be shown to obtain compensatory damages, Title II and Section 504 permit plaintiffs to obtain injunctive and equitable relief for violations); Phipps v. Sheriff of Cook Cnty., 681 F. Supp. 2d 899, 917 (N.D. Ill. 2009) ("it is necessary to show intentional discrimination in order to recover compensatory damages (as opposed, say, to injunctive relief)"); Paulone v. City of Frederick, 787 F. Supp. 2d 360, 390 (D. Md. 2011) (summary judgment unavailable to defendant in spite of lack of plaintiff's damages in Title II case; Plaintiff may obtain nominal damages).

> 2. <u>The record contains substantial evidence from which the trier of fact may determine that R.W. *did* suffer *intentional* discrimination</u>
>
> a. *Standard for establishing "intentional discrimination."*

GSU contends that it is entitled to summary judgment on the question of whether it engaged in intentional discrimination by requiring R.W. to comply

with the requirements of its mandatory risk assessment process and by placing conditions on his housing and enrollment. Their overall argument is that Dean Rebecca Stout, in taking these actions, was acting on a good faith desire to protect campus safety.

First, it must be noted that *intentional* discrimination does not have to be *malicious* discrimination. If GSU intentionally discriminated against R.W., they may be liable, even if their intentions for doing so were good. The Supreme Court and the Eleventh Circuit have long-recognized that intentional discrimination is often not motivated by ill will. See Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536-37, 119 S. Ct. 2118, 2125, 144 L. Ed. 2d 494 (1999) ("There will be circumstances where intentional discrimination does not give rise to punitive damages liability[. . . .] There will be cases [. . .] in which the employer discriminates with the distinct belief that its discrimination is lawful.") And the Eleventh Circuit, in the context of Section 504, has held that "intentional discrimination" need *not* be motivated by "discriminatory animus, [which] requires a showing of "prejudice, spite, or ill will." Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 344 (11th Cir. 2012); see also Wood v. President & Trustees of Spring Hill Coll. in City of Mobile, 978 F.2d 1214, 1220 (11th Cir. 1992) (noting that "intentional discrimination" is a "lesser requirement" than "discriminatory animus.") "Intentional discrimination," in the Section 504

context, may be established by evidence showing "deliberate indifference"; or, that the decision-making official (in this case, Dean Stout)[3] "*knew* that harm to a federally protected right was substantially likely and ... *failed* to act on that likelihood." Liese, 701 F.3d at 344 (emphasis in original).  Because claims under Title II and Section 504 are to be analyzed under the same standards, the "deliberate indifference" standard should be applied to both causes of action. See Everett, 138 F.3d at 1409.

In Liese, a hospital's staff denied a deaf patient auxiliary aids during pre-surgical meetings, and the Eleventh Circuit held that the evidence was sufficient to survive a motion for summary judgment on the question of "deliberate indifference" discrimination. Id. at 351. There, the doctor (a) knew the patient was deaf and needed auxiliary aids; (b) had the authority to provide interpreters or other aids to the patient; and (c) consciously decided not to offer the patient those aids. Id. The Court concluded that the doctor's "knowledge that [the patient] required an additional interpretive aid to effectively communicate with him and his deliberate refusal to provide that aid satisfies the deliberate indifference standard." Id.

---

[3] It is uncontested that Dean Stout made the decisions with respect to R.W.'s mandated risk assessment and conditions placed upon his housing and/or enrollment, and that she was an official with decisionmaking authority on behalf of GSU in that regard. (See Dfts. Brief at 21)

Similar to Liese, there is substantial evidence in this case that Dean Stout acted with deliberate indifference when both (a) she ordered that R.W. complete a "mandated risk assessment" as a condition to housing and enrollment; and (b) she placed ongoing conditions on his housing and enrollment.

GSU might have a good argument if R.W. had threatened someone, or disrupted a class, or even written or said something evincing a desire to harm someone. Then, GSU could say that it was not his diagnosis of schizophrenia that motivated them; rather, it was his bad behavior, which would be subject to scrutiny without respect to any mental illness. But in this case, there was no bad behavior, and every document in the record points clearly to the fact that his diagnosis was the overriding, if not sole, motivating factor.

> b. *There is substantial evidence of deliberate indifference with respect to the decision to require R.W. to undergo a mandated risk assessment.*

> (i)     Stout's knowledge of R.W.'s disability

With respect to the decision to require R.W. to undergo a mandated risk assessment, there is substantial evidence that Stout knew that R.W. suffered from mental health impairments. According to the report generated by Dr. Jill Lee-Barber regarding R.W.'s "risk screening," Dean Stout referred R.W. for a risk screening due to "Cognitive Impairment." (Lee-Barber Dep. at 47; see also [Doc

41-17 (MRS Report) at 1][4]). The "referral form" that R.W. was required to sign at the outset of the process also stated that he was being referred for a "Mandated Clinical Risk Screening" due to "cognitive impairment." (Johnson Dep. at 21; [Doc. 41-14] (referral form)). The MRS Report has check-boxes to indicate a referral for "Harm to Self," "Harm to Others," "Alcohol & Drug," and "Behavioral Disruption," among other categories; however, none of those boxes was indicated for R.W. (Lee-Barber Dep. at 47). Dean Stout testified that, at the time she made the decision to require R.W. to undergo a "mandated risk assessment," she had no knowledge of any threatening behaviors from him, but she did believe that he experienced "daily hallucinations." (Stout Dep. at 53-55). Therefore, there is substantial evidence from which a trier of fact may determine that Dean Stout was aware that R.W. suffered from a cognitive disability at the time of ordering the mandated risk assessment.

<blockquote>
(ii)   Stout's authority to require R.W. to undergo the mandated risk assessment
</blockquote>

As to the second element, there is no dispute that Stout had the authority to require R.W. to undergo the mandated risk assessment, and that it was her decision to do so. (Dfts. Brief at 21).

---

[4] For ease of use, R.W. shall cite to the attachments originally included as exhibits to his Summary Judgment Motion [Doc. 41 et al.].

