IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| R.W., | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:13-CV-2115-LMM |
| BOARD OF REGENTS OF THE | : | |
| UNIVERSITY SYSTEM OF GEORGIA, | : | |
| Defendant. | : | |

## ORDER

This is a disability discrimination action under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 *et seq.* This matter is before the Court on Plaintiff's Motion to Strike the Declaration of Dr. Jill Lee-Barber [55], Defendant's Motion to Exclude Report and Testimony of Dr. Bhushan Agharkar [52], Defendant's Motion to Exclude Report and Testimony of Jason Ebbeling [51], Defendant's Motion for Summary Judgment [39], and Plaintiff's Motion for Summary Judgment [41]. The Court held a hearing on the above-mentioned motions on February 5, 2015. For the reasons stated below, and with the benefit of oral argument, Plaintiff's Motion to Strike [55] is **DENIED**, Defendant's Motions to Exclude [51, 52] are **DENIED**, Plaintiff's Motion for Summary

Judgment [41] is **DENIED**, and Defendant's Motion for Summary Judgment [39] is **DENIED**.

## I.    Background

Plaintiff enrolled as a student at Georgia State University ("GSU") in the spring 2013 semester and was accepted to live in student housing. Dkt. No. [54-1] at 1; Dkt. No. [49] at 3. Defendant Board of Regents governs, controls, and manages the University System of Georgia, which includes GSU. Dkt. No. [49] at 1-2.

Plaintiff visited GSU's student health center on February 14, 2013, seeking medical testing. Dkt. No. [54-1] at 17. At the health center, Plaintiff met with Nurse Practitioner John Gentry. Id. In providing his medical history, Plaintiff disclosed to Mr. Gentry that he had been diagnosed with schizophrenia. Dkt. No. [49] at 5. Mr. Gentry contacted Dr. Donaldson, a staff psychologist at GSU's Counseling and Testing Center ("CTC"), informing him that Plaintiff was exhibiting unusual behavior in his ability to communicate. Dkt. No. [54-1] at 17-18; Dkt. No. [49] at 7. Plaintiff alleges that Mr. Gentry told him it was mandatory that Plaintiff go with him to the CTC, though Defendant contends that Mr. Gentry asked Plaintiff if he would like to go to the CTC and assisted Plaintiff in locating it. Dkt. No. [54-1] at 18.

At the CTC, Plaintiff provided information on a computer and then met with Dr. Donaldson. Dkt. No. [54-1] at 18. Dr. Donaldson initiated a clinical interview, which "segued pretty quickly into a mental status examination." Dkt.

No. [49] at 8. Dr. Donaldson questioned Plaintiff about his history of symptoms and his current symptoms, including any history of hallucinations. Id. Plaintiff disclosed that he sometimes experienced visual and auditory hallucinations and had experienced them within the last two days. Id.

Defendant alleges that during the meeting with Dr. Donaldson, Plaintiff engaged in a number of behaviors that suggested he might be experiencing a hallucination at that time, including looking into corners and checking around, having difficulty maintaining focus and eye contact, and having an unusual time and cadence to his speech. Dkt. No. [54-1] at 18; Dkt. No. [49] at 9. In Dr. Donaldson's opinion, Plaintiff seemed to be responding to "internal stimuli," which means a person is experiencing something that doesn't objectively exist. Dkt. No. [54-1] at 19. Plaintiff disputes he was having a hallucination at that time, and says his behavior was "agitated" because Dr. Donaldson was asking him questions he did not want to answer. Id. at 18-19; Dkt. No. [49] at 9.

During the meeting, Plaintiff asked Dr. Donaldson if he was required to be there and Dr. Donaldson said that he was not, so Plaintiff left the CTC. Dkt. No. [54-1] at 21. Defendant admits this, but adds that Plaintiff left at the moment when Dr. Donaldson asked him if he had experienced "command hallucinations." Id. at 21-22; Dkt. No. [49] at 10. Plaintiff testified that he did not remember being questioned about any hallucinations and left the meeting not because of any one question, but because Dr. Donaldson was asking him questions he did not want to answer. Dkt. No. [54-1] at 22.

3

After Plaintiff left, Dr. Donaldson consulted with Dr. Mikyta Daugherty, a licensed psychologist and Coordinator of Clinical Services at the CTC. Id. at 25. Dr. Donaldson and Dr. Daugherty agreed they should institute a safety check to make sure Plaintiff was not in danger, and they contacted the Office of the Dean of Students to make the request. Id. Dr. Donaldson signed "10-13" documentation authorizing the transportation of Plaintiff to Grady Hospital for a mental evaluation. Id.; Dkt. No. [49] at 13. Defendant alleges that Dr. Donaldson would have had the same level of concern about Plaintiff and his exit from the meeting even if he had not reported a history of schizophrenia with symptoms of hallucinations. Dkt. No. [54-1] at 25. Plaintiff disputes this assertion, claiming the objective evidence indicated that Plaintiff did not pose any risk and questions whether Dr. Donaldson's "concern" existed or was genuine. Id. at 26. Defendant contends that the psychologists at GSU's CTC regularly see students who have been diagnosed with schizophrenia and typically do not refer them for mandated risk screenings on that basis alone, a fact which Plaintiff disputes. Id. at 64-65.

Following receipt of Dr. Donaldson's "10-13" documentation, Nicole Johnson, Senior Coordinator of Student Assistance and Victim Assistance in the Office of the Dean of Students, contacted Plaintiff on his cell phone and asked him to come to the Dean of Students' Office. Id. at 2; Dkt. No. [49] at 13. Plaintiff agreed, and when he arrived two GSU police officers were waiting there for him. Dkt. No. [49] at 13-14. Ms. Johnson asked Plaintiff to complete a release of information form to allow Grady Memorial Hospital to communicate with GSU

about his medical care, and Plaintiff complied. Id. at 14. Plaintiff was then transported by patrol car to Grady, and was described by police as "calm and cooperative." Id. Plaintiff was at Grady for several hours and met with a physician there. Id. at 15. The physician determined that Plaintiff did not meet the "10-13 criteria" and released him. Id. Defendant notes that Plaintiff did not meet with a psychiatrist, psychologist, or any other mental health provider while at Grady. Id.

The following day, February 15, 2013, Dr. Rebecca Stout, Associate Vice President for Student Affairs and Dean of Students at GSU, referred Plaintiff for a mandatory risk screening. Dkt. No. [54-1] at 26. As Dean of Students, Dr. Stout is the primary and ultimate decision maker concerning the mandated risk screening process and the associated policies. Id. at 11. Dr. Stout made the decision to require that Plaintiff participate in the mandated risk screening process, indicating on the referral form that the reason for the screening was "cognitive impairment," not "harm to others." Id. at 14, 26. The referral form indicated examples of cognitive impairment include "nonresponsive, incoherent, loose associations, highly distractible." Dkt. No. [49] at 20. Defendant explains that cognitive impairment was indicated because "the cognitive break Plaintiff experienced while meeting with Dr. Donaldson had made Dr. Stout concerned that Plaintiff posed a potential risk of harm to others." Dkt. No. [54-1] at 27.

Defendant admits that Plaintiff has never been disciplined for any sort of threatening or disruptive behavior in classes or in student housing, has never written or said anything suggesting violence or a desire to harm someone, has

never been involved in any altercations, and has never been arrested or charged with a crime. Dkt. No. [49] at 3-4.

Plaintiff met with Ms. Johnson on February 15, 2013, and, per Dr. Stout's instruction, she informed him that he would be required to participate in the risk screening and would not be allowed to remain in student housing while the risk screening was being completed. Id. at 19; Dkt. No. [54-1] at 28-29. After the meeting with Ms. Johnson, Plaintiff met with Dr. Jill Lee-Barber, director of psychological and health services at GSU. Id. at 2; Dkt. No. [49] at 22. Plaintiff informed Dr. Lee-Barber that he had been diagnosed with schizophrenia at eight years old, was not in therapy or seeing a doctor, and had discontinued his medication approximately six months prior. Dkt. No. [54-1] at 29.

Dr. Lee-Barber also reviewed records from Plaintiff's prior mental healthcare providers, which Plaintiff was required to disclose. Id. at 30; Dkt. No. [49] at 23. Those records included notes and reports from Drs. Patel and Fox, who Plaintiff had previously seen regarding his schizophrenia. Dkt. No. [54-1] at 31. Both doctors indicated that Plaintiff had reported auditory and visual hallucinations in August 2011 and February 2012. Id. Dr. Fox's assessment, which was completed in October 2011 while Plaintiff was 17 years old, included notes from Plaintiff's sister indicating that Plaintiff had "a history of aggression, depression, anxiety, anger, language delays, poor social skills, temper tantrums, and sexual abuse." Id. at 32; Dkt. No. [49] at 26. However, Plaintiff and his sister claim Dr. Fox's report was not consistent with what they told him. Dkt. No. [54-1]

at 32. Dr. Fox's report also indicated that Plaintiff reported hitting a dog for no reason, but Plaintiff testified that he hit his dog because she bit him. Id. at 36-37.