>            (iii)   Stout's conscious decision to require R.W. to
>                    undergo the mandated risk assessment on the basis
>                    of his impairment

With respect to the third element, there is substantial evidence that Stout, in requiring R.W. to undergo the "mandated risk assessment," did so on the basis of his cognitive impairment. The primary evidence of this is the aforementioned references on the "referral form," all of which indicate that the sole reason for R.W.'s referral for a mandated risk assessment was "cognitive impairment," with no indications of a risk of harm to self or others. Moreover, even while stating that she believed R.W. experienced hallucinations, Dean Stout admitted she possessed no objective evidence that R.W. posed a risk of harm to anyone by merit of those hallucinations. (See Stout Dep. at 54 ("Q. At that time you were not aware of any objective evidence that he had been told to do anything that was harmful to others, correct? A. No objective evidence of that, yes.")). At the time of referring R.W. for a mandated risk assessment, Dean Stout had no evidence that R.W. had committed a crime, created a campus disturbance, threatened anyone, engaged in drug and alcohol abuse, or any other such objectively concerning behavior. (Stout Dep. at 54-55).

It is also clear that Dean Stout based her decision not on any specific information that R.W. was a threat, but based upon unfounded fears of what he "might" do by merit of his mental illness. Stout admitted that "there wasn't any

threatening behavior," but she "thought there was a possibility that he might be told to do something threatening." (Id. at 52-53). She testified, "I did not know what he was being told and, therefore, I did not know how threatening it may be." (Id. at 53-54).

Moreover, R.W.'s expert witness, Dr. Bhushan Agharkar, notes in his expert report, based on his years of conducting risk assessments, and his training and experience as a forensic psychiatrist, "Dr. Jill Lee-Barber's risk assessment report summarizes that [R.W.'s] diagnosis, and his lack of actively treating the symptoms of said diagnosis, was the primary if not sole reason for including him in the mandatory risk assessment program." (Agharkar Report at 3). He concludes:

> As my review of the materials indicates that [R.W.'s] diagnosis of schizophrenia was a primary—if not the sole—reason for subjecting him to monitoring and restrictions on his housing and enrollment, such action was contrary to scientific research and risks stigmatizing [R.W.] and similarly-situated individuals with mental illness without respect to any threat they actually pose.

(Id. at 6)

Moreover, as noted by Mr. Ebbeling, who is a nationally-recognized expert in campus risk assessment:

> In order to implicate the policy in the first place, the university must determine that there are demonstrated behaviors that pose a risk of harm. In this case, there is almost no explanation of the demonstrated behaviors of Mr. that pose a significant risk of harm,

instead, the University seems focused on the previous diagnosis of [R.W.'s] medical condition.

In looking at Jill Lee Barber's file on this case, there is no evidence that the referral was based on risk of harm to self or others. In fact, it is clearly marked on the Certificate of Progress and Completion of Mandated Screening Evaluation for Health and Safety form dated February 27, 2013 that the referral was based on a "cognitive impairment." Furthermore, it is also listed under Other Referral Issues that "[R.W.] is at a significant level of risk of harm related to his cognitive impairment and his lack of compliance with recommended medical treatment." This cognitive impairment is specifically and clearly a condition that is protected under the ADA, which should have led to heightened scrutiny in considering university action related to this disability. Interestingly, it is unstated whether the risk of harm is related to self or others, and the continued use of the term "cognitive impairment" continues to suggest that the University is focusing on the protected medical condition, not on any type of specific behavioral risk. Throughout the Evaluation, there is almost no information describing the ways in which [R.W.] poses a risk. While the report notes him being agitated at pervasive questioning regarding his medical history, and his admission of seeing "animals and creatures," this is hardly enough information to draw a conclusion that he poses a risk to others.

(Ebbeling Report [Doc. 41-26] at 8).

GSU appears to argue that it was not discriminating against R.W. by subjecting him to the mandated risk assessment, but was merely "assessing" him to determine whether he posed a direct threat. (Dfts. Brief at 22-23). However, as the U.S. Department of Education's Office of Civil Rights ("OCR") has stated, requiring a student to disclose mental health records to be "assessed" as a condition of enrollment, absent behavior that violates campus codes of conduct,

constitutes discrimination on the basis of disability. (December 16, 2010 Letter to Spring Arbor University, Docket No. 15- 10-2098 (hereinafter referred to as *Spring Arbor*)) [Doc. 41-27] at *Spring Arbor* at 12. Moreover, federal courts throughout the United States have held that requiring mentally ill people to disclose private mental health information as a pre-condition to privileges such as professional licensure constitutes discrimination under Title II. See Clark v. Virginia Bd. of Bar Examiners, 880 F. Supp. 430, 442 (E.D. Va. 1995) ("Unlike other applicants, those with mental disabilities are required to subject themselves to further inquiry and scrutiny. The Court finds that this additional burden discriminates against those with mental disabilities."); Brewer v. Wisconsin Bd. of Bar Examiners, 04-C-0694, 2006 WL 3469598 (E.D. Wis. Nov. 28, 2006) ("requiring that she undergo a psychological evaluation at her own expense and submit the results to the Board amounts to a burden to which the vast majority of her classmates and other applicants were not subjected"); Ellen S. v. Florida Bd. of Bar Examiners, 859 F. Supp. 1489, 1493-94 (S.D. Fla. 1994) (Florida bar association's mental health questions "discriminate against Plaintiffs by subjecting them to additional burdens based on their disability"); Medical Society of New Jersey v. Jacobs, 1993 WL 413016, * 7 (D.N.J.1993) (mental health questions imposed extra burdens on qualified persons with disabilities in violation of ADA); In re Applications of Underwood and Plano, No. BAR–93–21,

1993 WL 649283 at * 2 (Me. Dec. 7, 1993) (requirement that applicants answer mental health questions discriminates on the basis of disability and imposes eligibility criteria that unnecessarily screen out individuals with disabilities).

At least one court has confronted, and dispensed with, the argument that requiring "assessments" of mentally ill persons, absent behavioral evidence of a risk of harm, is not discrimination.

> The ADA prohibits a public entity from discriminating on the basis of one's disability. "To discriminate means merely to make a distinction on the basis of the prohibited factor." *Stratton v. Handy Button Machine Co.,* 639 F.Supp. 425, 430 (N.D.Ill.1986). Even if the Board were ultimately to certify that Brewer was fit to practice law, requiring that she undergo a psychological evaluation at her own expense and submit the results to the Board amounts to a burden to which the vast majority of her classmates and other applicants were not subjected. If the reason the Board required Brewer to undergo such an evaluation was because she is disabled, then it discriminated against her by reason of her disability. [. . .]