After meeting with Plaintiff and reviewing his medical records, Dr. Lee-Barber prepared an evaluation, concluding he was "at significant risk related to his diagnosis of paranoid schizophrenia." Dkt. No. [41-17] at 4. The report prepared by Dr. Lee-Barber identifies "cognitive impairment" as the reason for Plaintiff's referral for risk assessment. Dkt. No. [49] at 23. The report form has check boxes for "harm to self," "harm to others," "alcohol and drug," and "behavioral disruption," all of which were left unchecked. Id. The form also has a section where the Dean of Students or CTC can indicate that the student is a possible risk of suicide and/or violence, but that section did not indicate that Plaintiff posed such a risk. Id. Dr. Lee-Barber found that Plaintiff's "level of risk might decrease should he engage in regular treatment with a psychiatrist and follow treatment recommendations" and recommended that he provide monthly compliance reports. Dkt. No. [41-17] at 4; Dkt. No. [54-1] at 44-45, 47. Dr. Lee-Barber indicated "treatment should be on-going, as this is a chronic health issue." Dkt. No. [54-1] at 48. After preparing her report, Dr. Lee-Barber met with Dr. Stout to discuss the risk assessment. Id. at 49.

On March 4, 2013, Plaintiff met with Ms. Johnson and Dr. Lee-Barber. Dkt. No. [49] at 32. They suggested that Plaintiff withdraw from school and be hospitalized. Id. On March 15, 2013, Dr. Stout sent Plaintiff a letter recommending that he "resume psychiatric medication consultation, individual

counseling, and support classes . . . to learn how to manage [his] chronic medical condition." Id. at 32-33. Dr. Stout further recommended "the most effective way to provide you with that type of support would be through inpatient hospitalization. . . [D]ue to the length of stay . . . it was recommended that you complete the application for Hardship Withdrawal for the Spring 2013 term." Id. at 33. The letter also stated:

> your continued enrollment is conditioned upon compliance with . . .
> (1). . . psychiatric medication consultation and individual counseling services . . .
> (2) . . . a signed Release of Information consent form authorizing your providers to (a) discuss the status of your treatment. . . and (b) for your providers to confirm with me on a monthly basis during your enrollment whether or not you are participating in all aspects of the treatment recommended. . .
> (3) The monthly reports from your providers need to be received by my office by the following dates of the Spring 2013 term: March 29, 2013 and April 19, 2013. . . if you enroll in subsequent terms at Georgia State, I will indicate additional dates at the beginning of each term;
> (4) . . . a mandatory Risk Screening . . . if you discontinue treatment with your providers.
> (5) You are not eligible to reside in University Housing, until you have demonstrated compliance with your medical providers in the community.

Dkt. No. [54-1] at 50-51.

Defendant alleges this letter was drafted by Ms. Johnson using a template, and that Dr. Stout only intended to place conditions upon housing, not enrollment. Id. at 51-52. Dr. Stout testified that "the risk would be greater in housing because it is an area that is essentially unsupervised, unmonitored and, therefore, it's different than the classroom." Dkt. No. [41-7] at 67:12-14. However,

when asked what Plaintiff posed a risk of doing in housing, Dr. Stout responded "[a]ll I can say generally is a risk of disruption." Id. at 68:20-21.

Plaintiff also disputes the claim that Dr. Stout only intended to place conditions upon his housing, pointing to Ms. Johnson's testimony that she always understood that Plaintiff's enrollment was conditioned upon compliance with the requirements of the March 15, 2013, letter. Dkt. No. [54-1] at 51. On March 26, 2013, Ms. Johnson sent Plaintiff an email, on which Dr. Stout was copied, reminding Plaintiff that "your continued enrollment at the university is conditioned upon your participation in individual counseling, as well as psychiatric medication consultation." Dkt. No. [41-21]. On April 5, 2013, Ms. Johnson sent Dr. Stout an email, stating that she informed Plaintiff "he would need to seek services with another provider in order to remain enrolled." Dkt. No. [41-22].

Plaintiff failed to comply with the conditions set forth in Dr. Stout's March 15, 2013, letter. Dkt. No. [54-1] at 60. However, he completed the Spring 2013 semester and has never been withdrawn. Id. at 56, 61. Plaintiff also remained in campus housing throughout the Spring 2013 semester. Id. at 61.

On August 30, 2013, Dr. Stout sent a letter to Plaintiff stating that as long as he did not return to on-campus housing, he did not have to continue certifying his medical treatment. Dkt. No. [41-6]; Dkt. No. [49] at 35. The letter also stated "[i]n the event you wish to live in University Housing in the future, you will be

required to complete a follow-up mandated Risk Screening." Dkt. No. [41-6]; Dkt. No. [54-1] at 56-57.

Plaintiff alleges that he wishes to return to on-campus housing, though Defendant points out that Plaintiff testified his current housing is "way cheaper" than campus housing and he is not sure he can afford to live in campus housing. Dkt. No. [49] at 4.

Plaintiff filed the instant lawsuit on June 24, 2013, alleging multiple violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*, and § 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 701 *et seq.*

## II.     Motion to Strike Declaration of Dr. Jill Lee-Barber

Plaintiff argues that the declaration of Dr. Jill Lee-Barber must be stricken for Defendant's failure to disclose Dr. Lee-Barber as an expert witness under Federal Rule of Civil Procedure 26(a)(2)(A); or alternatively, that paragraphs 5 through 9 of Dr. Lee-Barber's declaration be stricken as an improper attempt to introduce expert testimony. Dkt. No. [55] at 2. Defendant responds that Dr. Lee-Barber "is simply a fact witness with expertise" and therefore not subject to Rule 26(a)(2)(A). Dkt. No. [58] at 1-2. Both parties agree that Dr. Lee-Barber "was one of the main players with respect to the acts that gave rise to this case," Dkt. No. [55] at 1; Dkt. No. [58] at 2, but Plaintiff argues that her declaration "improperly attempts to introduce expert medical testimony." Dkt. No. [55] at 2.

Rule 26(a)(2)(A) requires a party to disclose the identity of any witness who may present evidence at trial under Federal Rule of Evidence 702, 703, or

10

705. Federal Rule of Evidence 702, the relevant rule here, governs witnesses qualified as experts who testify in the form of opinion based on "scientific, technical, or other specialized knowledge." Treating physicians[1] like Dr. Lee-Barber may testify as lay witnesses—and avoid Rule 26(a)(2)(A) disclosure requirements for experts—"if the testimony is an account of [her] observations during the course of treatment or if it is offered for the purpose of explaining the physician's decision-making process or the treatment provided." Eberhart v. Novartis Pharm. Corp., 867 F.Supp.2d 1241, 1252-53 (N.D. Ga. 2011) (citing United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005)). A non-expert treating physician's opinion testimony must be "strictly and narrowly limited" to those circumstances. Id. at 1253. If the treating physician purports to "provide explanations of scientific and technical information not grounded in [her] own observations and technical experience," she becomes an expert witness under Federal Rule of Evidence 702 and subject to Rule 26(a)(2)(A) disclosure. Williams v. Mast Biosurgery USA, Inc., 644 F.3d 1312, 1317 (11th Cir. 2011).

Dr. Lee-Barber evaluated Plaintiff, reviewed his medical documentation, and prepared a report of her assessment. In paragraphs 5 through 9 of her declaration, Dr. Lee-Barber explains (1) why she hired Dr. Justin Donaldson, who also evaluated Plaintiff, and (2) what she understands the scientific literature

---

[1] The Court acknowledges that Dr. Lee-Barber has a Ph.D in counseling psychology and is therefore not a physician. However, the Court finds that the reasoning and principles of case law regarding treating physicians also applies to treating psychologists.

regarding command hallucinations and schizophrenia to mean. Dkt. No. [39-8] at 2. The Court finds that her testimony about why she reached those conclusions is "based on [her] experience as a physician and is clearly helpful to an understanding of [her] decision making process." Williams, 644 F.3d at 1317. Therefore, such information is properly presented as lay opinion testimony and is not subject to Rule 26(a)(2)(A) disclosure requirements. Plaintiff's Motion to Strike the Declaration of Dr. Lee-Barber [55] is **DENIED**.[2]

## III.   Defendant's Motions to Exclude

Defendant filed Daubert motions to exclude the reports and testimony of Plaintiff's proposed experts, Dr. Bhushan Agharkar and Jason Ebbeling, from consideration for purposes of summary judgment and at any trial or hearing.

Federal Rule of Evidence 702 governs the admissibility of proposed expert evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[2] This conclusion is not meant to preclude Plaintiff from objecting to particular testimony that strays outside Dr. Lee-Barber's role as a lay witness at trial.

The trial court, as the gate-keeper, must determine that the testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Daubert v. Merrell Dow Pharm., 509 U.S. 579, 591 (1993) (quoting United States v . Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). The trial court must also "make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

The Eleventh Circuit has synthesized the existing rules into a three-part inquiry, instructing courts to consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998), reh'g and reh'g en banc denied, 172 F.3d 884 (1999).