> It would be a stronger argument if the Board required psychological evaluations of *every* applicant: in that case, the fact that Brewer may have been disabled would have been mere coincidence and the evaluation would not have been required due to her disability. But when the Board uses a limited set of factors (including potential mental illness) as triggers for requiring the additional examination, a fact-finder could conclude that the examination was required "on the basis of" the applicant's mental disability.

> Brewer v. Wisconsin Bd. of Bar Examiners, 04-C-0694, 2006 WL 3469598 (E.D. Wis. Nov. 28, 2006).

Therefore, GSU's assertion that it was not discriminating against R.W. in requiring him to undergo an onerous "assessment" process is not consistent with

the law. Perhaps if GSU required all its students to turn over medical records for assessment as a condition to enrollment, they would have a good argument. But singling R.W. out for an invasive, expansive investigation into his medical history, absent any behavioral evidence that his medical condition posed a risk of harm to others, is discriminatory on its face. By way of analogy, if GSU were to subject a Muslim student to additional background checks based on the basis that Muslims were "possible terrorists," no one would contend that this wasn't discrimination since, after all, their purpose is only to "assess" whether that student might pose a risk. Very plainly, in that example, as in this case, it would be unfair and discriminatory to subject the student to additional burdens and scrutiny based on some immutable, protected characteristic, and absent any non-biased, objective evidence that the student posed a risk of harm.

And the inquiry really can end here. Had there been no "mandated risk assessment," there would have been no combing through R.W.'s medical records, and no ongoing conditions placed on his housing and enrollment, as complained of in Counts III through V of the Complaint.

      *c.* *There is substantial evidence of deliberate indifference with respect to the decision to place ongoing conditions on R.W.'s housing and enrollment.*

    (i)    Stout's knowledge of R.W.'s impairment

In her final assessment of R.W., which Stout relied upon to place conditions of R.W.'s housing and enrollment, Dr. Lee-Barber posited the "risk" that R.W. posed not in terms of any behavioral issues, but strictly in terms of R.W's personal mental health, to wit:

> Due to his history of chronic mental illness his struggle with treatment compliance, and currently being out of treatment compliance, Mr. [R.W.] is assessed to be at significant ***risk related to his diagnosis of paranoid schizophrenia.***

([Doc. 41-17] at 000103 (emphasis added)).

The letter authored by Stout, informing R.W. of the conditions that would be placed upon him read, in part, "[. . . T]he Counseling and Testing Center recommended that you resume psychiatric medication consultation, individual counseling, and support classes offered by Georgia Regional Hospital or Grady Memorial Hospital to learn ***how to manage your chronic medical condition***." [Doc. 41-20]. All of the conditions placed upon him were directly related to his mental health, including the condition that he "promptly initiate psychiatric medication consultation and individual counseling services" and sign a medical release. (Id.). Therefore, there is substantial evidence that Dean Stout knew of R.W.'s cognitive impairments at the time she placed conditions upon his housing and/or his enrollment.

> (ii)   Stout's authority to place conditions upon R.W.'s housing and enrollment.

27

As to the second element, there is no dispute that Stout had the authority to place conditions on R.W.'s housing and enrollment. (Dfts. Brief at 21).

        (iii)   Stout's conscious decision to place conditions on R.W.'s housing and enrollment on the basis of his impairment

The primary evidence supporting the conclusion that Stout made the decision to place conditions on R.W.'s housing and enrollment following completion of the mandated risk assessment has been previously cited *supra*. That is, the formative documents on this issue—Dr. Lee-Barber's formal recommendation, and Stout's letter informing R.W. of the conditions—all focus almost exclusively on his mental health, and not on any issues related to behavior. ([Doc. 41-17] at 000103, [Doc. 41-20]). Notably, none of the conditions placed on R.W. related to any troublesome *behavior*, as he had not engaged in any conduct that would violate codes of conduct or that were threatening or disruptive or dangerous. In other words, this was not a *behavior contract*, it was very plainly a mandated regime of *mental health treatment*.

To the extent that GSU intends to rely on the 2001 psychological assessment by Jaymie Lockow Fox, Ph.D, this assessment does not establish, as a matter of law, that R.W. posed an objective threat of harm to campus safety or order. Dr. Fox's assessment was completed on October 25, 2011, when R.W. was 17 years old. ([Doc.41-18] at 1). Dr. Fox's 2011 report, while it indicated R.W.

experienced hallucinations, made no reference to him experiencing hallucinations in which someone told him to do something harmful to others. [Doc.41-17] at 000102. And, although Dr. Fox noted that R.W.'s sister reported R.W. having a "history of aggression . . . anger, and . . . temper tantrums" (Id.), Dr. Fox's report did not indicate that R.W. had ever threatened or harmed anyone. (Lee-Barber Dep. at 58-59). With respect to any reference to R.W. being "aggressive," Lee-Barber admitted that she "do[esn't] know what that means"; she has "no idea" what "aggression" refers to; and that Dr. Fox used a "broad term." (Id.).[5] With respect to statements in Dr. Fox's report that R.W. had thrown "tantrums" or "gone berserk" during childhood, Dr. Lee-Barber admits that "there are lots of possibilities for what that could mean," and she simply did not know what happened in that supposed incident and, absent any context, she had no basis to conclude whether it was anything beyond a normal emotional response. (Lee-Barber Dep. at 59, 64).

As Dr. Agharkar notes, there is nothing in Dr. Fox's report to indicate that R.W. posed a threat, because he had never harmed anyone, nor threatened to harm anyone, nor exhibited "aggressive" behavior on a regular or habitual basis, nor outside the context of stressful interactions with members of his family.

---

[5] R.W.'s sister denies reporting any such information, and denies that R.W. exhibited any aggressive behavior as a child. (F.R. Dep. at 16-17, 25, 28-29 [Doc. 41-19]).

(Agharkar Expert Report at 4). The fact that a person has an occasional instance of acting emotional or verbally aggressive in a family setting is not necessarily indicative of a tendency toward violence in general. (Id.).

In sum, there is significant evidence that, when placing conditions on R.W.'s housing and enrollment, Dean Stout consciously based that decision on R.W.'s mental health diagnosis, and not on any non-mental-health-related reason. Therefore, she acted with deliberate indifference toward R.W.'s federally protected rights in this regard, and the question of "intentional discrimination" is one for the finder of fact.

### d. Stout's assertion that she did not intend to place conditions on R.W.'s housing is strongly contradicted by the record.