The trial court has a great deal of flexibility in the inquiry into the reliability of an expert. Daubert, 509 U.S. at 595. This flexibility includes "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability." Kumho Tire, 526 U.S. at 152.

**A. <u>Motion to Exclude Report and Testimony of Dr. Bhushan Agharkar</u>**

Dr. Bhushan Agharkar is a psychiatrist in private practice who has reviewed Plaintiff's psychiatric records, including those from his previous providers, GSU's CTC, and Grady Hospital, and the risk assessment report by Dr. Lee-Barber. Dkt. No. [40-1] at 52. Dr. Agharkar also reviewed GSU's Non-Academic Withdrawal Policy, GSU's policies regarding student risk assessment, and the Complaint in this case. <u>Id.</u> Basing his opinions on his professional experience and peer-reviewed research publications regarding the link between mental health disorders and violence and student mental health assessment in the context of campus safety, Dr. Agharkar concludes that "(1) GSU's risk assessment policies, as applied to . . . [Plaintiff], pose a substantial risk of subjecting students with mental health diagnoses to unequal treatment relative to their non-disabled colleagues, without achieving a countervailing interest in campus safety." <u>Id.</u> at 54. He also concludes that "(2) in the individual circumstances of [Plaintiff], it was not medically justified to remove him from housing and to subject him to mandatory risk assessment activities, because there were no objective indications that [Plaintiff] posed a threat to anyone." <u>Id.</u> at 54-55.

Defendant's <u>Daubert</u> motion requests that the Court exclude Dr. Agharkar from testifying because he is not qualified and his testimony is unreliable and will not assist the trier of fact. Defendant also argues that Dr. Agharkar offers

impermissible legal opinions. For the reasons stated below, Defendant's Motion to Exclude Dr. Agharkar is denied.

1.  <u>Whether Dr. Agharkar Is Qualified</u>

Defendant contends that Dr. Agharkar is not qualified as an expert because he is a physician, not a statistician or a social scientist, and that he has not researched or written on disability discrimination or risk assessment procedures.

In response, Plaintiff highlights Dr. Agharkar's experience in the field of forensic psychiatry and his qualification to testify in at least 35 legal proceedings throughout the country. Plaintiff contends that Dr. Agharkar is qualified to testify regarding the discriminatory effect of GSU's risk assessment policy, as he has written, researched, presented, and published on topics related to risk assessments, violence and mental illness, and schizophrenia specifically. <u>See</u> Dkt. No. [59] at 5.

Dr. Agharkar has been a licensed psychiatrist for over ten years. He has worked as a staff psychiatrist for several entities, including GSU, gaining experience related to mental illnesses. He is now in private practice as a psychiatrist and doubles as an Assistant Professor at two medical schools, teaching courses in forensic psychiatry for psychiatry residents. Dr. Agharkar has conducted research, published, and presented on topics related to mental illnesses, including schizophrenia, violence and mental illness, and risk management issues in psychiatry.

The Court finds that Dr. Agharkar has the requisite experience and educational background which would qualify him to testify as an expert. He has researched and published studies in the areas in which he testifies. The Court is not persuaded that it would be necessary for Dr. Agharkar to be a statistician or a social scientist to proffer his particular opinions in this case. His background and experience in psychiatry are sufficient given his expected area of testimony.

2. <u>Whether Dr. Agharkar's Opinions Are Reliable and Assist the Trier of Fact[3]</u>

Defendant contends that Dr. Agharkar's opinions are unreliable because he offers no particular methodologies for his opinions and leaps to conclusions without any investigatory basis. Defendant also argues that Dr. Agharkar's opinions are not based on verifiable propositions of fact. Defendant particularly points to the fact Dr. Agharkar relies on an absence of objective evidence that Plaintiff was a real threat. In addition, Defendant criticizes Dr. Agharkar's finding that there is no link between R.W.'s illness and symptoms and a risk of violence. Defendant alleges that Dr. Agharkar merely provides one side of a debate that science has not yet resolved and is only a difference of opinion between himself and Dr. Lee-Barber.

---

[3] Defendant also argues that Dr. Agharkar's opinions would confuse and mislead the jury. In support, Defendant offers the same arguments it provides in support of its contentions that Dr. Agharkar's testimony is unreliable and will not assist the trier of fact. Because the issues Defendant raises are the same, they will not be discussed separately.

16

Dr. Agharkar explains his methodology in his expert report. In reaching his conclusions, Dr. Agharkar relied on his own professional experience and research, peer-reviewed research publications studying the link between mental disorders and violence, and a 5-Level Risk Assessment Rubric established by the National Center for Higher Education Risk Management ("NCHERM"). Dkt. No. [40-1] at 52, 56. The research Dr. Agharkar cites has been published by the Oxford University Press, the American Journal of Psychiatry, and the Archives of General Psychiatry. Id. at 53. Additionally, the NCHERM Risk Assessment rubric has been relied on by the U.S. Department of Education. Id. at 56. This methodology is sufficiently reliable to support Dr. Agharkar's opinions in this case.

Although it is accurate that there are witnesses who testify that objective factors of threat were present, there is a difference of opinion between Dr. Agharkar and the witnesses that Defendant proffers relating to these objective factors. This difference in opinion does not invalidate Dr. Agharkar's opinions in this case. He is entitled to employ his methodology and testify as to the conclusions he reaches based upon that methodology and his interpretation of the facts. The fact that his interpretation differs from Defendant's does not invalidate it.

Defendant argues that Dr. Agharkar admits in his deposition that there is no medical consensus regarding the risk of violence among the mentally ill and that his testimony would only "represent one side of a debate that science has not

yet resolved." Dkt. No. [52] at 13-14. Despite this scientific debate, the Court finds that Dr. Agharkar's sources, published by well-respected organizations, are sufficiently reliable. <u>Daubert</u> does not require that there be unanimous agreement among professionals in support of an opinion. Instead, the testimony must only be reliable. 509 U.S. at 597 ("General acceptance is not a necessary precondition to the admissibility of scientific evidence . . . an expert's testimony [must] rest[] on a reliable foundation and [be] relevant to the task at hand.").

Finally, the Court must determine whether Dr. Agharkar's opinions assist the trier of fact in understanding the evidence or a fact in issue. Two key issues in this case are (1) whether GSU properly characterized Plaintiff as a direct threat to the safety of others, and (2) whether that decision was based upon Plaintiff's schizophrenia diagnosis. Dr. Agharkar's opinions will help a trier of fact determine whether there is a scientific link between mental illness and violence and whether Plaintiff's actions indicated a risk of violence.

  3.  <u>Whether Dr. Agharkar's Opinions Are Impermissible Legal Opinions</u>

Defendant alleges Dr. Agharkar's first opinion, regarding the risk of GSU's risk assessment policy resulting in unequal treatment of mentally ill students, is an inappropriate legal opinion. Dkt. No. [52] at 8. Plaintiff responds that Dr. Agharkar is offering his opinion as to an ultimate factual issue, which is distinct from a legal conclusion. Dkt. No. [59] at 9.

As a general principle, "testifying experts may not offer legal conclusions." <u>Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.</u>, 402 F.3d 1092,

1112 n.8 (11th Cir. 2005). Based on this general principle, all witnesses "are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct." Dahlgren v. Muldrow, No. 1:06-cv-00065-MP-AK, 2008 WL 186641, at *5 (N.D. Fla. Jan. 18, 2008). Instead, "[t]he determination of which law applies and what the law means is for the Court to decide." Id. However, "[a]n expert does not invade the court's authority by discoursing broadly over the entire range of the applicable law where the opinion is focused on a specific question of fact." Camacho v. Nationwide Mut. Ins. Co., 13 F. Supp. 3d 1343, 1366 (N.D. Ga. 2014).

Defendant cites to language in Montgomery v. Aetna Casualty & Surety Co., 898 F.2d 1537, 1541 (11th Cir. 1990), stating "a witness. . . may not testify to the legal implications of conduct; the court must be the jury's only source of law." In Aetna, the central legal issue of the case was whether an insurance company had a duty to defend. Id. at 1540. Plaintiff's expert testified about the interpretation of the policy and that the insurance company had a duty to provide counsel. Id. The Eleventh Circuit found that the testimony was a legal conclusion, and therefore should not have been admitted. Id. at 1541.

In this case, the central legal issue is whether GSU's conduct violated the ADA or the RA. Dr. Agharkar seeks to testify from a psychiatrist's viewpoint that GSU's risk assessment policy, as applied to Plaintiff, poses a risk of treating mentally ill students differently from non-disabled students. Such testimony seeks to resolve a factual dispute, but does not go so far as to say that GSU's

policy was discriminatory in violation of the ADA or RA. Therefore, Dr. Agharkar's opinions are permissible.

If in fact Dr. Agharkar attempts to provide testimony at trial that impermissibly interprets or applies the ADA or RA, such evidence can be excluded pursuant to proper evidentiary objections. Accordingly, at this stage in the litigation process, the Court will not prohibit Dr. Agharkar from providing testimony that discusses the ADA and RA.