GSU argues that Dr. Stout "never intended to impose any conditions on Plaintiff's enrollment." (Dfts. Brief at 24).

We must first address GSU's blatantly false assertion that *R.W.* only believed the conditions pertained to his housing, and not his enrollment. (Dfts. Brief 25). That is just a bald misstatement of the record. The cited-to testimony (R.W. Dep. at 78-79), simply does not say that in any form or fashion.[6] To the contrary, R.W. testified in numerous instances that he believed what he was

---

[6] Counsel GSU's blatant misrepresentation of the record borders on the sanctionable, particularly when it pertains to such a critical point as this.

being told—i.e., that he could be de-enrolled if he did not abide by GSU's conditions—and governed himself accordingly, to wit: "I had to worry about staying in school because they kept on telling me if I messed up or I didn't do one of those things, they could withdraw me out of class -- I mean out of school." (R.W. Dep. at 91).   R.W. also testified that Nicole Johnson of the Dean of Student's Office "rarely talked to me about housing actually."   (Id. at 77-79). Therefore, GSU's assertion that R.W. believed the conditions only related to his housing is patently false.

With respect to the contention that Stout did not intend to place conditions on R.W.'s enrollment, such contention may be rejected by the finder of fact based on substantial evidence, including the text of the March 15, 2013 letter Stout sent to R.W. stating, in part:

> [D]ue to the length of stay at Georgia Regional Hospital for inpatient stabilization, *it was recommended that you complete the application for Hardship Withdrawal for the Spring 2013 term*. [. . .]
>
> *In light of the results of your Risk Screening, your continued enrollment is conditioned upon compliance with the above-referenced treatment recommendations.* [. . .]

(Stout Dep. at 60-71; [Doc. 41-20]).

The notion that this letter—with so much specific detail about R.W.'s individual circumstances—was merely a "template" to which Stout did not pay sufficient attention, is truly incredulous. Moreover, on March 26, 2013, Nicole

Johnson sent R.W. an email, on which Stout was "courtesy copied," reminding R.W. that "your continued enrollment at the university is conditioned upon your participation in individual counseling, as well as psychiatric medication consultation with a provider in the community." (Stout Dep. at 71-72; [Doc. 41-21]). On April 5, 2013, Johnson sent to R.W. another email, on which Stout was copied, stating that R.W. would need to continue treatment with Dr. Patel or another medical provider "in order to remain enrolled." (Id. at 73-74; [Doc. 41-22). Stout admits that she reviewed and signed the March, 15, 2013, letter, and that she read the subsequent emails, but the alleged "error" regarding the conditions on enrollment "didn't stand out to [her]." (Id. at 72). Johnson, who was charged with enforcing the conditions placed upon R.W. by the Dean of Student's Office, testified that it was always her understanding that R.W.'s enrollment was conditioned upon his compliance with the requirements of the March 15, 2013, letter, and that she communicated such to R.W. in all her interactions with him. (Johnson Dep. at 28-29). Johnson maintained this belief until on or around August of 2013, when Stout prepared a letter informing R.W. that, so long as he did not return to on-campus housing, he did not have to continue certifying his medical treatment. (Id. at 29; see also Attachment 6).

So, while Stout is free to try and sell to the jury her claim that she did not intend to place conditions on R.W.'s enrollment, she is certainly not entitled to judgment as a matter of law on that question.

> e.  *GSU's "good faith" defense is contradicted by the record and, at most, creates a factual question as to intent.*

Despite this clear evidence, GSU insists that its actions toward R.W. were not based on his diagnosis, but upon Dr. Donaldson's, and Dr. Lee-Barber's, medical opinions that R.W. posed a risk of violence. (Dfts. Brief at 22-24). To address this argument, we have to acknowledge the difference between an *assertion* and *evidence*. Because there is no competent, objective evidence that R.W. posed a risk of violence, the mere assertion that he "might" pose a "possible" risk is insufficient to sustain GSU's burden to show an entitlement to summary judgment. GSU cannot escape liability simply by relying on the unfounded, stereotypical assumption that brought about this case in the first place—i.e., that a young man who had done nothing wrong whatsoever was a danger to campus by merit of his mental health impairment.

Again, the only alleged "disruptive" or "threatening" behavior cited by GSU has been R.W.'s leaving the meeting with Dr. Donaldson and declining to answer questions about his mental health, specifically whether he experienced

"command hallucinations." (See Lee-Barber Dep. at 48).[7] However, Dean Stout admitted that R.W. had not disrupted campus activities, caused a disturbance in housing, threatened anyone, written or said anything disturbing, violated any campus rule, abused drugs and alcohol, or otherwise engaged in any objectively disruptive or threatening behavior. (Stout Dep. at 54-55).

GSU's assertion of good faith must be viewed through the lens of Supreme Court precedent, which require that assessments of the "risk" posed by a disabled person must take into consideration an objective analysis of specific and demonstrated risks posed by the individual, and may not be based on broad generalizations about the illness. See School Board of Nassau County, Florida v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

While most cases interpreting the Arline "direct threat" test have been in the context of contagious disease, the Department of Education's Office of Civil Rights has adopted the "direct threat" test when analyzing whether a mentally ill student is entitled to protection under Section 504. In *Spring Arbor*, *supra*, for example, OCR stated: "Under Section 504, the 'direct threat' standard applies to situations where a university proposes to take adverse action against a student whose disability poses a significant risk to the health or safety of others." *In re*

---

[7] Notably, Dr. Donaldson never testified or reported that R.W. had indicated that "voices" were "directing him" to do anything. (See Donaldson Dep. at 23 ("I couldn't conclude that he was [having hallucinations]").

*Spring Arbor* [Doc. 41-27] at 9. OCR stated, a "significant risk" under this standard is "a high probability of substantial harm and not just a slightly increased, speculative, or remote risk." (Id.). In evaluating whether a student poses such a risk, a university must conduct an individualized assessment, based on "current medical knowledge" or "the best available objective evidence," to ascertain "the nature, duration and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will sufficiently mitigate the risk." (Id.). Moreover, "the student must not be subject to adverse action on the basis of unfounded fear, prejudice, and stereotypes." (Id.).