The Court finds that Dr. Agharkar is qualified to testify, his opinions are reliable and would assist the trier of fact in resolving the facts of this case, and his opinions are not impermissible legal opinions. Therefore, Defendant's Motion to Exclude the Report and Testimony of Dr. Bhushan Agharkar is **DENIED**.

### B. <u>Motion to Exclude Report and Testimony of Jason Ebbeling</u>

Plaintiff also offers as an expert Jason Ebbeling, Vice President for Student Affairs at Mitchell College. Mr. Ebbeling discusses the roles and responsibilities of educational institutions in minimizing risk on campuses while ensuring that policies and procedures do not unnecessarily exclude or discriminate against students. <u>See generally</u> Dkt. No. [41-26]. Mr. Ebbeling explains the decision-making process of student affairs professionals in the risk assessment context. He examines how standards applicable to colleges and universities are utilized in developing and implementing risk assessment policies, and how those policies are applied. <u>Id.</u> Mr. Ebbeling then uses this framework to examine GSU's risk assessment policies and its actions towards Plaintiff. <u>Id.</u>

In preparing his report, Mr. Ebbeling reviewed GSU's Risk Screening Policies, Dr. Lee-Barber's risk assessment report, and Plaintiff's psychiatric records. Id. at 3. Mr. Ebbeling concludes, based on his "professional judgment, experience in the Student Affairs field, [his] knowledge of the legal issues in higher education, as well as the best practices in the field of Student Affairs," that there are issues with both the policy utilized by GSU and the application of this policy to Plaintiff's situation. Id. at 11. Mr. Ebbeling alleges that GSU's policy does not reflect the 2011 changes to the ADA regarding "harm to self." Id. In addition, Mr. Ebbeling explains that GSU's policy was not properly applied to Plaintiff, as it "was written with a focus on behavior, yet the focus of the assessment [was]. . . on his diagnosed medical condition." Id. at 12. Furthermore, Mr. Ebbeling asserts that the OCR's four-part Direct Threat test should guide a university's actions with regard to involuntarily withdrawing a student, but GSU did not attempt to meet the standards of that test. Id. Finally, Mr. Ebbeling opines that "the response of the university was not focused on the ways in which [Plaintiff] and his condition could be managed on campus" and "there simply was not sufficient observable behavior[] that would justify the removal of [Plaintiff] from student housing, nor his participation in continuous mandatory monitoring." Id. at 12.

Defendant's Daubert motion requests that the Court exclude Mr. Ebbeling's testimony because he is not qualified and his opinion is unreliable and will not assist the trier of fact. Defendant also argues that Mr. Ebbeling offers impermissible legal opinions, which would confuse and mislead a jury.

1.  <u>Whether Mr. Ebbeling Is Qualified</u>

Defendant contends that Mr. Ebbeling is not qualified as an expert because he has never taken a bar exam nor been admitted to practice law in any state. Dkt. No. [51] at 10. Defendant also argues that Mr. Ebbeling does not know the actual direct threat requirements, and therefore is not qualified to testify as to how those standards should be applied. <u>Id.</u>

Plaintiff responds[4] that Mr. Ebbeling has experience and scholarly research in student affairs, specifically in campus risk assessments. Dkt. No. [60] at 11. Further, Plaintiff refutes the assertion that Mr. Ebbeling does not know the actual direct threat requirements, explaining that "Ebbeling has not attempted to state the law at all. . . [but] simply gives the standards, as articulated by the OCR, applicable to a college or university that seeks to remove a student due to a mental health concern." <u>Id.</u> at 9. Plaintiff contends that Mr. Ebbeling is qualified to give his opinions in this case. <u>Id.</u> at 11.

Mr. Ebbeling has over 13 years of professional experience in Student Affairs, the majority of which has been in crisis management working with at-risk students. Dkt. No. [41-26] at 2-3. His educational background includes a law degree, which he says has "uniquely prepared [him] to provide analysis on legal issues in higher education." <u>Id.</u> at 3. He has presented over twenty national

---

[4] Plaintiff's Brief in Opposition to Defendant's Motion to Exclude [60] exceeds the page limitations of Local Rule 7.1D (NDGa) and Plaintiff did not move for leave to file excess pages. The Court considers Plaintiff's brief in its entirety, but will disregard arguments made in pages exceeding the Local Rules' limitations in future filings.

seminars on topics related to crisis management and student risk assessment, and is a major contributor to a book entitled ENDING CAMPUS VIOLENCE: NEW APPROACHES TO PREVENTION. Id.

The Court finds that Mr. Ebbeling has the requisite experience and educational background which would qualify him to testify as an expert. The Court is not persuaded that a license to practice law is necessary to offer opinions regarding risk assessment practices in higher education. Defendant's argument that Mr. Ebbeling is not qualified because he does not apply the correct direct threat standard is simply unpersuasive.[5] Although the parties dispute the criteria that GSU should have used to evaluate Plaintiff's behavior, that dispute does not prove that Mr. Ebbeling is unqualified. Defendant will certainly be afforded an opportunity to cross examine Mr. Ebbeling and present testimony on the particular factors that should be considered. Mr. Ebbeling's background and experience in student affairs are sufficient given his expected area of testimony in this case.

    2.  <u>Whether Mr. Ebbeling's Opinions are Reliable and Assist the Trier of Fact</u>

Defendant contends that Mr. Ebbeling's opinions are unreliable because they are based on subjective beliefs and unsupported assumptions. Defendant also argues the direct threat test Mr. Ebbeling relies on differs from the direct

---

[5] Defendant also argues that Mr. Ebbeling's opinions would confuse and mislead the jury. In support, Defendant offers the same arguments it provides in support of its contentions that Ebbeling is not qualified. Because the issues Defendant raises are the same, they will not be discussed separately.

threat test described in the regulations. Dkt. No. [51] at 11. Therefore, Defendant concludes Mr. Ebbeling cannot reliably testify as to what the requirements are or whether GSU met those requirements. Id. at 12.

In response, Plaintiff explains that the direct threat test Mr. Ebbeling relies on is the OCR's adaptation of the test set forth in School Board of Nassau County, Florida v. Arline, 480 U.S. 273 (1987), for the student affairs context. Dkt. No. [60] at 13. Plaintiff contends that this information is useful for a finder of fact to understand how non-discrimination goals are applied, how risk assessment works, and how it may be done in compliance with the ADA. Id.

Mr. Ebbeling describes his methodology in his expert report. In reaching his conclusions, Mr. Ebbeling relied on various publications by the National Center for Higher Education Risk Management ("NCHERM") and the National Association of College and University Attorneys ("NACUA"), interpretations by the Equal Employment Opportunity Commission ("EEOC"), and rulings by the U.S. Department of Education's Office of Civil Rights ("OCR"). Dkt. No. [41-26] at 4. He specifically describes a four-part test ("Direct Threat test") set out by the OCR for use by colleges and universities seeking to remove students due to mental health concerns. Id. at 5. This methodology is sufficiently reliable to support Mr. Ebbeling's opinions in this case.

Although the OCR Direct Threat test differs from the definition of direct threat described in the regulations, that difference does not invalidate Mr. Ebbeling's opinions in this case. The parties dispute the criteria GSU should have

used in conducting Plaintiff's risk assessment, but that does not prove the criteria Mr. Ebbeling uses is not reliable. He is allowed to use his methodology and testify as to the conclusions he reaches based upon that methodology.

Finally, the Court must determine whether Mr. Ebbeling's opinions assist the trier of fact in understanding the evidence or a fact in issue. The Court finds that it does. A key fact at issue in this case is whether GSU's decision to place conditions on Plaintiff's continued occupation of campus housing were justified. Mr. Ebbeling's testimony sheds light on the decision-making process of student affairs professionals and what factors must be considered in assessing and addressing risk. Mr. Ebbeling's testimony would assist the trier of fact in determining whether Dr. Stout's actions were proper.

3.  Whether Mr. Ebbeling's Opinions Are Impermissible Legal Opinions

Defendant alleges that Mr. Ebbeling's opinions should be excluded as improper legal opinions. Dkt. No. [51] at 6. This argument is based on Mr. Ebbeling's statement that he relied on sources that "relate to the legal requirements imposed on universities" and his analysis of the Direct Threat test. Id. at 8-9.

Plaintiff responds that Mr. Ebbeling does not provide a legal opinion, but he instead "opines from a professional and scholarly standpoint what sort of issues the student affairs profession must identify and address in ensuring their risk management policies are compliant with [Department of Education] standards." Dkt. No. [60] at 5.

As a general principle, "testifying experts may not offer legal conclusions." Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla., 402 F.3d 1092, 1112 n.8 (11th Cir. 2005). Based on this general principle, all witnesses "are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct." Dahlgren v. Muldrow, No. 1:06-cv-00065-MP-AK, 2008 WL 186641, at *5 (N.D. Fla. Jan. 18, 2008). Instead, "[t]he determination of which law applies and what the law means is for the Court to decide." Id. However, "[a]n expert does not invade the court's authority by discoursing broadly over the entire range of the applicable law where the opinion is focused on a specific question of fact." Camacho v. Nationwide Mut. Ins. Co., 13 F. Supp. 3d 1343, 1366 (N.D. Ga. 2014).