OCR's interpretation of the "direct threat" test in the context of student mental health is consistent with the Supreme Court's articulation of that test in Arline, 480 U.S. at 288. The Arline Court noted that the purpose of Section 504 was to "ensure that handicapped individuals are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others." Id. at 284. The Court further held that, by enacting Section 504, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." Id. Further, Section 504 was "carefully structured to replace such reflexive

reactions to actual or perceived handicaps with actions based on reasoned and medically sound judgments." Id.

Indeed, the Arline Court's recognition that "[f]ew aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness" is directly analogous to the instant case: there are few aspects of disability that give rise to public fear and misapprehension as a mental illness like schizophrenia. (See Expert Report of Dr. Bhushan Agharkar (Attachment 24) at 4 ("[D]espite this lack of objective evidence creating a correlation between mental illness and risks of violence, the public perception is that mentally ill persons pose a heightened risk of violence. This public perception—and the attendant stigmatization of mental illness—is further fueled by policies such as the one at issue in this case, in which a student is subjected to heightened scrutiny and treated as a threat based primarily on his diagnosis. In fact, mentally ill persons are at heightened risk to be the victims of violence, as opposed to the perpetrators of violence.")

In other contexts, Courts have noted that, where an employer insists that a mentally ill person was excluded not due to their illness, but due to some adverse impact the person's symptoms had on the employer, the concerns laid out by the Supreme Court in Arline must be heeded. In Verzeni v. Potter, 109 F. App'x 485, 488 (3d Cir. 2004), the Third Circuit held that, where an employer

cited "business necessity" to terminate a mentally ill employee for concerning behavior, in spite of any evidence that the employee posed a significant risk of harm to others, the employer could not escape liability simply by showing that its decision was "reasonable." In this context, the Court held, the employer's assertion of "business necessity" "cannot be based on unfounded fears or uninformed attitudes about the disability. Verzeni, 109 F. App'x at 491. Moreover, "[e]ven an employer's good faith actions will not save him if the employer is misinformed about the realities of the disability. In such a case, the jury should 'assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments.'" Id., quoting Bragdon v. Abbott, 524 U.S. 624, 650, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). Furthermore, "There is no good faith defense to discrimination, and such discrimination does not have to be overt or hostile to be actionable. This simplification can lead to the very discrimination Congress was trying to prevent with the ADA. The jury's perception of what is reasonable may be misinformed by archaic notions and its own misunderstanding of the disability." Verzeni, 109 F. App'x at 492.

    As set forth *supra* in detail, GSU possessed no objective evidence that R.W., in particular, posed a threat to campus safety or order, either when it required

him to undergo the mandated risk assessment process, nor when it placed conditions on his housing and/or enrollment.

Moreover, the only properly admitted expert testimony in this case establishes that R.W. exhibited no signs of danger, either prior to the decision to subject him to the mandated risk assessment, nor after the completion of that assessment. (Agharkar Dep. at 94-95).

While GSU proffers a declaration from Dr. Jill Lee-Barber purporting to establish evidence that R.W.'s schizophrenia presented a risk, her expert testimony on the subject is not properly admitted, and is contradicted by the record. Federal Rule of Evidence 702 defines and governs the admission of expert testimony. Dr. Lee-Barber's Declaration attempts to offer opinion, purportedly based upon her reading of "scientific literature," as well as her "Ph.D. in counseling psychology." (Lee-Barber Dec. at paragraphs 3-4).  Her testimony clearly goes beyond that of a lay witness as defined by Fed. R. Evid. 701, as her declaration is clearly "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701(c).  Namely, she cites what appears to be scholarly literature (though the actual source is never clearly identified) for the proposition that schizophrenic person who experience command hallucinations is at a higher risk to engage in violence than others. (Id. at 6-8).

As GSU notes in its own brief, its' own brief, expert testimony is necessary to when medical issues are at the heart of a case.  (Dfts. Brief at 46-48) *citing, inter alia,* Wingster v. Head, 318 F. App'x 809, 815 (11th Cir. 2009)("medical causation issue presents a technical and scientific issue that requires the specialized knowledge of an expert medical witness."); Estate of Gilliam v. City of Prattville, 667 F.Supp.2d 1276, 1299 (M.D. Ala. 2009) ("Medical causation is a technical and scientific issue that requires the specialized knowledge of an expert medical witness."). Yet, Dr. Lee-Barber has never been properly tendered as an expert witness. Federal Rule of Civil Procedure 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witnesses it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed.R.Civ.P. 26(a)(2)(A). This disclosure *must* include "a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed.R.Civ.P. 26(a)(2)(B)(emphasis supplied). GSU has done none of these things with respect to Dr. Lee-Barber. "Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, ... compliance with the requirements of Rule 26 is not merely aspirational." Cooper v. Southern Co., 390 F.3d 695, 728 (11th Cir.2004) (internal citation omitted), *overruled on other*

*grounds,* <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454, 126 S.Ct. 1195, 163 L.Ed.2d 1053 (2006).

Quite plainly, Dr. Lee-Barber has not been properly tendered as an expert witness, and the medical and scientific opinions are not properly before the court. In contrast, R.W. identified his experts to GSU during discovery, produced an expert report, and allowed GSU's attorney to depose those experts. In sum, R.W. has presented competent, procedurally appropriate expert testimony establishing the key medical facts in this case; whereas GSU has not.

Dr. Agharkar's properly admitted testimony establishes that, while a schizophrenic person may have delusions that he is being persecuted or followed, there is no statistical evidence that such delusions increase that individual's risk of violence. (Agharkar Dep. at 63). While medication is generally recommended to manage the symptoms of schizophrenia, some with the illness do not use medication due to its high cost and negative side effects. (<u>Id.</u> at 77-79, 83). Certain types of schizophrenia can actually lower an individual's risk of violence relative to the general population. (<u>Id.</u> at 83-84). Individuals who experience "command hallucinations," in which they have an auditory illusion telling them to do something, are not necessarily at higher risk of violence, because individuals are less likely to act upon commands that are dangerous. (<u>Id.</u> at 89-90).

Moreover, every one of the cases cited by GSU in support of their "good faith" argument is in the context of prison conditions and the Eighth Amendment prohibition against "cruel and unusual punishment." The question in these cases is whether, in a very different context, prison officials were "deliberately indifferent" in responding to some medical or safety need of a prison. While each case is inapposite, at least two of them actual help R.W.'s case.