In discussing the decision-making process of student affairs professionals, Mr. Ebbeling is allowed to provide general background information on the ADA, RA, and Department of Education Office of Civil Rights ("OCR") standards applicable to colleges and universities. Such evidence would, in essence, attempt to resolve a factual dispute regarding whether GSU's actions with regard to Plaintiff were reasonable. As expressed in Camacho, this evidence would be admissible even if it broadly touches upon "the entire range of the applicable law." Therefore, Mr. Ebbeling is not prohibited from providing testimony that broadly addresses the ADA, RA, and OCR standards.

If in fact Mr. Ebbeling attempts to provide testimony at trial that impermissibly interprets or applies the ADA or RA, such evidence can be

excluded pursuant to proper evidentiary objections. Accordingly, at this stage in the litigation process, the Court will not prohibit Mr. Ebbeling from providing testimony that discusses the ADA and RA.

The Court finds that Mr. Ebbeling is qualified to testify, his opinions are reliable and would assist the trier of fact in resolving the facts of this case, and his opinions are not improper legal conclusions. Therefore, Defendant's Motion to Exclude the Report and Testimony of Jason Ebbeling is **DENIED**.

## IV.   Motions for Summary Judgment

Both parties have moved for summary judgment. Because both motions present nearly identical issues, the Court addresses both motions collectively below.

### A. <u>Summary Judgment Standard</u>

Federal Rule of Civil Procedure 56 provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[6]

---

[6] On December 1, 2010, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective. The amendments to Rule 56 "are intended to improve the procedures for presenting and deciding summary-judgment motions" and "are not intended to change the summary-judgment standard or burdens." Committee on Rules of Practice and Procedure, Report of the Judicial Conference, page 14 (Sept. 2009); <u>Farmers Ins. Exchange v. RNK, Inc.</u>, 632 F.3d 777, 782 n.4 (1st Cir. 2011). "[B]ecause the summary judgment standard remains the same, the amendments 'will not affect continuing development of the decisional law construing and applying' the standard now articulated in Rule 56(a). Adv. Comm. Notes to FED. R. CIV. P. 56 (2010 Amends.). Accordingly,

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

---

while the Court is bound to apply the new version of Rule 56, the undersigned will, where appropriate, continue to cite to decisional law construing and applying prior versions of the Rule." Murray v. Ingram, No. 3:10-CV-348-MEF, 2011 WL 671604, at *2 (M.D. Ala. Feb. 3, 2011).

There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id. (citations omitted). All reasonable doubts, however, are resolved in the favor of the non-movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).

### B. **Whether the Eleventh Amendment Bars Plaintiff's Claims**

The Eleventh Amendment provides state governments immunity from suits by individuals under certain circumstances. See U.S. CONST. amend XI; Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 67-68 (1996). Defendant contends that its Eleventh Amendment protections bar Plaintiff's claims. In response, Plaintiff maintains that Defendant's sovereign immunity has been (1) abrogated as to his ADA claims, and (2) waived as to his RA claims.

1. Whether Defendant's Sovereign Immunity is Abrogated for Plaintiff's ADA Claims

Plaintiff claims that Defendant cannot invoke sovereign immunity as a bar to his ADA claims because Congress has abrogated sovereign immunity for claims under the ADA. Defendant claims that sovereign immunity is not abrogated because Plaintiff cannot also prove that Defendant violated his constitutional rights. Plaintiff disputes the necessity of proving a separate constitutional violation to abrogate immunity and instead argues that Eleventh Circuit precedent establishes that a separate constitutional violation is not also required for abrogation of immunity under Section II of the ADA.

Congress abrogates immunity where (1) it "unequivocally expressed its intent to abrogate the States' . . . immunity" in the relevant legislation, and (2) "Congress effectuated that abrogation pursuant to a valid exercise of constitutional authority." Kimel v. Florida Bd. of Regents, 528 U.S. 62, 78 (2000).

As to the first factor establishing Congressional intent to abrogate immunity, the ADA explicitly states that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of [the ADA]." 42 U.S.C. § 12202. Therefore, Congress has unequivocally expressed its intent to abrogate a state's sovereign immunity for private suits under the ADA, and this first factor is met.[7]

The parties disagree as to whether the second factor is met. In determining whether a purported abrogation of sovereign immunity is a valid exercise of congressional authority, a Court must determine whether it falls within § 5 of the Fourteenth Amendment. City of Boerne v. Flores, 521 U.S. 507, 516 (1997). "[Section 5 of the Fourteenth Amendment] authorizes Congress to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause." Tennessee v. Lane, 541 U.S. 509, 520 (2004). However, Congress's § 5 power is

---

[7] The parties do not dispute that Congress intended to abrogate immunity under Title II of the ADA.

limited. The preventative measures must be remedial legislation and not a substantive redefinition of the governing law. Id. at 520. Legislation passed pursuant to § 5 is only "valid if it exhibits a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Id. (citing Boerne, 521 U.S. 507).

In the Eleventh Circuit, the Court applies a three-step analysis to determine whether legislation satisfies the Boerne "congruence and proportionality" test.

> Under this analysis, [the Court] must determine: (1) the constitutional right or rights that Congress sought to enforce when it enacted the ADA, (2) whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary; and (3) whether Title II is an appropriate response to this history and pattern of unequal treatment.

Assoc. for Disabled Ams., Inc. v. Florida Int'l Univ., 405 F.3d 954, 957 (11th Cir. 2005) (citing Bd. of Trustees v. Garrett, 531 U.S. 356, 365-70 (2001)). The Eleventh Circuit, applying the Boerne inquiry, has already determined that Title II of the ADA is a valid abrogation of sovereign immunity as applied to disability discrimination claims against public universities. Assoc. for Disabled Ams., Inc., 405 F.3d at 958.

Defendant acknowledges that Association for Disabled Americans "appears to suggest" that Title II of the ADA is a valid abrogation of sovereign immunity where there is no constitutional violation. Dkt. No. [39-16] at 34 n.6. However, Defendant argues that the case should be "revisited" because the U.S. Supreme

31

Court's subsequent decisions in <u>United States v. Georgia</u>, 546 U.S. 151 (2006) and <u>Coleman v. Court of Appeals of Maryland</u>, 132 S. Ct. 1327 (2012) call into question the Eleventh Circuit's reasoning. <u>Id.</u> Defendant also contends that the Eleventh Circuit erred in failing to consider the lack of a history and pattern of discrimination at the post-secondary level. <u>Id.</u> at 41.

Defendant contends that for sovereign immunity to be abrogated for Title II of the ADA, there must also be a constitutional violation committed in the case. Defendants also argue, in the alternative, that even if Title II of the ADA abrogates sovereign immunity for some non-constitutional claims, it is not a valid abrogation for Plaintiff's claims because Congress did not identify "a history and pattern of unconstitutional discrimination against the disabled." Dkt. No. [39-16] at 36.

In <u>Association for Disabled Americans</u>, 405 F.3d 954 (11th Cir. 2005), the Eleventh Circuit explicitly finds that Title II of the ADA is a valid abrogation of a state's sovereign immunity with respect to claims of discrimination by public universities, even for conduct that is not independently unconstitutional. The Eleventh Circuit also holds that "the unequal treatment of disabled persons in the administration of education has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination." <u>Id.</u> at 958. Because the Court declines to conclude that case was wrongly decided, the <u>Association for Disabled Americans</u> case controls unless it has been overruled by a more recent Supreme Court case. <u>United States v. Woodard</u>, 938 F.2d 1255,

1258 (11th Cir. 1991) ("The law in this circuit is emphatic that only a decision by this court sitting *en banc* or the United States Supreme Court can overrule a prior panel decision."). It has not.

Defendant suggests that the Supreme Court's holding in <u>United States v. Georgia</u>, 546 U.S. 151, 159 (2006), calls into question the sovereign immunity analysis in <u>Association for Disabled Americans</u>. But Defendant overstates the holding as it applies to this case. The Supreme Court held in <u>Georgia</u> that "the lower courts will be best situated to determine in the first instance . . . insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." 546 U.S. at 159. Consistent with that directive, the Eleventh Circuit has already determined that Congress's abrogation of sovereign immunity for Title II discrimination claims against public universities is valid. <u>Ass'n for Disabled Ams.</u>, 405 F.3d at 954. Neither the Supreme Court's subsequent decision in <u>Coleman</u>, which addressed abrogation under the Family and Medical Leave Act, nor the Eleventh Circuit's subsequent unpublished opinion in <u>Redding v. State</u>, 2014 U.S. App. LEXIS 2875 (11th Cir. 2014), which addressed sovereign immunity in the context of the penal system, call <u>Association for Disabled Americans</u> into question. Therefore, Defendant's sovereign immunity is validly abrogated for Plaintiff's Title II ADA claims.