Waldrop v. Evans, 871 F.2d 1030, 1033 (11th Cir. 1989), cited by GSU for the proposition that "a difference in professional opinion does not amount to deliberate indifference" actually holds that a medical professional's "good faith" judgment that a medical condition is not dangerous does not absolve him of liability if his opinion is contrary to the objective indications. Holding that "subjective good faith does not create qualified immunity in these circumstances," the court held that there was a question of fact as to whether the doctor-defendant was deliberately indifferent to the objective evidence that an inmate posed a danger to his cellmates. Waldrop, 871 F.2d at 1036. Similarly, in Nair v. Sikes, CIVA4:95-CV-0147-HLM, 1996 WL 882580 (N.D. Ga. Dec. 4, 1996), also cited by GSU, the district court **denied** prison officials' motion to dismiss a prisoner's claim that the officials had failed to provide him with needed medications. The court there rejected the prison officials' argument that they had "relied on the decisions of prison medical officials that Plaintiff could be trusted

to properly maintain his supply of medication." <u>Id.</u> The court ruled that, because prison officials had actual notice that the prisoner was suffering and needed the medicine for several days, their supposed reliance on medical advice would not absolve them of liability. Similarly, Dr. Lee-Barber's and Dr. Stout's "subjective good faith" belief that R.W. posed a danger does not absolve them of liability, where there are strong factual questions as to whether the objective evidence in fact showed that he did ***not*** pose a threat, and where their opinions were formed by the sort of stereotypes about mental illness that Title II and Section 504 prohibit.

The other cases, <u>Torres v. Gardner</u>, 5:05-CV-285(DF), 2006 WL 3095660 (M.D. Ga. Oct. 27, 2006), <u>Royal v. Bassett</u>, CIV.A. 7:08-CV-00222, 2008 WL 5169443 (W.D. Va. Dec. 9, 2008), and <u>Lee v. Young</u>, 533 F.3d 505, 511 (7th Cir. 2008) are totally inapposite, as they all involve whether a prisoner was subject to "cruel and unusual punishment" by not providing a prisoner with his preferred medical treatments. In each case, the courts held there was no deliberate indifference to the prisoner's medical needs, where the prison made medical decisions based on competent medical advice, and the prisoner could present no evidence that the decision were objectively unreasonable. Notwithstanding the fact that the Eight Amendment context is totally different than the instant case, is

the fact that here, all evidence indicates that GSU acted against what was objectively reasonable. Therefore, these cases are not helpful to GSU.

## C. **Regulatory Claims**

Defendant next argues that Plaintiff cannot prove a violation of the administrative regulations outlined in counts four and five of his Complaint. Plaintiff clarifies that he is not attempting to set out separate causes of action under 45 C.F.R. § 84.4(b)(4)(i) and (ii); however, Plaintiff certainly contends that those regulations define the scope of conduct prohibited by Section 504, and provide examples of GSU's violations.

45 C.F.R. § 84.4(b)(4)(i) and (ii) provide, in pertinent part:

> A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons . . . .

In support of their contention that R.W. cannot prove a violation of 45 C.F.R. § 84.4(b)(4)(i), Defendant states, in a wholly conclusory fashion that "the risk screening process is not targeted at persons with disabilities." (Def. Brief at p. 28). This assertion is simply not supported by the record, as demonstrated by the aforementioned record evidence and the reports of the experts. Dr. Agharkar

concluded that Plaintiff was clearly referred for a risk assessment based on his "diagnosis alone."  To wit,

> GSU's risk assessment policies, as applied to the individual case of Richard Washington, **pose a substantial risk of subjecting students with mental health diagnoses to unequal treatment relative to their non-disabled colleagues**, without achieving a countervailing interest in campus safety. Specifically, the policies, if applied in the manner that they were applied to Mr. Washington's case, would cause a student with a diagnosis of schizophrenia to be subjected to housing and enrollment restrictions even in the absence of objective evidence that the student poses a risk to the safety of others.

(Agharkar Report at 3).

Plaintiff's expert, Jason Ebbeling, agreed, stating that while GSU did look to medical data in the instant case, again, their focus was clearly on the diagnosis of schizophrenia itself, and not on any specific behaviors by Plaintiff or the extent to which those behaviors affected campus safety.  [Doc. 41-26] at 11.  Mr. Ebbeling then concluded,

> As a Vice President for Student Affairs, I am regularly faced with difficult decisions of how to manage student concerns and at-risk students.  I have made the decision to remove students who pose a substantial risk to the campus, and I don't take these decisions lightly.  However, in this case, there simply was not sufficient observable behaviors that would justify the removal of Mr. Washington from student housing, nor his participation in continuous mandatory monitoring.  I am quite sure that there are many students with schizophrenic diagnoses on other campuses, many who choose not to take medicine, some who are not appropriately medicated, and some who manage their medication consistent with doctor recommendations.  Our responsibility is to focus specifically on identifiable behaviors, and take action when

there is a high probability of substantial harm, not to simply exclude students based on their diagnosis or the ways in which they are managing their condition.

Id. at 12.

Similarly, Defendant's argument that their actions did not violate the requirements of 45 C.F.R. § 84.4(b)(4)(ii) because "[p]laintiff was unaware of the [mandatory risk assessment] process until he became a part of it," is ludicrous. Plaintiff is now very aware of GSU's mandatory risk screening process. To borrow Defendant's own language, it is "difficult to fathom" how Defendant could argue that given Plaintiff's experience, he (and any similarly situated student) would not be "discouraged" from seeking mental health services at GSU. The record is replete with evidence of Plaintiff's displeasure with the GSU's risk screening process, GSU's CTC, and the way he was treated by GSU personnel throughout the process. In fact, Plaintiff began expressing his displeasure with the process almost immediately upon coming into contact with GSU CTC personnel. Dr. Donaldson, who conducted the initial mental health status exam, confirmed that Plaintiff indicated he did not want to be there, and "became less responsive over time during [their] meeting," and [Richard] did finally leave the meeting. (Donaldson Dep. at 24-25, 28-29).

Moreover, documentation from Grady Hospital indicates that Plaintiff's stated reason for leaving the meeting with Donaldson was "because he did not

feel comfortable speaking about his mental health" with Donaldson.  [Doc. 41-13] Finally, Plaintiff became "very upset" following a meeting with GSU officials, including Jill Lee-Barber, in which they discussed the risk assessment process on March 4, 2013.  (F.R. Dep. at 44; Johnson Dep. at 25).  Accordingly, the record evidence makes it abundantly clear that due to the effects of the risk screening process, Plaintiff is discouraged from seeking mental health services at GSU.