2. Whether Defendant Waived Its Sovereign Immunity for Plaintiff's RA Claims

Under the Rehabilitation Act, state entities that accept federal funds are required to waive their Eleventh Amendment immunity as to claims arising under the Act. 42 U.S.C. § 2000d-7. The RA provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973. . . or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance." Id. The Eleventh Circuit has considered this statute and held that it "unambiguously conditions the receipt of federal funds on a waiver of Eleventh Amendment immunity to claims under section 504 of the Rehabilitation Act. By continuing to accept federal funds, the state agencies have waived their immunity." Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees, 344 F.3d 1288, 1293 (11th Cir. 2003).

Plaintiff is correct that Defendant has waived immunity for Plaintiff's RA claims because Defendant has received federal funds.[8] Accordingly, Defendant has waived its sovereign immunity for Plaintiff's RA claims.

C. **Claims under the ADA and RA**

Plaintiff claims that Defendant's actions violated Title II of the ADA and § 504 of the Rehabilitation Act. More specifically, Plaintiff alleges he was

---

[8] Defendant is correct that for the waiver of immunity to be valid, Plaintiff must prove violation of the exact statutory language of the RA. This includes the "solely by reason of" language of the RA's substantive provision. 29 U.S.C. § 794(a).

discriminated against when (1) Defendant removed and excluded him from student housing, and (2) Defendant conditioned Plaintiff's enrollment upon his continued disclosure of medical records, ongoing treatment by GSU-recommended doctors, participation in future risk assessments, and regular reporting from Plaintiff's treating physicians.[9] Dkt. No. [1] at 18-20. Plaintiff and Defendant move for summary judgment on these claims.

To prevail on a Title II claim, Plaintiff must prove "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of [his] disability." 42 U.S.C. § 12132; Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007). Section 504 of the Rehabilitation Act likewise provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "[C]auses of action under Title II of the ADA and the Rehabilitation Act are essentially identical" and may be considered simultaneously. Everett v. Cobb County Sch. Dist., 138 F.3d 1407, 1409 (11th Cir. 1998).

---

[9] In his Complaint, Plaintiff alleged additional claims. At the February 5, 2015, hearing, Plaintiff conceded that he was only proceeding with these two claims.

Defendant argues that Plaintiff must prove intentional discrimination for liability on both his ADA and RA claims. Instead, a plaintiff must prove intentional discrimination shown by deliberate indifference only if Plaintiff seeks to recover monetary damages. Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334 (11th Cir. 2012) ("A [violation of Section 504 of the RA] by itself will not sustain a claim for compensatory damages; the [Plaintiff] must also show by a preponderance that the [Defendant's violation] was the result of intentional discrimination."). For purposes of injunctive relief, the deliberate indifference standard is not required. See Washington v. Indiana High Sch. Athletic Ass'n, Inc., 181 F.3d 840, 846 (7th Cir. 1999) ("We cannot accept the suggestion that liability under Title II of the Discrimination Act must be premised on an intent to discriminate on the basis of disability. . . [The Supreme Court] has implied that requiring such proof would be contrary to the intent of Congress."); Phipps v. Sheriff of Cook Cnty., 681 F.Supp.2d 899, 917 (N.D. Ill. 2009) ("It is necessary to show intentional discrimination in order to recover compensatory damages (as opposed, say, to injunctive relief)."). Contrary to Defendant's assertion, intentional discrimination is not an element of **liability** under Title II of the ADA or the RA. Dkt. No. [39-16] at 19-21. See Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000) ("To establish a prima facie case of discrimination under the ADA, a plaintiff must show. . . (3) she was subjected to unlawful discrimination because of her disability.")[10]

---

[10] Accordingly, the deliberate indifference standard will be discussed in

Because the parties dispute the application of each of the ADA and RA elements, they are discussed separately below.[11]

1.  Qualified Individual With A Disability

To succeed on his claims, Plaintiff must prove that he is a qualified individual with a disability. The parties do not dispute that Plaintiff has a disability. However, an individual is not "qualified" within the meaning of the statute if he poses a direct threat to the health and safety of others. Onishea v. Hopper, 171 F.3d 1289, 1296-97 (11th Cir. 1999). The parties vehemently dispute that Plaintiff was a direct threat.

The term "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 28 C.F.R. § 35.104. Public entities may impose legitimate safety requirements necessary for the safe operation of services, programs, or activities, although the safety requirements must be based on actual risks, not on mere speculation,

conjunction with Plaintiff's claims for monetary damages. See infra Part IV.D.2.

[11] Defendant argues that once Plaintiff demonstrates a prima facie case of discrimination, the burden then shifts to Defendant to establish a non-discriminatory reason for Plaintiff's treatment and then to Plaintiff to demonstrate the proffered reason is mere pretext. Dkt. No. [39-16] at 21. Plaintiff disputes this analysis is necessary. Neither party has briefed the issue in detail. Because both the issues of whether Defendant has a non-discriminatory reason and whether such a reason is pretext are nearly identical to those of whether Plaintiff was a direct threat and whether he suffered discrimination solely on the basis of his disability, it is not necessary for the Court to determine whether these factors apply and to analyze these factors for purposes of summary judgment. Questions of fact also remain as to these issues as would prevent summary judgment.

stereotypes, or generalizations about individuals with disabilities. 28 C.F.R. §

35.130(h).

> In determining whether an individual poses a direct threat to the
> health or safety of others, a public entity must make an
> individualized assessment, based on reasonable judgment that relies
> on current medical knowledge or on the best available objective
> evidence, to ascertain: the nature, duration, and severity of the risk;
> the probability that the potential injury will actually occur; and
> whether reasonable modifications of policies, practices, or
> procedures or the provision of auxiliary aids or services will mitigate
> the risk.

28 C.F.R. § 35.139(b). See also Sch. Bd. of Nassau Cnty, Fla. v. Arline, 480 U.S.

273, 288 (1987) (Factors to consider in determining a direct threat in a

contagious disease case include "(a) the nature of the risk, (b) the duration of the

risk, (c) the severity of the risk, and (d) the probabilities the disease will be

transmitted and will cause varying degrees of harm.").

The existence, or nonexistence, of a significant risk must be determined

from the standpoint of the person who [makes the decision], and the risk

assessment must be based on medical or other objective evidence." Bragdon v.

Abbott, 524 U.S. 624, 649 (1998) (discussing direct threat under Title III of the

ADA). The belief that a significant risk existed, even if maintained in good faith,

does not relieve a defendant of liability. Id. The Court "should assess the objective

reasonableness of the views of health care professionals without deferring to their

individual judgments." Id. at 650.

With regard to the nature of the risk Plaintiff allegedly posed, Defendant

asserts that there was a threat to the safety of other students residing in campus

housing. To support its position, Defendant points to Dr. Donaldson's testimony that Plaintiff was exhibiting behaviors that correspond with possible psychosis and Plaintiff's medical records that suggested an increased likelihood of aggression, anger, hallucinations, and violence toward an animal. Dkt. No. [39-16] at 22-23. Plaintiff disputes those facts, claiming his behavior with Dr. Donaldson was because he did not want to answer questions about his mental health and that his medical records from a prior provider were inaccurate and not current. Dkt. No. [54-1] at 22, 32.

Plaintiff also points to the fact that Dr. Stout testified that she was not aware of any behavioral issues or threats from Plaintiff, and she determined that Plaintiff did not pose a threat to others in the classroom setting. Dkt. No. [41-7] at 54:6-55:13, 66:20-24. Dr. Stout was also unable to articulate what specifically Plaintiff was at risk of doing in housing other than a general risk of disruption. Id. at 68:20-21. It is also clear that although Defendant claims Plaintiff was a direct threat, he was still allowed to attend classes and remain on campus. Therefore, the nature of the risk Plaintiff posed is an issue of material fact.

Similarly, there are issues of material fact with regard to the probability, severity, and duration of the risk posed by Plaintiff. Again, Defendant points to Dr. Donaldson's testimony about Plaintiff's behavior in addition to Plaintiff's prior medical records. Dr. Lee-Barber opines that Plaintiff will continue to pose a risk until he complies with medical treatment for his mental illness. Dkt. No. [41-17] at 5.

However, Plaintiff continues to go to school at GSU without causing disruption. Dkt. No. [41-2] at 33. The parties agree that Plaintiff has never been disciplined for any sort of threatening or disruptive behavior, has never written or said anything suggesting violence or a desire to harm someone, has never been involved in any altercations, and has never been arrested or charged with a crime. Dkt. No. [49] at 3-4. When being transported to Grady Hospital for an involuntary evaluation, police described Plaintiff as "calm and cooperative." Dkt. No. [41-12]. While at Grady, doctors concluded Plaintiff did not meet the criteria for such an evaluation. Dkt. No. [41-13]. Although GSU determined Plaintiff was a direct threat in campus housing, he remained there, completely unnoticed by GSU, for the entirety of the Spring 2013 semester. Dkt. No. [54-1] at 61.