### D. <u>Plaintiff is entitled to equitable relief as a matter of law</u>

GSU contends that "Plaintiff is not entitled to any relief," neither in the form of monetary damages or equitable relief. Because Plaintiff is in fact entitled to equitable relief, as a matter of law, Plaintiff will address that argument first.

> 1. *Absent an injunction, R.W. will continue to suffer an actual, irreparable injury*

GSU argues that this first element for an injunction has not been met because R.W. cannot show discrimination. However, as set forth in detail in this brief and in Plaintiff's brief in support of his own motion for summary judgment, the record indisputably shows that Plaintiff suffered discrimination on the basis of his disability. The Eleventh Circuit has held that "irreparable injury may be presumed from the fact of discrimination." <u>Gresham v. Windrush Partners, Ltd.</u>, 730 F.2d 1417, 1423 (11th Cir. 1984) "Where ... an injunction is authorized by statute and the statutory conditions are satisfied ... the usual prerequisite of

irreparable injury need not be established and the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury before obtaining an injunction." Id.; see also Doe, 906 F. Supp. at 1545. ("Discrimination on the basis of disability is the type of harm that warrants injunctive relief"). Title II and Section 504 explicitly authorize injunctive relief to remedy violations. 42 U.S.C. § 12133; 29 U.S.C. § 794.

R.W.'s injury is, in fact, ongoing and irreparable. R.W. may not return to student housing without first resubmitting to the onerous, intrusive requirements of GSU's mandated risk assessment process. He has testified that he wants to return to housing and would do so absent the mandated risk assessment. (R.W. Dep. at 96). His collegiate studies will conclude upon his graduation and, once he graduates, he cannot get back what he has lost in terms of being unable to enjoy on-campus housing on an even playing field relative to his non-disabled counterparts. Only an immediate injunction can prevent him from losing any further time as an equal.

Though GSU argues that R.W. has not suffered ongoing injury because he remains enrolled at GSU, that fact does not negate the discrimination he lives under. The Eleventh Circuit rejected a similar argument in the context of wheelchair-bound plaintiffs' claims that courthouse facilities made it more

difficult for them to attend proceedings, relative to their non-disabled counterparts, to wit:

> The County contends that because both Shotz and Tacl were able to attend the trial, they have not alleged a violation of Title II. A violation of Title II, however, ***does not occur only when a disabled person is completely prevented from*** enjoying a service, program, or activity. The regulations specifically require that services, programs, and activities be "readily accessible." 28 C.F.R. § 35.150. If the Courthouse's wheelchair ramps are so steep that they impede a disabled person or if its bathrooms are unfit for the use of a disabled person, then it cannot be said that the trial is "readily accessible," ***regardless whether the disabled person manages in some fashion to attend the trial.***

Shotz v. Cates, 256 F.3d 1077, 1080 (11th Cir. 2001) (emphasis added)

> 2. *The remedies available at law will not adequately compensate for the injury*

GSU argues that equitable relief is not necessary here because R.W. is seeking monetary damages, which is generally considered an "adequate legal remedy." (Dfts. Brief at 50). This argument is hard to swallow, given that the previous section of GSU's brief is dedicated to the argument that R.W. is barred from receiving any monetary damages. (See Dfts. Brief at 44-48). GSU cannot have it both ways.

In any case, there is no hard dollar amount that can compensate R.W. for the loss of his right to attend school and live in student housing without the onerous and burdensome requirements that GSU may place upon him as part of

its "mandated risk assessment" process. Notably, the Eleventh Circuit has held that one's lack of equal access to housing, which is a primary injury suffered by RW, is an injury that warrants injunctive relief because monetary damages are not an adequate replacement for the basic security of equal housing rights. Rogers v. Windmill Pointe Vill. Club Ass'n, Inc., 967 F.2d 525, 528-29 (11th Cir. 1992).

Indeed, what R.W. has lost, and what he continues to lose to this day—the right to live in peace, undisturbed, to maintain his privacy, the right to opportunities equal to those of his non-disabled counterparts—are inherently difficult to quantify monetarily.

> 3.     *Considering the balance of the hardships between the parties, an equitable remedy is warranted, and the public interest will not be disserved by the injunction*

GSU's argument as to the third and fourth elements for injunctive relief are merely a continuation of the baseless, stereotypical assumptions that have driven its actions throughout the events giving rise to this case. GSU asserts that Plaintiff's requested "order that he be allowed to live in campus housing without providing any medical documentation that he is psychologically stable . . . could put the persons around whom he resides at risk." (Dfts. Brief at 51). Again, what evidence can GSU cite for its assertion that RW's psychological state places others at risk? He had never demonstrated behavioral problems, never

threatened anyone, never disrupted classes of housing activities, or anything of that nature. The only properly admitted expert testimony in this case indicates that there is *no* objective evidence in R.W.'s file indicating a risk of harm to others. Therefore, the raw assertion that R.W. will place others at risk if not controlled and monitored is inadequate to deny him the right to equal treatment.

Moreover, as the U.S. District Court for the Southern District of Florida recently held:

> Through the FHA and ADA, Congress has declared that it is in the public interest to allow individuals with disabilities to live on an equal footing with the non-disabled. Therefore, it is not against the public interest to enjoin discrimination against individuals with disabilities or those who provide housing and treatment services on their behalf.

Caron Found. of Florida, Inc. v. City of Delray Beach, 879 F. Supp. 2d 1353, 1374 (S.D. Fla. 2012), appeal dismissed (Aug. 16, 2012)

With respect whether the public interest would be disservice, as the Supreme Court has noted, the ADA represents a "comprehensive national mandate for the elimination of discrimination . . . and "Congress is the final authority as to desirable public policy." Bd. of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 374, 121 S. Ct. 955, 967, 148 L. Ed. 2d 866 (2001). Moreover, "Discrimination against disabled students in education affects disabled persons' future ability to exercise and participate in the most basic rights and responsibilities of citizenship, such as voting and participation in public

programs and services." <u>Ass'n for Disabled Americans, Inc.</u>, 405 F.3d at 959. Therefore, there can be no doubt that the public interest will be furthered, and not harmed, by an injunction that prohibits discrimination against mentally ill students based on stereotypical and baseless assumptions about their illness.