The Court finds that there are material issues of fact with regard to the severity, probability, and duration of the risk Plaintiff poses and whether Plaintiff was a direct threat. Although both parties request summary judgment on this issue, their interpretations of the facts could not be further apart. Both parties point to the same incidents but interpret them in entirely different lights. At this point, it is unclear as to which interpretation of events a fact-finder would choose. Because material issues of fact remain as to whether Plaintiff was a direct threat and a qualified individual, summary judgment is denied as to this element for both parties.

2.  Excluded from Participation or Otherwise Discriminated Against

With respect to the second inquiry, whether Plaintiff was excluded from participation, Plaintiff argues that he was discriminated against when (1) Defendant removed and excluded him from student housing, and (2) Defendant conditioned Plaintiff's enrollment upon his continued disclosure of medical records, ongoing treatment by GSU-recommended doctors, participation in future risk assessments, and regular reporting from Plaintiff's treating physicians. Dkt. No. [1] at 18-20.

Defendant does not dispute that removing Plaintiff and then conditioning his ability to live in campus housing would be sufficient to establish that he was excluded from participation, but Defendant disputes that conditions were ever placed on Plaintiff's enrollment. Defendant argues that the enrollment conditions were merely a clerical error.[12] Dkt. No. [39-16] at 24-25.

The evidence shows that Dr. Stout sent Plaintiff a letter on March 15, 2013, stating "your continued enrollment is conditioned upon compliance with the above-referenced treatment recommendations." Dkt. No. [41-20] at 1. Subsequently, Ms. Johnson sent Plaintiff an email, copying Dr. Stout, which expressly stated "your continued enrollment at the University is conditioned upon your participation in individual counseling, as well as psychiatric medication consultation with a provider in the community" and "[f]ailure to meet

---

[12] Defendant also argues that Plaintiff did not ever believe there were conditions upon his continued college enrollment. However, a review of the cited deposition transcript does not support this contention.

this requirement may result in your being administratively withdrawn from the University." Dkt. No. [41-21]. Ms. Johnson also sent Dr. Stout an email on April 5, 2013, explaining that she informed Plaintiff "he would need to seek services with another provider in order to remain enrolled." Dkt. No. [41-22]. Ms. Johnson testified that until August 2013, she understood Plaintiff's continued enrollment to be conditioned upon his compliance with Dr. Stout's March 15, 2013, letter. Dkt. No. [39-3] at 7. Dr. Stout admitted to reading the letter and both emails, albeit not "carefully enough" but explained that the references to Plaintiff's continued enrollment "didn't stand out." Dkt. No. [41-7] at 10-11. Dr. Stout also testifies that she made no effort to disenroll Plaintiff "because it wasn't a condition." Id. at 11.

Although both parties want the Court to accept the above evidence in the light most favorable to its position as the truth, a question of fact remains as to whether Defendant conditioned Plaintiff's enrollment at GSU. Whether there were conditions upon Plaintiff's enrollment creates a material issue of fact, and summary judgment is denied as to this factor for both parties.

3. By Reason of Disability

The parties also disagree as whether the actions taken in regard to Plaintiff were by reason of his disability. Similar to the analysis regarding direct threat, Plaintiff contends that the actions taken against Plaintiff were because of his disability, but Defendant contends that they were taken to serve the legitimate purpose of maintaining a safe university community.

42

With regard to referring Plaintiff for a risk assessment, two different versions of the facts are again asserted by the parties. Defendant contends its decision was "based on cognitive impairment because the cognitive break Plaintiff experienced while meeting with Dr. Donaldson had made Dr. Stout concerned that Plaintiff posed a potential risk of harm to others." Dkt. No. [39-17] at 12. Plaintiff responds that there was no objective evidence indicating he posed a risk of harm. Dkt. No. [54-1] at 28.

Defendant points to Dr. Donaldson's testimony that during his evaluation, Plaintiff had difficulty maintaining focus and eye contact, he was overtly gazing into corners, the timing and cadence of his speech was "as if there was an interruption" or delay, and he did not answer all of Dr. Donaldson's questions. Dkt. No. [41-10] at 19. He also testified that if a hypothetical patient had the same symptoms and behaviors as Plaintiff, but did not report a diagnosis of schizophrenia, he would have had the same level of concern. Id. at 30. Defendant also contends that the psychologists at the CTC regularly see student patients who have been diagnosed with schizophrenia, and those students are not typically referred for mandated risk screenings. Dkt. No. [54-1] at 64-65.

Dr. Lee-Barber's risk screening report references records from Dr. Fox, a psychiatrist Plaintiff saw in October 2011, when he was 17, that Plaintiff hears voices "that insult him and tell him to harm himself" and has "paranoid thoughts and feels that people are following him or that there is a guy waiting for him." Dkt. No. [40-17] at 3. Dr. Fox's report also mention Plaintiff's "history of being

43

bullied by peers, being picked on, pushed, hit, spit on, and called [derogatory names.]" Id. The same records indicate that Plaintiff's sister reported that Plaintiff had a "history of aggression, depression, anxiety, anger, language delays, poor social skills, temper tantrums, and sexual abuse." Id.

In support of Plaintiff's position, there is the police report detailing Plaintiff's transportation to Grady Hospital, which described him as "calm and cooperative," and the hospital's report, which indicated that Plaintiff did "not meet 10-13 criteria." Dkt. Nos. [41-12], [41-13].  Plaintiff also contends that Dr. Stout testified that she was not aware of any objective evidence that Plaintiff had been told to do anything harmful to others or had ever engaged in any threatening behavior. Dkt. No. [41-7] at 54.

There are also statements in some of the records that suggest that Defendant's decisions made about Plaintiff were because of his disability. With regard to the conditions placed on Plaintiff's eligibility for student housing, Dr. Lee-Barber's risk screening report explained that Plaintiff "is assessed to be at a significant risk **related to his diagnosis of paranoid schizophrenia**." Dkt. No. [40-17] at 4 (emphasis added). Dr. Stout's March 15, 2013, letter to Plaintiff recommends that he "resume psychiatric medication consultation, individual counseling, and support classes . . . to learn how to manage your chronic medical condition." Dkt. No. [41-20] at 1. The letter goes on to explain that "compliance with the above medical advice is critical to your health, your success as a student, and your success in community living," and "non-compliance with the above

medical advice would likely increase your risk for cognitive impairment." Id. These documents appear to demonstrate that actions were taken because of Plaintiff's diagnosis rather than his current behavior.

Based on the above evidence, a question of fact remains as to whether Plaintiff's mental illness motivated his referral for a risk screening and the determination that he posed a risk. Whether Defendant acted by reason of Plaintiff's disability creates a material issue of fact, and summary judgment is denied as to this factor.

There are material issues of fact with regard to each of the three prongs of the Title II and RA discrimination inquiry. Therefore, summary judgment is denied as to both parties.

### D. **Remedies**

Plaintiff seeks injunctive relief and monetary damages. First, he requests an injunction preventing Defendant from requiring Plaintiff to obtain medical care and make regular reports of his medical treatment as a condition of enrollment at GSU. Second, he requests an injunction requiring Defendant to allow him to reside in on-campus housing. Plaintiff asks this Court to also award nominal, compensatory, and punitive damages, pre-judgment and post-judgment interest, and costs and attorneys' fees under 42. U.S.C. §12205 and 29 U.S.C. § 794a. Because Defendant argues that Plaintiff is not entitled to any relief, the Court discusses the availability of those remedies.

1. <u>Injunctive Relief</u>

Plaintiff argues that he is entitled to injunctive relief. Under well-established principles of equity, a plaintiff seeking a permanent injunction must demonstrate: (1) he has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction. <u>eBay, Inc. v. MercExchange, LLC</u>, 547 U.S. 388, 391 (2006).

Defendant argues that Plaintiff cannot show irreparable injury because there was no discrimination. Plaintiff responds that an injunction is explicitly authorized under Title II and the RA, and the Eleventh Circuit has held that "where an injunction is authorized by statute and the statutory conditions are satisfied the usual prerequisite of irreparable injury need not be established and the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury before obtaining an injunction." <u>Gresham v. Windrush Partners, Ltd.</u>, 730 F.2d 1417 (11th Cir. 1984).

As discussed in the prior sections, questions of fact remain as to whether Plaintiff was subjected to discrimination. Furthermore, as Plaintiff contends, the fact that he may not return to university housing without resubmitting to a risk assessment, could also be seen as an ongoing and irreparable injury. Dkt. No. [54] at 47.