    E.  **Issues of fact exist as to Plaintiff's entitlement to compensatory damages**

As more fully set forth above, there exists significant evidence in the record from which a trier of fact could determine that R.W. did, in fact, suffer "deliberate indifference" discrimination and is therefore entitled to recover compensatory damages.[8]

### 1. *Refund of tuition and fees*

GSU argues that R.W. cannot recover a refund of tuition and fees for the time that he was being required by GSU to undergo the mandated risk assessment. They argue that he "received the educational and housing services for which he paid." (Dfts. Brief at 45). However, as a result of these events, R.W. was "sad," "depressed," and "stressed out," throughout the Spring 2013 semester. (R.W. Dep. at 92-93). He was unable to focus on his studies, ended up failing several classes, and had to retake them the following summer, when he passed. (<u>Id.</u>). However, he lost his eligibility for a HOPE scholarship. (R.W. Dep.

---

[8] R.W. concedes that he cannot recover for the increased cost of off-campus housing, given his testimony that off-campus housing is cheaper than on-campus housing.

at 43). As previously set forth above, the mere fact that he has been able to attend school, and has avoided homelessness, does not mitigate his injury. The question is whether he was able to enjoy these things on an equal footing with his non-disabled counterparts. See Shotz, 256 F.3d at 1080.

Moreover, at least one court has recognized a cognizable injury where, as here, discrimination against a disabled student prevented her from fully participating in a class and therefore hampered her academic progress. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005) (denial of accommodation "excluded her from meaningful participation in Professor Lund's course or denied her the benefits of that course, or at least discriminated against her with respect to that course.") Therefore, R.W.'s entitlement to this category of damages is a question of fact.

### 2.   R.W. is entitled to recover damages for emotional distress

GSU argues that R.W. cannot recover for emotional distress because (a) he has not presented an expert witness as to the extent of such damages, and (b) he has previous-existing issues with depression. To be clear, a plaintiff may recover non-economic emotional distress damages for discrimination under the Rehabilitation Act. Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1199.

With respect to the first argument, R.W. does not seek to recover for any specific emotional or psychological condition that has been caused by GSU's

actions in this regard. Rather, he seeks to recover for "garden variety" emotional distress, i.e., the natural distress that emerges from suffering some unlawful hardship. Such distress does not require expert testimony. Bogle v. McClure, 332 F.3d 1347, 1359 (11th Cir. 2003); See also In re Jolly Roger Cruises & Tours, S.A., 10-23257-CIV, 2011 WL 1467172 (S.D. Fla. Apr. 18, 2011) ("Starkey's claims remain one of garden variety emotional distress, that is certainly susceptible of careful consideration by a jury without resort to experts").

With respect to GSU's argument that R.W. had pre-existing depression, this again demonstrates the stereotypical attitude that GSU continues to take toward R.W. They are essentially arguing that, because R.W. has historically struggled with mental illness, there was no cognizable harm done to him by the difficulties GSU's actions placed upon him. Again, GSU cannot dispute R.W.'s testimony that he experienced a unique degree of sadness, frustration, and stress due to GSU's adverse treatment of him. This includes a meeting in which, on his birthday, he was called into the Dean of Student's Office and told he needed to withdraw from school and check into a mental hospital, causing him to become tearful and distraught. (See Johnson Dep. at 25). He is entitled to recover for this distress. See Sheely, 505 F.3d at 1199 ("emotional distress is a predictable, and thus foreseeable, consequence of discrimination").

## F.  In addition, Plaintiff may recover nominal damages

GSU argues that R.W. is not entitled to nominal damages for these claims, because his claims are "statutory, not constitutional." (Dfts. Brief at 44). However, the case that GSU cites for that proposition is totally distinct, and in no way holds that R.W. is prohibited from recovering nominal damages here. In Walker v. Anderson Elec. Connectors, 944 F.2d 841, 845 (11th Cir. 1991), the Eleventh Circuit merely held that nominal damages were not *mandated* where the Plaintiff had not requested nominal damages in the jury charges. Id. Indeed, as the U.S. District Court for the Southern District of Florida has found, in a similar case of disability discrimination under the Fair Housing Act, "While the Eleventh Circuit [in Walker] has stated that merely a violation of a purely statutory right does not mandate an award of nominal damages for such statutory violation, it has not precluded such an award where the district court finds it appropriate." Jeffrey O. v. City of Boca Raton, 511 F. Supp. 2d 1339, 1361 (S.D. Fla. 2007). In Jeffrey O., case, the district court awarded nominal damages because, even though the disabled plaintiff had showed no actual injury, such an award was necessary "to not take away the importance of such violation." Id.

In the instant case, R.W. has explicitly requested nominal damages. (See Complaint [Doc. 1] at 24, subpart (d)). Therefore, Walker is inapposite.

Furthermore, Courts have held that nominal damages are appropriate to remedy violations of the ADA even where there are no actual damages. See Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 239 (5th Cir. 2001) (while finding that Plaintiff suffered no actual damages due to disability-based harassment, ordering district court to enter award of nominal damages for said violations); see also Tolbert v. Queens Coll., 242 F.3d 58, 74 (2d Cir. 2001) ("a plaintiff who has proven a civil rights violation [under Title VI], but has not proven actual compensable injury, is entitled as a matter of law to an award of nominal damages."); Paulone v. City of Frederick, 787 F. Supp. 2d 360, 390 (D. Md. 2011) (Plaintiff may obtain nominal damages under Title II).

## IV.   **Conclusion**

WHEREFORE, Plaintiff prays that this Court DENY Defendant's Motion for Summary Judgment.

Respectfully submitted, this April 17, 2014.

/s/ James Radford
James Radford
Georgia Bar No. 108007

James Radford, LLC
545 N. McDonough St., Suite 212
Decatur, Georgia 30030
(678) 369-3609
james@jamesradford.com

*Counsel for Plaintiff*

55

## LOCAL RULE 7.1D CERTIFICATION

By signature below, counsel certifies that the foregoing document was prepared in Book Antiqua, 13-point font in compliance with Local Rule 5.1B.

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this day, April 17, 2014, I filed the foregoing *Brief in Opposition to Defendant's Motion for Summary Judgment* with the Court's CM/ECF electronic filing system, which should generate notice to counsel of record.

Respectfully submitted, this April 17, 2014.

/s/ James Radford
James Radford
Georgia Bar No. 108007