Defendant also argues that because Plaintiff requests monetary damages, he cannot show legal remedies are inadequate. Plaintiff responds that no dollar amount can compensate him for the loss of his right to attend school and live in student housing without the burden of the risk assessment process. The cases Defendant cites do not stand for the proposition that a request for monetary damages precludes a showing of an inadequate remedy at law. See Rosen v. Cascade Int'l, 21 F.3d 1520 (11th Cir. 1994) (holding district court lacked equitable authority to freeze defendant's assets pending trial where plaintiffs sought only the award of monetary damages); Morgan Stanley DW, Inc. v. Frisby, 163 F. Supp. 2d 1371 (N.D. Ga. 2001) (finding adequate legal remedies where (1) expedited arbitral hearing for injunctive relief was available, and (2) injury to plaintiff was lost commissions, which were easily calculable). In this case, Plaintiff alleges some injuries that can be compensated through monetary damages and others that cannot. The Court finds that Plaintiff's loss of the college campus-living experience is not easily quantifiable; therefore monetary damages are not an adequate remedy at law for that injury. See Crane by Crane v. Indiana High Sch. Athletic Ass'n, 975 F.2d 1315 (7th Cir. 1992) (finding high school student had no adequate legal remedy and was entitled to permanent injunction allowing him to compete in state golf tournament, which was unique experience important in the development of golfers, and participation in competitive athletics had emotional and psychological benefits that could not be easily quantified).

Finally, Defendant claims that the public interest would be disserved by an injunction because allowing Plaintiff to live in on-campus housing without medical documentation that he is psychologically stable puts others around him at risk. Plaintiff responds that Defendant's claim is based on stereotypical assumptions about schizophrenia, and there is no objective evidence that he in fact puts others at risk. Dkt. No. [54] at 49-50. Again, this argument is similar to the direct threat analysis performed in the preceding sections. There is a factual dispute as to whether allowing Plaintiff to live in the dorm without conditions would subject others to risk. Accordingly, questions of fact remain as to whether Plaintiff is entitled to an injunction.

### 2. Monetary Damages

Defendant alleges that even if Plaintiff can establish liability, he is not entitled to the monetary relief he seeks. To prevail on a claim for compensatory damages under either the RA or the ADA, Plaintiff must show that Defendant violated his rights under the statutes and did so with discriminatory intent. Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 342 (11th Cir. 2012). Plaintiff may prove discriminatory intent by showing that Defendant was deliberately indifferent to his statutory rights. Id. at 345. This is an exacting standard, which requires more than a showing of gross negligence. Id. at 344. To establish deliberate indifference, Plaintiff must show that the Defendant "knew that harm to a federally protected right was substantially likely" and "failed to act on that likelihood." Id.

A jury may infer that the Defendant had actual knowledge of a substantial risk of harm where the risk is obvious. McCullum v. Orlando Regional Healthcare Sys., Inc., 768 F.3d 1135, 1147 (11th Cir. 2014). However, such an inference "cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of." Farmer v. Brennan, 511 U.S. 825, 842 (1994) (analyzing deliberate indifference standard in Eighth Amendment context and finding it is a subjective standard). "[S]chool administrators will only be deemed deliberately indifferent if their response . . . is clearly unreasonable in light of the known circumstances." Doe v. Sch. Bd. of Broward Cnty., Fla., 604 F.3d 1248, 1259 (11th Cir. 2010) (discussing deliberate indifference in the Title IX context).

Similarly, intentional discrimination is required to recover non-economic compensatory damages under § 504 of the RA. Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1198 (11th Cir. 2007).

Defendant argues that Dr. Stout could not be deliberately indifferent because she relied in good faith on medical advice from Dr. Lee-Barber. Dkt. No. [39-16] at 24. District Courts within the Eleventh Circuit have held, in the context of suits against prison officials for failure to provide medical care, that prison officials may "rely on the decisions of trained professionals concerning the medication and care to be given inmates." Waldrop v. Evans, 681 F. Supp. 840, 848 (M.D. Ga 1988). See also Nair v. Sikes, 1996 U.S. Dist. LEXIS 20907, *8-9 (N.D. Ga. 1996) (quoting Waldrop).

Although deliberate indifference is a high burden for Plaintiff to meet, Defendant has not met its burden to show that, with the evidence viewed in the light most favorable to Plaintiff, that Plaintiff cannot establish the discriminatory intent necessary to support an award of monetary damages.

In this case, Dr. Stout's reliance on Dr. Lee-Barber's advice does not preclude a finding of deliberate indifference and cannot be said to be in good faith as a matter of law. The language of Dr. Lee-Barber's report that Dr. Stout seeks to rely on is clear: "Due to his history of chronic mental illness, his struggle with treatment compliance, and currently being out of treatment compliance, [Plaintiff] is assessed to be at significant risk **related to his diagnosis of paranoid schizophrenia**." (emphasis added). Dkt. No. [41-17]. In addition, various written records have boxes to check regarding whether decisions were being taken because Plaintiff posed a risk of violence. No such boxes were checked as to Plaintiff. Instead, the report prepared by Dr. Lee-Barber identifies "cognitive impairment" as the reason for Plaintiff's referral for risk assessment. Dkt. No. [49] at 23. The report form has check boxes for "harm to self," "harm to others," "alcohol and drug," and "behavioral disruption," all of which were left unchecked. Id. The form also has a section where the Dean of Students or CTC can indicate that the student is a possible risk of suicide and/or violence, but that section did not indicate that Plaintiff posed such a risk. Id. Dr. Lee-Barber found that Plaintiff's "level of risk might decrease should he engage in regular treatment with a psychiatrist and follow treatment recommendations" and recommended

that he provide monthly compliance reports. Dkt. No. [41-17] at 4; Dkt. No. [54-1] at 44-45, 47. Dr. Lee-Barber indicated "treatment should be on-going, as this is a chronic health issue." Dkt. No. [54-1] at 48. After preparing her report, Dr. Lee-Barber met with Dr. Stout to discuss the risk assessment. Id. at 49. Defendant cannot use as a shield the advice of a medical provider if that very advice is discriminatory on its face.

Defendant also argues that Dr. Stout cannot be deliberately indifferent because she followed the standards set forth the by OCR. While compliance with OCR standards serves as evidence that Dr. Stout's actions were proper, it is not dispositive of the issue. There is evidence to the contrary, such as Dr. Stout's testimony that she had no evidence Plaintiff had disrupted campus activities, caused a disturbance in housing, threatened anyone, written or said anything disturbing, violated any campus rule, abused drugs and alcohol, or otherwise engaged in any objectively disruptive or threatening behavior. Dkt. No. [41-7] at 54-55. After Plaintiff's risk assessment was complete and conditions had been imposed, Dr. Stout described Plaintiff's risk of harm by stating "[a]ll I can say generally is a risk of disruption." Dkt. No. [41-7] at 9. Although Dr. Stout testified Plaintiff posed a risk to others in campus housing, Defendant admitted at the hearing that GSU made no efforts to ensure that Plaintiff had vacated campus housing. Thus, Dr. Stout's failure to conduct any follow-up on her exclusionary orders creates a question of fact regarding whether Dr. Stout ever truly believed Plaintiff was a direct threat. These facts are sufficient to create a question as to

whether Defendant was deliberately indifferent. Therefore, summary judgment is improper.

Defendant argues that even if Plaintiff meets the high burden necessary to establish deliberate indifference, Plaintiff should not be entitled to the specific monetary damages he requests. Plaintiff seeks a refund of his tuition and fees for enrollment and housing for all periods during which he alleges he was subject to discrimination.

Defendant argues that he is not entitled to these damages because Plaintiff received the services for which he paid. In response, Plaintiff contends that as a result of Defendant's actions, he was unable to focus on his studies, failed several classes, and lost his eligibility for a HOPE scholarship. The issue, as Plaintiff alleges, is whether he was able to enjoy the services for which he paid on an equal footing with his non-disabled counterparts. Plaintiff has proffered a feasible argument as to why he might be entitled to compensatory damages based on the discrimination he alleges.

Defendant also contends that in terms of Plaintiff's claimed monetary damages for not living in student housing, such damages would be speculative as Plaintiff may not have been able to afford to continue living in student housing. As to this issue, Plaintiff was seemingly able to afford campus housing before the incidents relating to this case occurred. The jury would be entitled to determine if he suffered damages when he was forced to obtain different housing.

As with the majority of the other issues in this case, questions of fact remain as to whether and the amount of compensatory damages to which Plaintiff may be entitled.

Finally, Defendant argues that Plaintiff cannot prove emotional distress damages without expert testimony as to causation because Plaintiff had a pre-existing condition of stress and depression. Plaintiff responds that he is not seeking to recover for a specific emotional or psychological condition caused by GSU's actions, but instead seeks "garden variety" emotional distress damages. The Court can find no reason that Plaintiff should be treated differently than others in terms of damages for emotional distress. That Plaintiff has pre-existing conditions of stress and depression does not necessarily mean that an expert witness is required to establish emotional distress damages.

## V.    Conclusion

For the above stated reasons, Plaintiff's Motion to Strike [55] is **DENIED**, Defendant's Motions to Exclude [51, 52] are **DENIED**, Plaintiff's Motion for Summary Judgment [41] is **DENIED** and Defendant's Motion for Summary Judgment [39] is **DENIED**. The parties are **DIRECTED** to file their Joint Consolidated Pre-Trial Order within thirty (30) days of the date of this Order.

**IT IS SO ORDERED** this 27th day of February, 2015.

_____

**Leigh Martin May**
**United States District Judge**